## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DANA DUGGAN**, *individually and on behalf of persons similarly situated,*<br><br>*Plaintiff,*<br><br>*v.*<br><br>**BIG PICTURE LOANS, LLC, MATT MARTORELLO, ASCENSION TECHNOLOGIES, LLC F/K/A BELLICOSE CAPITAL, LLC,**<br><br>*Defendants.* | CIVIL ACTION NO. 18-12277 |

## CLASS ACTION COMPLAINT

## I.     INTRODUCTION

1.     This case involves the online payday lending industry,[1] which takes advantage of desperate Americans needing quick access to money by charging unconscionably high interest rates, often exceeding 500%. The usury law in

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks coinciding with the borrower's next payday, at a high rate of interest. Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to unlicensed loans of $6,000 or less made to Massachusetts borrowers at interest rates that exceed an annual percentage rate ("APR") of 12 percent. M.G.L. c. 140, § 96. Additionally, Massachusetts has codified criminal usury as any loan at an APR exceeding 20 percent unless the Massachusetts Attorney General has been placed on notice of the loan. M.G.L. c. 271, § 49.

Massachusetts, similar to statutes across the country, "is designed to protect the necessitous debtor from [such] outrageous demands by lenders."[2] Payday lenders, such as Big Picture Loans, LLC, claim that they are exempt from usury laws because they are supposedly wholly-owned by a Native American tribe. But the reality is that a complicated corporate management structure masks the fact that non-tribal members reap the overwhelming majority of the profits. The purpose of this litigation is to expose this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, to obtain statutory damages in accordance with Massachusetts and federal law, and to enjoin the Defendants from collecting on their illegal loans or otherwise continuing their illegal practices with Massachusetts borrowers.

2.      Attempting to insulate themselves from legal liability for their usurious lending practices, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a lender associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity.

3.      In this instance, Defendant Matt Martorello used the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to set up a lending entity supposedly beyond the reach of state and federal licensing and lending laws. Under the

---

[2] *Begelfer v. Najaran*, 381 Mass. 177, 182, 409 N.E.2d 167, 171-172 (1980) (addressing the criminal usury statute and also noting "the public policy against usury is clearly a matter for grave legislative concern").

rent-a-tribe model, Defendants made high-interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claims to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), funded the loans, controlled the underwriting, and handled the day-to-day operations of the business.

4.      Big Picture Loans served as a front to disguise Martorello's and his company's roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of its name to exploit claims of tribal sovereign immunity, the Tribe received about two percent of the revenue from the loans.[3]

5.      In approximately January 2016, Ascension Technologies, LLC ("Ascension Technologies") acquired Bellicose Capital. Like Big Picture Loans, Ascension Technologies claims to be owned and operated by the Tribe.[4] Despite the alleged tribal

---

[3] Zeke Faux, Payday Lenders are Changing the Game Ahead of a U.S. Crackdown, Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue…."). https://bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown (last visited October 31, 2018).

[4] This lawsuit challenges Big Picture Loans' and Ascension Technologies' anticipated claim that they are an "arm of the Tribe" and thus entitled to the protection of sovereign immunity. Although the doctrine of tribal sovereign immunity protects the Tribe itself, the tribal sovereignty does not automatically extend to economic subdivisions of a tribe; the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citation omitted). Whether an entity is entitled to sovereign immunity as an "arm of the Tribe" turns on several factors, including (1) the method of creation of the entity, (2) its purpose, (3) its structure, ownership, and management, including the amount of control the tribe has over the entity, (4) the

ownership, Ascension Technologies continues to conduct its business off the tribal reservation and generate massive profits for Martorello. In fact, Ascension Technologies conducts a significant amount of its illegal operations at its corporate offices in Atlanta, Georgia. On information and belief, at all times relevant to this litigation, the Tribe has had no direct control over the income, expenses, or day-to-day operations of Big Picture Loans, Bellicose Capital, or Ascension Technologies. Further, on information and belief, the Tribe does not fund the loans or handle the servicing or collection of the loans.

6.     From her residence in Plymouth County, Massachusetts, Plaintiff Dana Duggan received a short-term installment loan in October 2017. Through online application and confirmation by telephone, Ms. Duggan obtained a $425 loan from Big Picture Loans with monthly payments of $191.52. The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 596%. Ms. Duggan was not given the opportunity to consider Big Picture Loans' agreement and

---

tribe's intent with respect to the sharing of its sovereign immunity, and (5) the financial relationship between the tribe and the entity. *United States, ex rel. Cain v. Salish Kootenai College, Inc.*, 862 F.3d 939, 944 (9th Cir. 2017) (internal quotations and citations omitted). In addition to the analysis in this Complaint concerning the creation, purpose, and business structure of Big Picture Loans and Ascension Technologies, these companies are not entitled to sovereign immunity because the conduct at issue occurred outside of the reservation boundaries; the vast majority of the profits from the scheme went to non-tribal participants; the companies are not wholly owned, operated, and/or controlled by the Tribe; and the companies were established for the sole purpose of evading state usury laws. *See, e.g., Cashcall, Inc. v. Mass. Div. of Banks*, 33 Mass. L. Rptr. 5 (Mass. Sup. 2015) (addressing lack of tribal authority or jurisdiction over internet loans, because sovereign immunity and tribal jurisdiction is limited to acts taking place on the reservation), *citing Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782 (7th Cir. 2014). Further, extending the protections of tribal immunity to Defendants' scheme would not serve the policies underlying tribal sovereign immunity.

was not informed that it would attempt to set aside her rights under Massachusetts law. Over six months, Ms. Duggan paid a total of $1,083.22 as principal and interest on the $425 loan.

7.      From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40. The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and she was not explained the loan agreement, nor was she informed that it would attempt to set aside her rights under Massachusetts law. Before initiating this suit, Ms. Duggan paid a total of $875 on her $775 loan, but based on its calculation of the usurious interest, Big Picture Loans currently claims that she owes at least $719.06.

8.      Plaintiff asserts a class claim for Defendants' violations of Massachusetts' lending statutes. Under Massachusetts law, a lender must be licensed to make a loan of $6,000 or less, unless the annual interest rate does not exceed 12 percent. M.G.L. c. 140, § 96. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110. The loans also should be deemed void under Massachusetts' prohibition against criminal usury and in the interests of equity. M.G.L. c. 271, § 49. Plaintiff also assert claims against Defendants for their violations of M.G.L. c. 93, § 101, which prohibits the waiver of consumer rights, and the Consumer Protection Act. M.G.L. c. 93A, §§ 2, *et seq.*

9.      Defendants' conduct, as alleged herein, also violates the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.
Defendants acted in concert and conspired with others to repeatedly violate state
lending and consumer fraud statutes, resulting in the collection of an unlawful debt
from Plaintiff and the Class members. In violation of the statute, Defendants sought to
collect, and did collect on usurious, "unlawful debts" under 18 U.S.C. § 1961(6),
specifically Defendants collected debts incurred in "the business of lending money"
where the "usurious rate is at least twice the enforceable rate" under state or federal
law. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

10.     In the alternative, Plaintiff also asserts a class claim for Defendants' unjust
enrichment. Defendants were unjustly enriched by their receipt of any payments on the
void and uncollectable loans. It would be inequitable for the Defendants to accept or
retain the benefit conferred by their unlicensed and usurious lending scheme, namely
the collection on illegal loans.

11.     In a judgment entered against the Defendants jointly and severally, the
Court should order that the debts at issue are void and that Defendants must repay the
principal and interest to Ms. Duggan and the Class arising out of Defendants' loan
transactions. Plaintiff further seeks injunctive and/or declaratory relief in the form of
debt forgiveness on all pending and future loans with Massachusetts borrowers, as well
as other injunctive relief addressed in detail below. Plaintiff further seeks the collection
of statutory damages, attorneys' fees, and costs to the extent permissible under state
and federal law.

12.     Plaintiff also seeks a declaratory judgment that the choice-of-law, forum

selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they violate Massachusetts law. Additionally, the terms of the loan agreement are void and unenforceable because they are unconscionable and against public policy. For example, the loan agreement seeks to disclaim all federal and state laws in favor of "tribal law." The choice of law, dispute resolution, and class action waiver provisions offer no forum for a just and fair adjudication of Plaintiff's rights and obligations. These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy.[5]

## II.   JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff, Dana Duggan, is a resident of this District and a substantial part of Plaintiff's claims and damages occurred in this Division of the District of Massachusetts.

## III.   PARTIES

15.    Plaintiff Dana Duggan is a natural person and resident of Quincy, Norfolk

---

[5] For example, in two recent cases, the Fourth Circuit held that similar provisions were unenforceable for violating public policy. *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *see also Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("[W]e interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.").

County, Massachusetts.

16.     Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. Big Picture Loans is the successor in interest of Red Rock Tribal Lending, LLC and Castle Payday (collectively referred to hereafter as "Big Picture Loans").[6] Big Picture Loans was formed in approximately August 2014. Big Picture Loans does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

17.     Defendant Matt Martorello is a natural person and resident of Dallas, Texas and/or Dorado, Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Martorello does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

18.     Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC ("Ascension Technologies") is a limited liability company. Bellicose Capital was formed in approximately 2011 under the laws of the U.S. Virgin Islands and then Puerto Rico. Based on available evidence, Ascension Technologies' principal place of business is in

---

[6] Castle Payday, We Have Big News! Castle Payday is now Big Picture Loans, https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited October 31, 2018).

Atlanta, Georgia. On information and belief, Bellicose Capital procured the investment capital, serviced the loans, and received the vast majority of the revenue from loans created through Big Picture Loans. In approximately April 2016, Martorello transferred, sold, or merged Bellicose Capital into Ascension Technologies, a subsidiary of Tribal Economic Development Holdings, LLC, in an attempt to shield Bellicose Capital's illegal business practices. Although the nominal ownership of the company changed, Ascension Technologies continues to funnel a significant amount of its income to Martorello and/or other non-tribal members.[7] Further, Ascension Technologies operates independent of the Tribe with most of its business services and operations based in Atlanta, Georgia and Puerto Rico. Ascension Technologies does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

## IV.   FACTUAL ALLEGATIONS

19.    Dana Duggan has had two loans from and through the Defendants. From her residence in Scituate, Plymouth County, Massachusetts, she applied online for her first short-term loan on or about October 14, 2017. On or about April 30, 2018, she applied for the second loan from her new residence in Quincy, Norfolk County, Massachusetts.

---

[7] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Martorello is selling Bellicose to the tribe for just $1.3 million upfront, plus as much as $300 million in future payments, depending on how the business does.").

**A.    Ms. Duggan's October 14, 2017 Loan**

20.    Shortly after completing her first online application, a Big Picture Loans representative called Ms. Duggan, informed her that she was eligible for a $425 loan, and noted that she would be making payments of $191.52 every month.

21.    The Big Picture Loans representative did not explain that the annual percentage rate for her loan would be 596% or that the anticipated finance charges for her loan would be a total of $724.19 (in addition to the repayment of the principal).

22.    During the same call, the Big Picture Loans representative sent Ms. Duggan an email with an internet link that would enable her to complete the loan application process. The Big Picture Loans representative made sure that Ms. Duggan digitally signed the loan document and returned/submitted it before she got off the phone.

23.    The Big Picture Loans representative did not explain the terms of the loan agreement and knew that Ms. Duggan could not have read the six-page document during their short call.

24.    Ms. Duggan was not aware that, according to the terms of her loan, she was purportedly waiving her rights as a Massachusetts consumer under the loan.

25.    On or about October 14, 2017, Ms. Duggan received a deposit into her account for $425.

26.    Over the next six months, Big Picture Loans deducted monthly payments of $191.52 from Ms. Duggan's bank account and deducted $125.62 for her final payment.

27.     Thus, over a period of approximately six months, Ms. Duggan paid a total of $1,083.22 for repayment of the $425 loan.

28.     If the October 2017 loan had been at an APR of 12%, Ms. Duggan would have paid approximately $450 in principal and interest. At an APR of 20%, Ms. Duggan would have paid approximately $468.

**B.     Ms. Duggan's April 30, 2018 Loan**

29.     From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40.

30.     The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and she was not explained the loan agreement, nor was she informed that it would attempt to set aside her rights under Massachusetts law.

31.     Before initiating this suit, Ms. Duggan paid a total of $875 on the $775 loan.

32.      Big Picture Loans currently claims that Ms. Duggan owes $719.06 on the $775 loan. However, the account balance is premised on inaccurate data about payments that Ms. Duggan has made on her account. Big Picture Loans calculates that Ms. Duggan has paid $1,099.20, which is $224.20 more than she has actually paid as of the filing of this lawsuit.

33.     Ms. Duggan's bank credited her with two payments that were deducted

from her account by Big Picture Loans, each for $366.40.

34.     On August 31, 2018, Ms. Duggan sent a payment of $508.60, which is not yet reflected on her Big Picture Loans account statement.

## V.     CLASS ALLEGATIONS

**A.     Massachusetts Licensing Requirements, Consumer Protection Statutes, and Equitable Considerations Protect Massachusetts Residents from Defendants' Predatory Lending Practices**

35.     The Commonwealth of Massachusetts has taken aggressive measures to protect Massachusetts residents from predatory lending practices.

36.     Under the Massachusetts Small Loan Act, a lender must be licensed to make a loan of $6,000 or less, unless the APR does not exceed 12% percent. M.G.L. c. 140, § 96.

37.     Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, §§ 96, 110.

38.     To effectuate the purposes of Massachusetts law, it is mandatory that the loan by an unlicensed lender be held void:

> Where the loan is by an unlicensed lender, the loan itself, and not merely the excessive interest offends the statute in respect to its goal to prohibit the unlicensed business of making small loans. The loan is invalid because the lender was precluded by law from making it. Such a lender cannot profit by his criminal conduct, and he is entitled to no return on his asset.

*Beach Assocs, Inc. v. Fauser*, 9 Mass. App. Ct. 386, 391, 401 N.E.2d 858, 862 (1980) (internal quotation omitted).

39.     Massachusetts courts have long recognized that the Small Loan Act does not permit predatory lending practices to take advantage of Massachusetts borrowers.

*See, e.g., Cuneo v. Bornstein*, 269 Mass. 232, 236, 168 N.E. 810, 811 (1929) (noting statute's purpose is "to prohibit the unlicensed business of making small loans and to prevent an excessive rate of interest on such loans" and noting that the "statute was passed as a protection to the borrower").

40.     The charging of excessive interest serves as additional grounds for rendering the subject loan void and uncollectible. The contracting for, charging, or receipt of interest and expenses that exceed an APR of 20% of the sum loaned constitutes criminal usury unless the lender has notified the Massachusetts Attorney General of its intent to make such a loan and abides by other restrictions not applicable in this case. M.G.L. c. 271, § 49(a), (d).

41.     When a lender commits criminal usury by its excessive interest charges, the Court has discretion to invalidate the entire loan, including the repayment of principal as well as interest. M.G.L. c. 271, § 49(c).

42.     Even in the absence of Massachusetts consumer protection statutes, it is well-established that unlicensed and usurious loans made under the guise of a legal enterprise are void. *Thomas v. Burnce*, 223 Mass. 311, 312, 111 N.E. 871, 873 (1916) (noting "courts of equity will grant relief against usurious contracts no matter what may be their form, and will permit no shift or devise of the creditor to shield him in taking more than legal interest on a loan").

43.     "Illegality, such as usury, is sufficient ground to justify application of the equitable remedy of cancellation of the contract." *Bernhardt v. Atlantic Fin. Corp.*, 311 Mass. 183, 187-88, 40 N.E.2d 713, 715 (1942). "The whole transaction was tainted with

illegality[.]" *Id.*, 311 Mass. at 188, 40 N.E.2d at 716. "From considerations of public policy the [borrower] is not regarded as standing in pari delicto." *Id.*

### B. Overview of Defendants' Enterprise

44. Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

45. Defendant Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and making high interest loans to desperate and vulnerable consumers, many of whom are Massachusetts residents.

46. Through Bellicose Capital, Martorello established a rent-a-tribe business model with the Tribe. They assisted the Tribe in forming Big Picture Loans as a "business enterprise" of the Tribe, which then claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[8]

47. According to tribal records, "all information and records of Big Picture are confidential," so the agreements and business operations among Defendants have not

---

[8] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity—Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf (last viewed October 31, 2018).

yet been fully disclosed.

48.     Upon information and belief, the Tribe has had no direct control over the income or expenses of Big Picture Loans.

49.     Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front. The Tribe allowed Defendants to use its name and, in return, received a nominal percentage of the revenue.[9] Bellicose Capital provided the infrastructure and investment capital to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

50.     Moreover, nearly all activities performed on behalf of Big Picture Loans were performed by officers and employees of Bellicose Capital, now Ascension Technologies, who were not located on the Lac Vieux Reservation. On information and belief, Bellicose Capital employees were located in the Virgin Islands, Puerto Rico, and the Philippines.

51.     On information and belief, Bellicose Capital handled the lead generation used to identify and solicit potential consumers.[10] Bellicose Capital's lead generation

---

[9] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("[Matt Martorello's] company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue….").

[10] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. *Pew Charitable Trust, Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/-

procedures were developed by Martorello.

52.     On information and belief, if a consumer called the number on the letter, he or she would reach a call center in the Philippines, which took direction and instructions from Bellicose Capital and not the Tribe.

53.     In January 2016, due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred or sold Bellicose Capital in an attempt to shield Bellicose Capital's illegal business practices. Bellicose was re-branded as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

54.     As part of this arrangement, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as *$300 million* in future payments. Faux, *supra* notes 2, 6. Through several corporate shells, Martorello is receiving variable, non-regular payments that may total $300 million over the course of seven years. According to a press release by the Tribe, each of the annual payments to Martorello's company will "build additional equity in its own lending support business."[11] Thus, the Tribe acknowledges that it does not own all of the equity in the company. With the purchase

---

/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf (last visited October 31, 2018). Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id*.

[11] https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html (last visited October 31, 2018).

structured so that Martorello's company continues to receive substantial profits, the

Tribe continues to receive only a modest fee in return for the use of its name.

55.     And while it is now purportedly organized under the laws of the Tribe,

Ascension Technologies continues to operate in the same manner and with several of

the same individuals who ran Bellicose Capital—none of whom appear to be affiliated

with the Tribe.

56.     Upon information and belief, tribal members do not participate in the day-

to-day operations of Ascension Technologies and Big Picture Loans, and nearly all the

activities associated with these companies occurred off the Tribe's reservation, such as

the office management, business development, internet marketing, call centers,

payment processing, and servicing of the loans.

57.     For example, approximately 20 individuals identify Ascension

Technologies as their employer on LinkedIn; however, none of these people are located

on the reservation. https://www.linkedin.com/search/results/index/

?keywords=%22ascension%20technologies%22&origin=GLOBAL_SEARCH_HEADER

(last visited August 23, 2018).

58.     Three LinkedIn members claim an ownership interest in Defendant

Ascension Technologies. None of these owners are residents on tribal land. Instead, the

alleged owners are located near Phoenix, Arizona, Green Bay, Wisconsin, and Jackson,

Mississippi. https://www.linkedin.com/search/

results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords=ascensi

on%20technologies%20owner&origin=GLOBAL_SEARCH_HEADER (last visited

August 23, 2018).

59.     Additionally, the Defendant's CEO claims to be located near Kansas City,

Missouri:



https://www.linkedin.com/in/james-birch-642a805b/ (last visited August 23, 2018).

60.     The company's co-founder is in the New York City area:



https://www.linkedin.com/in/bob-clyne-90b15a/ (last visited August 23, 2018).

61.     The Facebook page for Ascension Technologies lists Atlanta, Georgia as its

place of business.



https://www.facebook.com/pages/Ascension-Technologies-LLC/1151747724868477

(last visited August 23, 2018).

62.     According to its employees' LinkedIn pages, Ascension Technologies

conducts its risk analysis, database development, analytics, database marketing,

strategic marketing, digital marketing, information technology, and information

security in Atlanta, Georgia. At least two corporate vice presidents work in Atlanta.

https://www.linkedin.com/search/results/people/?facetGeoRegion=%5B%22us%3A5



2%22%5D&keywords=%22ascension%20technologies%22&origin=FACETED_SEARCH

(last visited August 23, 2018).

63.     In Puerto Rico, where Martorello claims his residence, Ascension

Technologies has additional business operations.[12] According to the LinkedIn pages of

its employees, corporate office management for Ascension Technologies occurs from

Puerto Rico. Additionally, the company's predictive modeling, data science, and

compliance testing are conducted in Puerto Rico. James Dowd, one of the corporate vice

presidents of Ascension Technologies, is located in Puerto Rico; Mr. Dowd was

formerly a director of Bellicose Capital.

64.     Ascension Technologies' director of business development is located in

Chattanooga, Tennessee, and on his LinkedIn page, he describes the company's

business as follows:



**Director of Business Development**
Ascension Technologies, LLC
Aug 2016 – Present  •  1 yr 11 mos

Ascension Technologies, LLC is a wholly owned subsidiary of Tribal Economic Development
Holdings, LLC, a wholly owned and operated economic arm and instrumentality of the Lac
Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe.

The team at Ascension Technologies, LLC has an extensive history in servicing lending
portfolios, helping hundreds of thousands of people to achieve their financial goals. They
specialize in facilitating personal, unsecured loans and financing, as well as the building of risk
models, marketing, and providing customer service. Ascension does this by using cutting-edge
technology, big data, and creative innovation to provide a transparent, frictionless, and highly
efficient marketplace for the everyday borrower. Ascension effectively automates all aspects of
operations while ensuring the ability to scale the lending portfolio, including the borrower
application process, regulatory compliance, credit decisions, and underwriting. Combining
strategic, technical, operational and organizational expertise with proven disciplined
approaches, Ascension builds solutions that get results

---

[12] https://www.linkedin.com/search/results/people/?facetCurrentCompany
=%5B%2212899424%22%5D&keywords=ascension%20technologies%20puerto%20rico&
origin=GLOBAL_SEARCH_HEADER (last visited August 23, 2018);
https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%221
2899424%22%5D&keywords=ascension%20technologies%20manager&origin=GLOBAL
_SEARCH_HEADER (last visited August 23, 2018).

https://www.linkedin.com/in/ben-u-63532012/ (last visited August 23, 2018).

65.    Ascension Technologies' vice president of marketing in Atlanta describes her position as follows:



**Vice President Marketing**
Ascension Technologies, LLC
Nov 2016 – Present  •  1 yr 8 mos
Atlanta, Georgia

Create and lead data-driven omni-channel marketing strategies and tactics for customer acquisition and retention in B2C sub-prime lending. Drive strategy, brand, digital, traditional and emerging channels to deliver marketing success. Use data and sophisticated analytics to accelerate revenue growth.

https://www.linkedin.com/in/lorialsterberg/ (last visited August 23, 2018).

66.    Ascension Technologies' director of digital marketing in Atlanta describes his position at the company as follows:



**Director of Digital Marketing**
Ascension Technologies, LLC
Jan 2017 – Present  •  1 yr 6 mos
Greater Atlanta Area

Vertical – B2C Online Personal Lending – Big Picture Loans – www.bigpictureloans.com

Responsible for all digital marketing & advertising for Big Picture Loans including; mixed-media channel budget planning & multi-channel integration, partner directly with Direct Mail channel owner, ensuring all creative assets and messaging unify both the digital and offline customer journey

Directly hands-on, build & manage all digital marketing campaigns and strategies including; SEO, SEM, Social, Programmatic, Content Marketing & Amplification, email Marketing, Campaign Landing Page Development, Re-targeting and Marketing Automation

Directly manage all Paid Search accounts and Programmatic Display strategy leads through testing, campaign optimizations and budget allocations

Develop and manage all CRM touch points including; direct marketing, email marketing (customer lists exceeding 2MM), retention strategies, and new customer acquisition initiatives via Hubspot

Lead and spearhead the redesigned of Big Picture Loans Website, hands-on built landing pages, designed and sourced digital assets, photo selections and architected all UX/Conversion Optimization strategy

Establish and manage all Social Media channel presence, including identifying and targeting audience segmentation, reporting, budget recommendations and content publishing

Create, manage, source and publish all digital content in a variety of shareable and downloadable formats

Build, manage and report on all cross-channel digital marketing efforts through various campaign strategies and performance metrics

https://www.linkedin.com/in/mike-richardson-9048204/ (last visited August 23, 2018).

67.     Upon information and belief, none of Ascension Technologies' employees referenced above are members of the Tribe.

68.     Nearly all of the activities of Ascension Technologies are performed by these non-tribal members who are located off the reservation.

**C.     Defendants' Lending Practices Violated Massachusetts Law**

69.     At the time that Big Picture Loans made its loans to Ms. Duggan and the Class, Defendants were aware that Massachusetts law prohibits unlicensed lenders from making loans for less than $6,000 at interest rates exceeding 12 percent. M.G.L. c. 140, § 96.

70.     At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Class, Defendants were aware that any loan made to Massachusetts borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110.

71.     Defendants have never applied to the Massachusetts Commissioner of Banks for a license permitting them to make loans to Massachusetts borrowers.

72.     The Tribe has never applied to the Massachusetts Commissioner of Banks for a license to be a lender to Massachusetts borrowers.

73.     Defendants have never had a consumer finance license permitting them to make loans to Massachusetts borrowers.

74.     Accordingly, Defendants' loans to Massachusetts residents are null and

void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiff.

75.     At the time that Big Picture Loans made its loans to Ms. Duggan and the Class, Defendants were aware that Massachusetts law prohibits criminal usury, as defined in M.G.L. c. 271, § 49.

76.     Defendants also were aware that their lending practices were at interest rates that constitute criminal usury, as defined in M.G.L. c. 271, § 49.

77.     Under the terms of the standard loan agreement, the interest rates charged by Defendants were significantly greater than the maximum legal rate that can be charged under Massachusetts law.

78.     For example, Defendants marketed loans to Dana Duggan and made two loans to her, one for $425 and the second for $775, with interest at an APR of 596% and 535.5%, respectively.

79.     Through advertising and marketing, Defendants targeted Massachusetts consumers for their lending practices, including the loans to Ms. Duggan.

80.     Defendants chose Massachusetts as a place where loans and collection efforts would ensue and participated in and knew of the actions of the other Defendants in Massachusetts.

81.     Martorello knew the subject loans were illegal under Massachusetts law, but pursued the scheme anyway through Big Picture Loans and Bellicose Capital.

82.     In order to qualify for Defendants' loan product, Massachusetts consumers were required to electronically sign a form contract created by Defendants—

not created by the Tribe.

**D.      Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable**

83.      Because the loans were made and collected without a consumer finance license and charged an interest rate in excess of the maximum rate permitted under Massachusetts law, the agreements are void and unenforceable.

84.      Defendants' loan agreement not only violates Massachusetts's consumer lending statutes and the public policy against usurious loans, but it also contains unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim laws and legal rights and ultimately deprive consumers of their day in court.

85.      For example, Defendants' Loan Agreement with Plaintiff provides:

> **GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.
>
> **SOVEREIGN IMMUNITY**: This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and is generally immune from suit as a sovereign nation unless such immunity is waived by the Tribe in accordance with Tribal law or abrogated by applicable federal law ("tribal sovereign immunity"). Because the Tribe and Lender are entitled to tribal sovereign immunity, You will be limited in what claims,

if any, You may be able to assert against both the Tribe and Us. To encourage resolution of consumer complaints as well as provide an authorized method of dispute resolution for consumers, pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

**PRESERVATION OF SOVEREIGN IMMUNITY**: It is the express intention of the Tribe and Lender, operating as an economic arm-of-the-tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges, and immunities, to which they are entitled including the tribal sovereign immunity of the Tribe and Lender. To protect and preserve the rights of the parties, no person may assume a waiver of immunity exists except by express written resolution of the Tribe's Tribal Council specifically authorizing such a waiver as required by Article XIII of the Tribe's Constitution specifically for the matter in question.

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You in the course of Your otherwise lawful and proper use of Lender's business believe Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an

administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination. The Authority may hold an administrative review hearing, if requested by You or Us, which will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied. At any such hearing, You may be represented by legal counsel at Your own expense. You may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(Duggan Loan Agreement, attached as Exh. 1, at 4–5.)

86.     Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Big Picture Loans.

87.     Defendants' loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

88.     Defendants' choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

89.     Defendants' choice-of-law provision is unenforceable as a matter of Massachusetts law because it purports to disclaim the application of any state law.

90.     Likewise, the forum selection clause is also unenforceable because it deprives Massachusetts borrowers of *any* forum to bring state or federal law claims.

91.     The loan agreement disclaims that Plaintiff and the Class have any right to

pursue either litigation or arbitration by a neutral third party. (March 6, 2018 Loan

Agreement, attached as Exh. 1, at 5. ("NO LITIGATION OR ARBITRATION IS

AVAILABLE") (emphasis in original).)

92.     Instead, the Tribal Dispute Resolution Procedure only purports to allow

consumers to follow a "Formal Dispute Resolution" with the Tribal Financial Services

Regulatory Authority and the Tribal Court. (*Id.*)

93.     The Tribal Dispute Resolution Procedure states that consumers do not

have "any binding procedural or substantive rights" against Big Picture Loans. (*Id.*)

94.     The Formal Dispute Resolution is a sham because the Tribal Financial

Services Regulatory Authority does not have subject matter jurisdiction to consider: (1)

any claims brought under state or federal law or (2) claims regarding the legality of the

debt. Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.1(B)(4), *available at*

http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited October 31, 2018).

95.     Specifically, the Regulations indicate that the Tribal Financial Services

Regulatory Authority will not "grant the consumer an opportunity be heard" if the only

allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the

Tribe." *Id.*, Reg. 1.1(B)(4)(b).

96.     Further, the Regulations only provide that the Tribal Financial Services

Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding

that the [tribal entity] ***violated a law or regulation of the Tribe***." *Id.*, Reg. 1.1(B)(4)(c)

(emphasis added).

97.     The loans at issue are not related to on-reservation activity and are not

necessary to protect tribal self-government or internal relations. *See, e.g., CashCall, Inc. v. Mass. Div. of Banks*, 33 Mass. L. Rptr. 5 (Mass. Sup. 2015), citing *Plains Commerce Bank v. Tong Family Land & Cattle Co.*, 554 U.S. 316, 327-37 (2008) and *Nev. v. Hicks*, 533 U.S. 353, 367 (2001).

98.     Defendants' loan agreement violates Tribal law, which requires that the following provisions must be conspicuous: "Governing Law and Forum Selection," "Sovereign Immunity," and "Preservation of Sovereign Immunity." Specifically, under Tribal law, each of these paragraphs must be included "**in bold or all caps and conspicuously placed**." Tribal Cons. Fin. Servs. Reg. Code § 7.2(a); Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.5(B) (emphasis added), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited October 31, 2018). None of the provisions were conspicuous in the subject loan.

99.     Defendants' governing law clause is unenforceable because it violates public policy concerns in Massachusetts and was procured through fraud and misrepresentations, including that Big Picture Loans was "wholly owned and operated by the Tribe."

100.     These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

101.     In reality, the loans were owned and/or operated by non-tribal members, including Ascension Technologies, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

102.    Through the Tribal regulatory code and class action waiver provision, Defendants also seek to deprive borrowers of any just and cost-effective means of seeking redress for Defendants' wrongful acts.

103.    The Tribal regulatory code prohibits an award of attorneys' fees or costs to the borrower, if she were to prevail in the Tribe's formal dispute resolution procedure. Tribal Cons. Fin. Servs. Regulatory Code § 9.3(i). Big Picture Loans, on the other hand, is permitted to recover attorneys' fees and reasonable costs for the collection of a debt. *Id.,* § 7.2(c).

104.    Similarly, the loan agreement seeks to strip Plaintiff of the opportunity to pursue her claims as a class action. (Duggan Loan Agreement, attached as Exh. 1, at 5 ("All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law.") (emphasis in original).)

105.    The class action waiver clause violates Plaintiff's statutory right to maintain a class action to redress unfair or deceptive acts or practices in accordance with Massachusetts law. M.G.L. c. 93A, § 9(2).

106.    The purported waiver of Plaintiff's statutory rights under Massachusetts laws which protect consumers' health, safety or welfare violates M.G.L. c. 93, § 101.

107.    In essence, Defendants use the forum selection and choice of law clauses to convert the terms of the loan agreement into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

E.   **Class Definitions**

108.   Plaintiff bring this action on her own behalf and as a class action pursuant

to Federal Rule of Civil Procedure 23 for the following Class:

> All persons: (1) who executed a loan with Big Picture Loans, (2) when they
> resided or were located in Massachusetts, (3) where the loan was
> originated and/or any payment was made on or after October 31, 2014.

109.   **Numerosity**. Fed. R. Civ. P. 23(a)(1). Upon information and belief, Plaintiff

alleges that the Class members are so numerous that joinder of all is impractical. The

names and addresses of the Class members are identifiable through the internal

business records maintained by Defendants, and the Class members may be notified of

the pendency of this action by published and/or mailed notice.

110.   **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P.

23(a)(2) & (b)(3). Common questions of law and fact exist as to all members of the Class.

These questions predominate over the questions affecting only individual Class

members. These common questions include, as to the Class:

(a)   whether the choice-of-law, forum selection, dispute resolution, and class
action waiver provisions in Defendants' loan agreement violate
Massachusetts law, offend public policy interests, and should be deemed
unenforceable;

(b)   whether Defendants were licensed to make loans to Massachusetts
residents by the Massachusetts Commissioner of Banks;

(c)   whether the failure to obtain the license renders the loans to Plaintiff and
the class members void and/or unenforceable;

(d)   whether Defendants notified the Massachusetts Attorney General to
charge interest at an APR that exceeds 20%;

(e)   whether Defendants' acts and/or practices in the conduct of commerce
were unfair and/or deceptive;

(f)     whether Defendants participated in an enterprise under RICO;

(g)     whether the loans to Massachusetts residents included interest rates at more than twice the legal maximum APR, in violation of Massachusetts usury laws;

(h)     whether Plaintiff and the class members conferred a benefit on Defendants because of their payments of principal and interest on Defendants' void and uncollectible loans;

(i)     whether Defendants knew or should have known of the benefit conferred;

(j)     whether Defendants retained an unjust benefit because the loan was void;

(k)     whether Defendants violated the elements of 18 U.S.C. § 1962(c), as previously alleged;

(l)     whether Defendants entered into a series of agreements to violate § 1962(c);

(m)     whether Defendants conspired or endeavored to collect on an unlawful debt through a pattern of racketeering activity; and

(n)     what is the proper recovery for Plaintiff and the Class members against each Defendant.

111.     **Typicality**. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each Class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class. All are based on the same facts and legal theories.

112.     **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has prosecuted and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Neither

Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this action.

113. **Superiority**. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

114. **Injunctive Relief Appropriate for the Class**. Fed. R. Civ. P. 23(b)(2). Class certification is also appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable, injunctive relief with respect to Plaintiff and the Class members. Plaintiff and the Class seek an injunction prohibiting Defendants from collecting any further amounts from Massachusetts consumers in connection with their loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory

reporting on tradelines to the credit bureaus or other consumer reporting agencies, as well as ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

## VI.    CAUSES OF ACTION

### COUNT I - DECLARATORY JUDGMENT

115.    Defendants' loan agreement contains illegal and unconscionable choice of law, forum selection, class action waiver, and dispute resolution provisions that violate Massachusetts law and are void and unenforceable for public policy concerns.

116.    The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the Loan Agreement as well as the validity, if any, of the choice of law, forum selection, class action waiver, and dispute resolution provisions.

117.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

118.    Accordingly, Plaintiff, on behalf of himself and all others similarly situated, seek a declaratory judgment that the choice of law, forum selection, class action waiver, and dispute resolution provisions are void and unenforceable as to Massachusetts residents because such terms (a) violate Massachusetts law, and (b) are unconscionable and contrary to matters of public policy.

## COUNT II - VIOLATIONS OF MASSACHUSETTS SMALL LOANS ACT
## MASS. GEN. LAWS c. 140, §§ 96, 110

119.    Defendants made loans to Massachusetts consumers even though they are not licensed by the Commissioner of Banks to make loans in the State of Massachusetts.

120.    Defendants' unlicensed lending to Massachusetts consumers was, and remains, a violation of Massachusetts consumer protection laws.

121.    Plaintiff and the Class Members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

122.    Because the loans at issue are void and unenforceable, Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

123.    Additionally, Plaintiff and the Class request that the Court permanently enjoin Defendants from the unlicensed practice of lending less than $6,000 to Massachusetts borrowers, including but not limited to:

1.    engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of

$6,000.00 or less at an interest rate that exceeds 12% APR in the Commonwealth of Massachusetts;

2.  advertising, marketing, or soliciting in the State of Massachusetts for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $6,000.00 or less at an interest rate that exceeds 12% APR through any media, including but not limited to the Internet, television, print, and radio;

3.  collecting or attempting to collect payment of interest or principal pursuant to any loan agreement with any person in the State of Massachusetts for a loan of $6,000.00 or less at an interest rate that exceeds 12% APR;

4.  enforcing or attempting to enforce any loan agreement for a loan of $6,000.00 or less at an interest rate that exceeds 12% APR with any person in the State of Massachusetts in any court or other tribunal, including but not limited to the Tribal authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

5.  selling or assigning any agreement for a non-mortgage loan of $6,000.00 or less at an interest rate that exceeds 12% APR between any Defendant and any person residing in the State of Massachusetts to any third party.

124.   Plaintiff further requests the Court enter an injunction prohibiting Defendants from collecting any further amounts from Massachusetts consumers in connection with their loans of $6,000.00 or less at an interest rate that exceeds 12% APR, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## COUNT III - PROHIBITION OF CRIMINAL USURY
## MASS. GEN. LAWS c. 271, § 49

125.   In their loans to Massachusetts consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under

Massachusetts law.

126.    Defendants did not notify the Massachusetts Attorney General of their lending practices at interest rates that exceed 20% per annum.

127.    Plaintiff and the Class Members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

128.    Because the loans at issue are voidable and unenforceable, Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

## COUNT IV - MASS. GEN. LAWS c. 93, § 101

129.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

130.    Defendants' choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they purport to waive rights granted to Plaintiff and class members by M.G.L. c. 140, §§ 96, 110, c. 271, § 49, and c. 93A.

## COUNT V - UNFAIR OR DECEPTIVE ACTS OR PRACTICES
## MASS. GEN. LAWS c. 93A

131.    Defendants are engaged in trade or commerce in that they provide

marketing and consumer lending services.

132.    None of the Defendants maintain a place of business within

Massachusetts, so no demand letter is required of Plaintiff under Chapter 93A.

133.    As detailed in the preceding paragraphs, Defendants established the

subject corporate entities to circumvent and systematically violate state lending laws

and regulations, including but not limited to the Massachusetts Small Loans Act and the

Massachusetts criminal usury statute.

134.    Based on the facts previously stated, Defendants' marketing and lending

to Massachusetts residents constituted unfair or deceptive acts or practices because they

(a) make loans to Massachusetts residents without the requisite license; (b) commit

criminal usury by extending credit to Massachusetts residents at interest rates that

exceed the maximum permissible rate of interest under Massachusetts law; and/or (c)

require Massachusetts borrowers to agree to illegal and unconscionable contract terms

pertaining to choice of law, jurisdiction, forum selection, and class actions.

135.    Plaintiff and the Class request that the Court enter judgment against the

Defendants jointly and severally for the recovery of all principal and interest paid to the

Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of

statutory damages, attorneys' fees, and costs as well as all other relief which may be

due and owing under Massachusetts law.

## COUNT VI - VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)

136.     At all relevant times, Big Picture Loans, LLC, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, and Matt Martorello were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

137.     The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.

138.     The enterprise is engaged in, and its activities affect, interstate commerce. The Defendants' leadership is based in Atlanta, Georgia, Denver, Colorado, Chattanooga, Tennessee, and other locations as addressed in preceding paragraphs. Defendants' enterprise operates throughout the United States, including the District of Massachusetts, as well as in Puerto Rico and the Philippines. Additionally, Defendants claim to do business on Tribal lands.

139.     The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

140.     As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt."

18 U.S.C. § 1962(c).

141.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

142.    The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Massachusetts, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Massachusetts law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

143.    All of the loans made to Massachusetts residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Massachusetts.

144.    In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

145.    The predicate acts of collection of unlawful debt are described herein and in particular in paragraphs 44 through 68 herein. The debts incurred by Plaintiff and all

other members of the Class are unlawful and unenforceable.

146.   The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, following the formation of Red Rock Tribal Lending, LLC, continued with the formation of Defendant Big Picture Loans in 2014, continues to date, and will occur repeatedly in the future to the detriment of Massachusetts consumers.

147.   Plaintiff and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VII - VIOLATIONS OF RICO
### 18 U.S.C. § 1962(d)

148.   Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of agreements to violate § 1962(c) and Massachusetts's usury laws—that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and

engaged in overt acts to further the business interests of the enterprise.

149.    Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants, including their predecessors in interest, Red Rock Tribal Lending, LLC and Bellicose Capital, to create the necessary legal frameworks and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants to investigate and solicit investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants to generate high-interest loans to desperate borrowers, including residents of Massachusetts; (e) agreements between and among Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

150.    Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise.

151.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. §

1964(c).

## COUNT VIII - UNJUST ENRICHMENT

152.    The loans made by Defendants to Plaintiff and the Class members were void and illegal.

153.    Plaintiff and the Class members conferred a benefit on Defendants when they repaid principal and interest on the void loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

154.    The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

155.    Accordingly, Plaintiff seeks to recover from Defendants, jointly and severally, all principal and interest repaid on Defendants' loans by Plaintiff and the Class members.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of herself and the Class she seeks to represent against Defendants for:

(a)      Certification for this matter to proceed as a class action;

(b)  Declaratory relief, injunctive relief, actual damages, statutory damages, treble damages, and punitive damages, as pled herein;

(c)  Attorney's fees and costs of suit; and

(d)  Such other and further relief as the Court deems proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

This 31st day of October 2018.

Respectfully submitted,

*/s/ John Roddy*
John Roddy, BBO # 424240
jroddy@baileyglasser.com
Elizabeth Ryan, BBO # 549632
eryan@baileyglasser.com
Bailey & Glasser LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Jonathan R. Marshall (*pro hac vice* forthcoming)
jmarshall@baileyglasser.com
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 (fax)

Of Counsel, *pro hac vice* forthcoming:

Michael A. Caddell
Cynthia B. Chapman
John B. Scofield, Jr.
Amy E. Tabor
**CADDELL & CHAPMAN**
628 East 9th Street
Houston, Texas 77007

*Counsel for Plaintiff*