## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **DANA DUGGAN**, *individually and on behalf of persons similarly situated,*<br><br>    *Plaintiff,*<br><br>*v.*<br><br>**BIG PICTURE LOANS, LLC, MATT MARTORELLO, ASCENSION TECHNOLOGIES, LLC F/K/A BELLICOSE CAPITAL, LLC, EVENTIDE CREDIT ACQUISITIONS, LLC, JAMES WILLIAMS, JR., MICHELLE HAZEN, BRIAN MCFADDEN, HENRY SMITH, ANDREA RUSSELL, ALICE BRUNK, TINA CARON, MITCHELL MCGESHICK, JEFFERY MCGESHICK, ROBERTA IVEY, AND JUNE SAAD,**<br><br>    *Defendants.* | CIVIL ACTION NO. 18-12277<br><br><br>Leave to Amend<br>Granted on 7/11/2019 |

## FIRST AMENDED CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.       This case involves the online payday lending industry,[1] which takes

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks coinciding with the borrower's next payday, at a high rate of interest. Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to unlicensed loans of $6,000 or less made to Massachusetts borrowers at interest rates that exceed an annual percentage rate

advantage of desperate Americans needing quick access to money by charging unconscionably high interest rates, often exceeding 535%. The usury law in Massachusetts, similar to statutes across the country, "is designed to protect the necessitous debtor from [such] outrageous demands by lenders."[2] Payday lenders, such as Big Picture Loans, LLC ("Big Picture" or "Big Picture Loans"), claim that they are above the law because they are supposedly wholly-owned by a Native American tribe. However, lurking in the shadows, there is a complicated corporate management structure attempting to hide the fact that non-tribal members reap the overwhelming majority of the profits. The purpose of this litigation is to shed light on this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, to obtain statutory damages in accordance with Massachusetts and federal law, and to enjoin the Defendants from collecting on their illegal loans or otherwise continuing their illegal practices with borrowers from Massachusetts and all other states that set usury laws with a maximum annual interest rate that is less than half of the lowest interest rate charged by Big Picture.

2.      Attempting to insulate themselves from legal liability for their usurious lending practices, Defendants established what is commonly referred to as a "rent-a-

---

("APR") of 12 percent. M.G.L. c. 140, § 96. Additionally, Massachusetts has codified criminal usury as any loan at an APR exceeding 20 percent unless the Massachusetts Attorney General has been placed on notice of the loan. M.G.L. c. 271, § 49.

[2] *Begelfer v. Najaran*, 381 Mass. 177, 182, 409 N.E.2d 167, 171-172 (1980) (addressing the criminal usury statute and also noting "the public policy against usury is clearly a matter for grave legislative concern").

tribe" business model, where a lender and/or lending service associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity.[3]

3.      In this instance, Defendant Matt Martorello used the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to set up a lending entity supposedly beyond the reach of state and federal licensing and lending laws. Under the rent-a-tribe model, Defendants made and/or participated in an enterprise to charge high-interest loans in the name of Big Picture, which claims to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital") handled the marketing, prescreened potential borrowers for pre-approved loans, funded the loans, controlled the underwriting, and handled the day-to-day operations of the business; this management of the lending enterprise was then transferred to Ascension Technologies, LLC ("Ascension Technologies").

4.      Big Picture Loans and Ascension Technologies serve as a front to disguise Martorello's and his company Eventide Credit Acquisitions, LLC's ("Eventide") roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of its name to exploit claims of tribal sovereign immunity, the Tribe initially

---

[3] The term "rent-a-tribe" has been repeatedly used in federal indictments, actions by attorneys general, and private litigants to describe the subject "scheme" or business model. *See, e.g., Commonwealth of Pa. v. Think Finance, Inc.,* Case No. 14-cv-7139, 2018 WL 637656 *2, 5-7 (E.D. Pa. Jan. 31, 2018) (addressing motion to dismiss claims on grounds of personal jurisdiction and differentiating facts of "rent-a-bank" and "rent-a-tribe" claims on violations of state and federal laws by loan servicer and its related entities).

received about two percent (2%) of the revenue from the loans.[4]  The lending scheme

has been modified in recent years so that the Tribe may receive as much as three percent

(3%) of the gross revenues of the lending enterprise plus the potential for an additional

two percent (2%) that is reinvested into the operation.  The overwhelming majority of

the profits of the lending enterprise are paid to Martorello through his company

Eventide.

     5.     In approximately January 2016, through a complex series of mergers and

acquisitions, Bellicose Capital began operating as Ascension Technologies. Like Big

Picture Loans, Ascension Technologies claims to be owned and operated by the Tribe.[5]

---

[4] Zeke Faux, Payday Lenders are Changing the Game Ahead of a U.S. Crackdown, Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue…."). https://bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown (last visited August 23, 2018).

[5] This lawsuit challenges Big Picture Loans' and Ascension Technologies' claim that they are an "arm of the Tribe" and thus entitled to the protection of sovereign immunity. Although the doctrine of tribal sovereign immunity protects the Tribe itself, the tribal sovereignty does not automatically extend to economic subdivisions of a tribe; the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citation omitted). Whether an entity is entitled to sovereign immunity as an "arm of the Tribe" turns on several factors, which may include (1) the method of creation of the entity, (2) its purpose, (3) its structure, ownership, and management, including the amount of control the tribe has over the entity, (4) the tribe's intent with respect to the sharing of its sovereign immunity, (5) the financial relationship between the tribe and the entity, and (6) the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities.  *Id.* The First Circuit has not addressed whether or how sovereign immunity extends to an

Despite the alleged tribal ownership, Ascension Technologies continues to conduct its

business off of the tribal reservation and, as a crucial part of the lending enterprise,

generates massive profits for Martorello through Eventide. In fact, Ascension

Technologies conducts the majority of its illegal operations at its corporate offices in

Atlanta, Georgia as well as offices in Puerto Rico and/or the Virgin Islands. At all times

relevant to this litigation, the Tribe has had nothing more than nominal control over the

income, expenses, or day-to-day operations of Bellicose Capital or Ascension

Technologies.

6.      James Williams, Jr., Michelle Hazen, Brian McFadden, Henry Smith,

Andrea Russell, Alice Brunk, Tina Caron, Mitchell McGeshick, Jeffrey McGeshick,

Roberta McGeshick, Roberta Ivey, and June Saad (collectively referred to as "the

Individual Defendants," which specifically excludes Defendant Matt Martorello from

---

"arm" of a Native American tribe, so additional factors may also bear upon the
determination of sovereign immunity.  *See, e.g., Johnson v. Harrah's Kansas Casino Corp.*,
No. 04–4142–JAR, 2006 WL 463138 *4 (D. Kan. Feb. 23, 2006); *Runyon ex. Rel. B.R. v.
Ass'n of Village Council of Presidents*, 84 P.3d 437 (Alaska 2004).  In addition to the
analysis in this Complaint concerning the creation, purpose, and business structure of
Big Picture Loans and Ascension Technologies, these companies are not entitled to
sovereign immunity because the conduct at issue occurred outside of the reservation
boundaries; the vast majority of the profits from the scheme went to non-tribal
participants; the companies are not wholly operated and/or controlled by the Tribe;
and the companies were established for the sole purpose of evading state usury laws.
*See, e.g., Cashcall, Inc. v. Mass. Div. of Banks*, 33 Mass. L. Rptr. 5 (Mass. Sup. 2015)
(addressing lack of tribal authority or jurisdiction over internet loans, because sovereign
immunity and tribal jurisdiction is limited to acts taking place on the reservation), *citing
Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782 (7th Cir. 2014). Further, extending the
protections of tribal immunity to Defendants' scheme would not serve the policies
underlying tribal sovereign immunity.

such definition) are solely named in their official capacities as co-managers, chief

executive officers, and tribal council members. Plaintiff sues these Individual

Defendants only in their official capacities for equitable relief – specifically, for

declaratory judgment and prospective, injunctive relief based on the claims and causes

of action described below.[6]

7.      From her residence in Plymouth County, Massachusetts, Plaintiff, Dana

Duggan, received a short-term installment loan in October 2017. Through online

application and confirmation by telephone, Ms. Duggan obtained a $425 loan from Big

Picture Loans with monthly payments of $191.52. The Big Picture Loans representative

did not tell Ms. Duggan that the interest rate for her loan would exceed 596%. Ms.

Duggan was not given the opportunity to consider Big Picture Loans' agreement and

was not informed that it would attempt to set aside her rights under Massachusetts law.

Over six months, Ms. Duggan paid a total of $1,083.22 as principal and interest on the

---

[6] *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 785 (2014) (permitting "legal actions against the responsible individuals" and "suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction"); *Ex Parte Young*, 209 U.S. 123 (1908) (holding that plaintiffs may seek prospective, injunctive relief in suit against state government officials for violations of federal law); *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2nd Cir. 2019) ("[The tribe-affiliated lender] is a payday lending entity cleverly designed to enable[] Defendants to skirt federal and state consumer protection laws under the cloak of tribal sovereign immunity.  That immunity is a shield, however, not a sword.  It poses no barrier to plaintiffs seeking prospective equitable relief for violations of state or federal law.  Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law."); *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) (holding that "tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands").

$425 loan.

8.      From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40. The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and she was not explained the loan agreement, nor was she informed that it would attempt to set aside her rights under Massachusetts law. Before initiating this suit, Ms. Duggan paid a total of $875 on her $775 loan, but based on its calculation of the usurious interest, Big Picture Loans currently claims that she owes at least $719.06.

9.      Plaintiff asserts a class claim for Defendants' violations of Massachusetts' lending statutes. Under Massachusetts law, a lender must be licensed to make a loan of $6,000 or less, unless the annual interest rate does not exceed 12 percent. M.G.L. c. 140, § 96. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110. The loans also should be deemed void under Massachusetts' prohibition against criminal usury and in the interests of equity. M.G.L. c. 271, § 49. Plaintiff also asserts claims against Defendants for their violations of M.G.L. c. 93, § 101, which prohibits the waiver of consumer rights, and the Consumer Protection Act. M.G.L. c. 93A, §§ 2, *et seq.*

10.     Defendants' conduct, as alleged herein, also violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants acted in concert and conspired with others to repeatedly violate state

lending and consumer fraud statutes, resulting in the collection of an unlawful debt

from Plaintiff and the Class members. In violation of the statute, Defendants sought to

collect, and did collect on usurious, "unlawful debts" under 18 U.S.C. § 1961(6),

specifically Defendants collected debts incurred in "the business of lending money"

where the "usurious rate is at least twice the enforceable rate" under state or federal

law. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

Plaintiff asserts these claims for violation of RICO on behalf of a Class of all Defendants'

borrowers nationwide and also on behalf of a Subclass of Massachusetts borrowers.

11.    In the alternative, Plaintiff also asserts a class claim for Defendants' unjust

enrichment. Defendants were unjustly enriched by their receipt of any payments on the

void and uncollectable loans. It would be inequitable for the Defendants to accept or

retain the benefit conferred by their unlicensed and usurious lending scheme, namely

the collection on illegal loans. Plaintiff asserts these claims for unjust enrichment on

behalf of a Class of all Defendants' borrowers nationwide and also on behalf of a

Subclass of Massachusetts borrowers.

12.    In a judgment entered against Defendants Big Picture, Ascension

Technologies, Martorello, and Eventide jointly and severally, the Court should order

that the debts at issue are void and that said Defendants must repay the principal and

interest to Ms. Duggan and the Class arising out of Defendants' loan transactions.

Plaintiff further seeks injunctive and/or declaratory relief in the form of debt

forgiveness on all pending loans and a prohibition against future lending practices, as

well as other injunctive relief addressed in detail below. Plaintiff further seeks the

collection of statutory damages, attorneys' fees, and costs to the extent permissible under state and federal law.

13.     Plaintiff also seeks a declaratory judgment that the choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they violate applicable law. Additionally, the terms of the loan agreement are void and unenforceable because they are unconscionable and against public policy. For example, the loan agreement seeks to disclaim all federal and state laws in favor of "tribal law." The choice of law, dispute resolution, and class action waiver provisions offer no forum for a just and fair adjudication of Plaintiff's rights and obligations. These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy.[7]

---

[7] For example, courts have repeatedly held that similar provisions were unenforceable for violating public policy. *Gingras*, 922 F.3d at 128 ("Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law. Attempts to disclaim application of federal and state law in an arbitral forum subject to exclusive tribal court review fare no better."); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *see also Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("[W]e interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*."); *Brice v. Plain Green, LLC*, No. 18-cv-01200-WHO, 2019 WL 1500361 *17-18 (N.D. Ca. March 12, 2019) (finding choice of law provision "wholly unenforceable"); *Rideout v. CashCall, Inc.*, No. 16-02817, 2018 WL 1220565 *6 (D. Nev. Mar. 8, 2018) (in finding arbitration agreement unenforceable, holding that, "Plaintiff cannot, based upon the facts of this case, waive substantive federal rights through a choice of law or forum selection clause."); *Titus v. ZestFinance, Inc.*, No. 18-5373 RJB, 2018, WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018) ("[T]he arbitration agreement here uses a choice of law provision, which, when construed with the other provisions in the Loan  Agreement,

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  In addition, this Court has diversity jurisdiction because a diversity of citizenship exists between Plaintiff and Defendants, and the amount in controversy greatly exceeds $75,000.  28 U.S.C. § 1332.

15.     This Court may enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202.

16.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) as Plaintiff, Dana Duggan, is a resident of this District and a substantial part of Plaintiff's claims and damages occurred in this Division of the District of Massachusetts.

## III.     PARTIES

17.     Plaintiff Dana Duggan is a natural person and resident of Quincy, Norfolk County, Massachusetts.

18.     Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. Big Picture Loans is the successor in interest of Red Rock Tribal Lending, LLC and Castle Payday (collectively referred to hereafter as "Big Picture Loans").[8] Big Picture Loans

---

prospectively waives most federal statutory remedies. Although the language in this case is not as specific as it was in *Hayes*, it implicitly achieves the same results.").

[8] Castle Payday, We Have Big News! Castle Payday is now Big Picture Loans, https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited August 13, 2018).

was formed in approximately August 2014. In furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Big Picture Loans does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

19.     Defendant Matt Martorello is a natural person and resident of Dallas, Texas. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Martorello was intimately involved with creating the complete business-ready package of the lending enterprise and related service company.  Martorello has attempted to appear distantly related to the lending operation through the creation of separate corporate forms and the execution of various legal documents.  By such efforts, Martorello has attempted to isolate himself and decrease his legal liability, despite the fact that he continues to reap millions of dollars in profits from the predatory lending pactices.  In furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Martorello does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

20.     Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC is a limited liability company. Bellicose Capital was formed in approximately 2011 under the laws of the U.S. Virgin Islands and then Puerto Rico. Based on available evidence, Ascension Technologies' principal place of business is in Atlanta, Georgia. On

information and belief, Bellicose Capital procured the investment capital, serviced the

loans, and received the vast majority of the revenue from loans created through Big

Picture Loans. In a series of mergers and acquisitions that began in October 2015,

Martorello and Eventide transferred, sold, or merged Bellicose Capital into Ascension

Technologies, a subsidiary of Tribal Economic Development Holdings, LLC, in an

attempt to shield Bellicose Capital's illegal business practices. Although the nominal

ownership of the company changed, Ascension Technologies continues to operate in

conjunction with Big Picture to funnel the overwhelming majority of their income to

Martorello, Eventide, and/or other non-tribal members.[9] Further, Ascension

Technologies operates independent of the Tribe with most of its business services and

operations based in Atlanta, Georgia, the Virgin Islands, and Puerto Rico. In furtherance

of the illegal enterprise that defrauds Massachusetts borrowers, Ascension Technologies

does business in Plymouth County, Norfolk County, and throughout the State of

Massachusetts and the United States.

        21.     Defendant Eventide Credit Acquisitions, LLC ("Eventide") is a limited

liability company.  It was incorporated under the laws of Delaware in approximately

February 2015. Based on available evidence, Eventide's principal place of business is in

Dallas, Texas. Eventide is owned and managed by Liont, LLC through its president,

Matt Martorello. Eventide served as the entity that transferred Bellicose Capital's

---

[9] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016)
("Martorello is selling Bellicose to the tribe for just $1.3 million upfront, plus as much as
$300 million in future payments, depending on how the business does.").

operations to Ascension Technologies through a complex series of mergers and acquisitions.  Through Martorello and almost exclusively for his benefit, Eventide schemed to receive the overwhelming majority of the profits from the lending enterprise.   In furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Eventide does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.  Eventide may be served through its registered agent, Incorporating Services, Inc., 1201 Orange St., Suite 600 One Commerce Center, Wilmington, DE 19899.

22.    Defendant James Williams, Jr. is the Tribe's Chairman as well as the Co-Manager of Big Picture and Ascension Technologies, and he is sued in these official capacities.  As a Tribal council member, Williams is responsible for the illegal activity described in this Complaint.  He has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. The council, in conjunction with approval from Martorello and Eventide, also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with applicable state and federal laws.  As a Co-Manager of Big Picture and Ascension Technologies, Williams has the power to manage the daily operations of the companies, subject to the oversight and control of Defendant Martorello and Eventide. Acting in his official capacities as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Williams does business in Plymouth County, Norfolk County, and

throughout the State of Massachusetts and the United States.

23.     Defendant Michelle Hazen is the Co-Manager of Big Picture and Ascension Technologies and also serves as chief executive officer ("CEO") of Big Picture; she is sued in these official capacities.  As a Co-Manager of Big Picture and Ascension Technologies as well as in her capacity as CEO of Big Picture, Hazen has the power to stop the illegal activities that are the subject of this Complaint and manage the daily operations of the companies, including their management, development, and support of the fraudulent and illegal lending operations, subject to the supervision and control of Defendant Martorello and his company, Eventide. Acting in her official capacities as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Hazen does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

24.     Defendant Brian McFadden is sued in his official capacity as the CEO of Ascension Technologies.  In that role, McFadden has the power to stop the illegal activities that are the subject of this Complaint and manage the daily operations of the company, including its management and support of the fraudulent and illegal lending operations, all subject to the supervision and control of Defendant Martorello and his company, Eventide. McFadden is a minority owner in Eventide, which incentivizes him to maximize the profits generated through the illegal lending enterprise. Acting in his official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant McFadden does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United

States.

25.     Defendant Henry Smith is sued in his official capacity as the Tribe's Vice Chairman.  As a Tribal council member, Smith has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Smith has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Smith also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law.  Acting in his official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Smith does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

26.     Defendant Alice Brunk is sued in her official capacity as the Tribe's Secretary.  As a Tribal council member, Brunk has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Brunk has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Brunk also has the power to

terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law.  Acting in her official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Brunk does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

27.     Defendant Andrea Russell is sued in her official capacity as the Tribe's Treasurer.  As a Tribal council member, Russell has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Russell has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Russell also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law.  Acting in her official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Russell does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

28.     Defendant Tina Caron is sued in her official capacity as a Tribal council member.  In that official capacity, Caron has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of

16

Martorello and Eventide. In this official capacity, Caron has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Caron also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law. Acting in her official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Caron does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

29.    Defendant Mitchell McGeshick is sued in his official capacity as a Tribal council member.  In that official capacity, Mitchell McGeshick has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Mitchell McGeshick has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Mitchell McGeshick also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law.  Acting in his official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Mitchell McGeshick does business in Plymouth County, Norfolk County, and throughout the

17

State of Massachusetts and the United States.

30.     Defendant Jeffrey McGeshick is sued in his official capacity as a Tribal council member.  In that official capacity, Jeffrey McGeshick has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Jeffrey McGeshick has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Jeffrey McGeshick also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law. Acting in his official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Jeffrey McGeshick does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

31.     Defendant Roberta Ivey is sued in her official capacity as a Tribal council member.  In that official capacity, Ivey has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Ivey has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in

conjunction with approval from Martorello and Eventide, Ivey also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law.  Acting in her official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Ivey does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

32.     Defendant June Saad is sued in her official capacity as a Tribal council member.  In that official capacity, Saad has the power to vote in conjunction with other Tribal council members to stop the illegal enterprise and to cease the operations of Big Picture and/or Ascension Technologies, subject to the oversight and approval of Martorello and Eventide. In this official capacity, Saad has the power to influence the daily operations of the companies subject to the oversight and control of Defendant Martorello and his company, Eventide. As a Tribal council member working in conjunction with approval from Martorello and Eventide, Saad also has the power to terminate the CEOs of Big Picture and Ascension Technologies and to appoint new CEOs who will comply with state and federal law. Acting in her official capacity as described above and in furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Defendant Saad does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States.

## IV.    FACTUAL ALLEGATIONS

33.     Dana Duggan has had two loans from and through the Defendants. From her residence in Scituate, Plymouth County, Massachusetts, she applied online for her

first short-term loan on or about October 14, 2017. On or about April 30, 2018, she

applied for the second loan from her new residence in Quincy, Norfolk County,

Massachusetts.

34.     Ms. Duggan has never been to the Tribe's reservation.  She applied for the

loans from her residences in Massachusetts. Defendants negotiated the purported and

fraudulent contract with Ms. Duggan in Massachusetts. Defendants wired the funds to

Ms. Duggan's account in Massachusetts.  As a part of Defendants' lending enterprise

and conspiracy, Big Picture Loans and/or Ascension Technologies withdrew payments

on the illegal loans from Ms. Duggan's bank account in Massachusetts by ACH

withdrawal.  In furtherance of the lending enterprise and conspiracy, Defendants had

automatic access to Ms. Duggan's bank account and continued to withdraw money

from her account even after they had recouped the principal of the illegal loans and any

lawful interest.  Other than the administrative entry of details about the completed loan

transaction, none of the loan activity actually occurred on the Tribe's reservation.

Defendants have extended similar loans to, and collected on the fraudulent debts from,

thousands of people in Massachusetts and across the United States.

**A.     Ms. Duggan's October 14, 2017 Loan**

35.     Shortly after completing her first online application, a Big Picture Loans

representative called Ms. Duggan, informed her that she was eligible for a $425 loan,

and noted that she would be making payments of $191.52 every month.  Though

claiming to be a Big Picture Loans representative, the representative was likely an

employee or contractor of Ascension Technologies.

36.     The Big Picture Loans representative did not explain that the annual percentage rate for her loan would be 596% or that the anticipated finance charges for her loan would be a total of $724.19 (in addition to the repayment of the principal).

37.     During the same call, the Big Picture Loans representative sent Ms. Duggan an email with an internet link that would enable her to complete the loan application process. The Big Picture Loans representative made sure that Ms. Duggan digitally signed the loan document and returned/submitted it before she got off the phone.

38.     The Big Picture Loans representative did not explain the terms of the loan agreement and knew that Ms. Duggan could not have read the six-page document during their short call.

39.     The "Big Picture Loans representative" was operating under the instruction, direction, and/or supervision of the Defendants.

40.     Ms. Duggan was not aware that, according to the terms of her loan, she was purportedly waiving her rights as a Massachusetts consumer under the loan.

41.     On or about October 14, 2017, Ms. Duggan received a deposit into her account for $425.

42.     Over the next six months, Big Picture Loans deducted monthly payments of $191.52 from Ms. Duggan's bank account and deducted $125.62 for her final payment.

43.     Thus, over a period of approximately six months, Ms. Duggan paid a total of $1,083.22 for repayment of the $425 loan.

44.     If the October 2017 loan had been at an APR of 12%, Ms. Duggan would have paid approximately $450 in principal and interest. At an APR of 20%, Ms. Duggan would have paid approximately $468.

**B.      Ms. Duggan's April 30, 2018 Loan**

45.     From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40.

46.     The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and she was not explained the loan agreement, nor was she informed that it would attempt to set aside her rights under Massachusetts law. Though claiming to be a Big Picture Loans representative, the representative was likely an employee or contractor of Ascension Technologies.

47.     The "Big Picture Loans representative" was operating under the instruction, direction, and/or supervision of the Defendants.

48.     Before initiating this suit, Ms. Duggan paid a total of $875 on the $775 loan.

49.      Big Picture Loans currently claims that Ms. Duggan owes $719.06 on the $775 loan. However, the account balance is premised on inaccurate data about payments that Ms. Duggan has made on her account. Big Picture Loans calculates that Ms. Duggan has paid $1,099.20, which is $224.20 more than she has actually paid as of the filing of this lawsuit.

50.     Ms. Duggan's bank credited her with two payments that were deducted from her account by Big Picture Loans, each for $366.40.

51.     On August 31, 2018, Ms. Duggan sent a payment of $508.60, which is not yet reflected on her Big Picture Loans account statement.

## V.     CLASS ALLEGATIONS

**A.     Massachusetts Licensing Requirements, Consumer Protection Statutes, and Equitable Considerations Protect Massachusetts Residents from Defendants' Predatory Lending Practices**

52.     The Commonwealth of Massachusetts has taken aggressive measures to protect Massachusetts residents from predatory lending practices.

53.     Under the Massachusetts Small Loan Act, a lender must be licensed to make a loan of $6,000 or less, unless the APR does not exceed 12% percent. M.G.L. c. 140, § 96.

54.     Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, §§ 96, 110.

55.     To effectuate the purposes of Massachusetts law, it is mandatory that the loan by an unlicensed lender must be held void:

> Where the loan is by an unlicensed lender, the loan itself, and not merely the excessive interest offends the statute in respect to its goal to prohibit the unlicensed business of making small loans. The loan is invalid because the lender was precluded by law from making it. Such a lender cannot profit by his criminal conduct, and he is entitled to no return on his asset.

*Beach Assocs, Inc. v. Fauser*, 9 Mass. App. Ct. 386, 391, 401 N.E.2d 858, 862 (1980) (internal quotation omitted).

56.     Massachusetts courts have long recognized that the Small Loan Act does

not permit predatory lending practices to take advantage of Massachusetts borrowers. *See, e.g., Cuneo v. Bornstein*, 269 Mass. 232, 236, 168 N.E. 810, 811 (1929) (noting statute's purpose is "to prohibit the unlicensed business of making small loans and to prevent an excessive rate of interest on such loans" and noting that the "statute was passed as a protection to the borrower").

57.     The charging of excessive interest serves as additional grounds for rendering the subject loan void and uncollectible. The contracting for, charging, or receipt of interest and expenses that exceed an APR of 20% of the sum loaned constitutes criminal usury unless the lender has notified the Massachusetts Attorney General of its intent to make such a loan and abides by other restrictions not applicable in this case. M.G.L. c. 271, § 49(a), (d).

58.     When a lender commits criminal usury by its excessive interest charges, the Court has discretion to invalidate the entire loan, including the repayment of principal as well as interest. M.G.L. c. 271, § 49(c).

59.     Even in the absence of Massachusetts consumer protection statutes, it is well-established that unlicensed and usurious loans made under the guise of a legal enterprise are void. *Thomas v. Burnce*, 223 Mass. 311, 312, 111 N.E. 871, 873 (1916) (noting "courts of equity will grant relief against usurious contracts no matter what may be their form, and will permit no shift or devise of the creditor to shield him in taking more than legal interest on a loan").

60.     "Illegality, such as usury, is sufficient ground to justify application of the equitable remedy of cancellation of the contract." *Bernhardt v. Atlantic Fin. Corp.*, 311

Mass. 183, 187-88, 40 N.E.2d 713, 715 (1942). "The whole transaction was tainted with illegality[.]" *Id.*, 311 Mass. at 188, 40 N.E.2d at 716. "From considerations of public policy the [borrower] is not regarded as standing in pari delicto." *Id.*

## B.    Overview of Defendants' Enterprise

### 1.    The predecessor operations

61.    Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

62.    Defendant Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and making high interest loans to desperate and vulnerable consumers, many of whom are Massachusetts residents.

63.    Through Bellicose Capital, LLC and its subsidiaries, Martorello established a rent-a-tribe business model with the Tribe, which was doing business as Red Rock Tribal Lending, LLC ("Red Rock").

64.    Although the Tribe held itself out as the actual lender, the Tribe is merely a front. The Tribe allowed Defendants to use its name and, in return, received a nominal percentage of the revenue.[10] Bellicose Capital provided the infrastructure and

---

[10] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("[Matt

investment capital to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

65.     Moreover, nearly all activities performed on behalf of Red Rock were performed by officers and employees of Bellicose Capital, now Ascension Technologies, who were located outside the Lac Vieux Reservation. On information and belief, Bellicose Capital employees were located in the Virgin Islands, Puerto Rico, and the Philippines.

66.     On information and belief, Bellicose Capital handled the lead generation used to identify and solicit potential consumers.[11] Bellicose Capital's lead generation procedures were developed by Martorello.

67.     On information and belief, if a consumer called the number on Defendants' marketing materials, he or she would reach a call center in the Philippines,

---

Martorello's] company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue….").

[11] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. *Pew Charitable Trust, Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/-/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf (last visited August 23, 2018). Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

which took direction and instructions from Bellicose Capital and not the Tribe.

### 2.   Growing state and federal resistance to tribe-affiliated internet lending led Defendants to develop a new business operation

68.     In August 2013, Red Rock received a cease and desist letter from the New York Department of Financial Services ("DFS") asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action.  Resolution No. T2013-054 of the Tribe, 2 (ECF 28-12).  Weeks later, Red Rock and the Tribe filed suit against the DFS seeking to enjoin the State from its regulation of the tribe-affiliated lending enterprise.  *Otoe-Missouria Tribe of Indians v. N.Y. State Depart. of Financial Servs.*, 974 F. Supp. 3d 353, 357 (S.D. N.Y. 2013), *aff'd* 769 F.3d 105 (2nd Cir. 2014).  Noting that the DFS has a right to protect its consumers from predatory loans in New York, the district court found that the lending operation that "the State seeks to regulate is taking place in New York, off of the Tribes' lands."  *Id.* at 361.  Further, the court found that the tribe-affiliated companies "are subject to the State's non-discriminatory anti-usury laws."  *Id.*  Because Red Rock and the Tribe "failed to demonstrate a likelihood of success on the merits or even a sufficiently serious question going to the merits of their underlying claims," the district court denied the injunctive relief.  *Id.*  The Second Circuit affirmed the district court's findings. *Otoe-Missouria Tribe of Indians v. N.Y. State Depart. of Financial Servs.*, 769 F.3d 105, 117-18 (2nd Cir. 2014).

69.     By August 2014, Martorello approached Tribal officials about the reconfiguration of the entire lending operation.  Nominally, Martorello only owned

Bellicose Capital, LLC and its subsidiaries, which were the "marketing, technological and vendor services" of the enterprise.  However, he had been making the overwhelming majority of the profits from the entire lending operations.  Martorello wanted to continue to reap the vast majority of the profits from the lending operation.

70.     In January 2016, due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred or sold Bellicose Capital in an attempt to shield Bellicose Capital's illegal business practices. Bellicose was re-branded as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe. Other than the sovereignty that they attempted to purchase, Martorello and Bellicose provided everything that the lending enterprise needed to operate.

71.     As part of this arrangement, the Tribe-affiliated companies paid Martorello $1.3 million dollars, plus he is entitled to receive as much as *$300 million* in future payments. Faux, *supra* notes 2, 6.  The sale is merely a front to empower Martorello to reap the majority of the profits for the entire lending enterprise, *e.g.* the profits of both Big Picture and Ascension Technologies.  In actuality, Bellicose Capital had never been valued in excess of $30 million, one-tenth of what the Tribe-affiliated companies agreed to pay.  It is also noteworthy that Ascension Technologies had an operating budget of approximately $7 million and apparently generated no actual income for the Tribe, not an investment warranting a $300 million purchase price.

72.     Through several corporate shells, Martorello is receiving variable, non-regular payments that may total $300 million over the course of seven years. According

to a press release by the Tribe, each of the annual payments to Martorello's company will "build additional equity in its own lending support business."[12] Thus, the Tribe acknowledges that it does not own all of the equity in the company. With the purchase structured so that Martorello's company continues to receive substantial profits, the Tribe continues to receive only a modest fee in return for the use of its name.

73.     Additionally, despite the nominal sale of the business operations, Martorello, through Eventide, continues to control the lending enterprise.  Big Picture and Ascension Technologies cannot terminate or replace any manager, director, or officer of the companies without Martorello's consent.  Loan and Servicing Agreement, § 5.14 (ECF 28-17 at 14).  Likewise, Martorello must consent in order for Big Picture and its affiliated companies to amend, modify, or terminate the servicing agreement with Ascension Technologies.  *Id*. at § 5.12.  Also, Big Picture, Ascension Technologies, and their affiliated companies cannot dissolve, modify, or amend their articles of organization or operating agreement without Martorello's consent. *Id*. at § 5.15.

74.     Martorello must approve any changes to Big Picture's budget, if it seeks to make a change that would increase labor costs by more than five percent (5%); similarly, any expansion of the lending enterprise must be approved by Martorello. Secured Promissory Note, § 1.2(b)(4)(b) (ECF 28-18 at 3).  Further, Big Picture has a fiduciary duty to maximize the cash flow to Martorello, through Eventide.  *Id*.

---

[12] https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html (last visited August 23, 2018).

### 3.   Operations of Ascension Technologies

75.     And while it is now purportedly organized under the laws of the Tribe, Ascension Technologies continues to operate in the same manner and with several of the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

76.     Ascension Technologies operates under the direction and control of its CEO, Brian McFadden.  Not coincidentally, Martorello has known McFadden since the fourth grade and considers McFadden to be a close friend.  In his entrusted position, McFadden has been integral to the operations of Bellicose Capital, its predecessor, and subsidiaries since approximately 2012, and he now directs and controls the entire lending enterprise from his position as the CEO of Ascension Technologies.  McFadden plays an integral part of the financial underwriting, collections, the data analytics for the lending operations, vendor management, employee management, and direction of the company.

77.     Despite the service of two Tribe members as co-managers of Ascension Technologies, the Tribe does not participate in the day-to-day operations of Ascension Technologies, and the activities associated with Ascension Technologies occurred off the Tribe's reservation, such as the office management, technology services, business development, internet marketing, call centers, payment processing, and most of the servicing of the loans.

78.     For example, approximately 20 individuals identify Ascension Technologies as their employer on LinkedIn; however, none of these people are located

on the reservation. https://www.linkedin.com/search/results/index/

?keywords=%22ascension%20technologies%22&origin=GLOBAL_SEARCH_HEADER

(last visited August 23, 2018).

79.    The Facebook page for Ascension Technologies lists Atlanta, Georgia as its

place of business.



https://www.facebook.com/pages/Ascension-Technologies-LLC/1151747724868477

(last visited August 23, 2018).

80.     According to its employees' LinkedIn pages, Ascension Technologies conducts its risk analysis, database development, analytics, database marketing, strategic marketing, digital marketing, information technology, and information security in Atlanta, Georgia. At least two corporate vice presidents work in Atlanta. https://www.linkedin.com/search/results/people/?facetGeoRegion=%5B%22us%3A5



2%22%5D&keywords=%22ascension%20technologies%22&origin=FACETED_SEARCH

(last visited August 23, 2018).

81.     In Puerto Rico, Ascension Technologies has additional business operations.[13] According to the LinkedIn pages of its employees, corporate office management for Ascension Technologies occurs from Puerto Rico. Additionally, the company's predictive modeling, data science, and compliance testing are conducted in Puerto Rico. James Dowd, one of the corporate vice presidents of Ascension Technologies, is, or at least was, located in Puerto Rico; Mr. Dowd was formerly a director of Bellicose Capital.

82.     Ascension Technologies' director of business development is located in Chattanooga, Tennessee, and on his LinkedIn page, he describes the company's business as follows:



**Director of Business Development**
Ascension Technologies, LLC
Aug 2016 – Present • 1 yr 11 mos

Ascension Technologies, LLC is a wholly owned subsidiary of Tribal Economic Development Holdings, LLC, a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe.

The team at Ascension Technologies, LLC has an extensive history in servicing lending portfolios, helping hundreds of thousands of people to achieve their financial goals. They specialize in facilitating personal, unsecured loans and financing, as well as the building of risk models, marketing, and providing customer service. Ascension does this by using cutting-edge technology, big data, and creative innovation to provide a transparent, frictionless, and highly efficient marketplace for the everyday borrower. Ascension effectively automates all aspects of operations while ensuring the ability to scale the lending portfolio, including the borrower application process, regulatory compliance, credit decisions, and underwriting. Combining strategic, technical, operational and organizational expertise with proven disciplined approaches, Ascension builds solutions that get results

---

[13] https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords=ascension%20technologies%20puerto%20rico&origin=GLOBAL_SEARCH_HEADER (last visited August 23, 2018); https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords=ascension%20technologies%20manager&origin=GLOBAL_SEARCH_HEADER (last visited August 23, 2018).

https://www.linkedin.com/in/ben-u-63532012/ (last visited August 23, 2018).

83.   Ascension Technologies' vice president of marketing in Atlanta describes

her position as follows:



Vice President Marketing
Ascension Technologies, LLC
Nov 2016 – Present • 1 yr 8 mos
Atlanta, Georgia

Create and lead data-driven omni-channel marketing strategies and tactics for customer
acquisition and retention in B2C sub-prime lending. Drive strategy, brand, digital, traditional
and emerging channels to deliver marketing success. Use data and sophisticated analytics to
accelerate revenue growth.

https://www.linkedin.com/in/lorialsterberg/ (last visited August 23, 2018).

84.   Ascension Technologies' director of digital marketing in Atlanta describes

his position at the company as follows:



Director of Digital Marketing
Ascension Technologies, LLC
Jan 2017 – Present • 1 yr 6 mos
Greater Atlanta Area

Vertical – B2C Online Personal Lending – Big Picture Loans – www.bigpictureloans.com

Responsible for all digital marketing & advertising for Big Picture Loans including; mixed-media
channel budget planning & multi-channel integration, partner directly with Direct Mail channel
owner, ensuring all creative assets and messaging unify both the digital and offline customer
journey

Directly hands-on, build & manage all digital marketing campaigns and strategies including;
SEO, SEM, Social, Programmatic, Content Marketing & Amplification, email Marketing,
Campaign Landing Page Development, Re-targeting and Marketing Automation

Directly manage all Paid Search accounts and Programmatic Display strategy leads through
testing, campaign optimizations and budget allocations

Develop and manage all CRM touch points including; direct marketing, email marketing
(customer lists exceeding 2MM), retention strategies, and new customer acquisition initiatives
via Hubspot

Lead and spearhead the redesigned of Big Picture Loans Website, hands-on built landing
pages, designed and sourced digital assets, photo selections and architected all
UX/Conversion Optimization strategy

Establish and manage all Social Media channel presence, including identifying and targeting
audience segmentation, reporting, budget recommendations and content publishing

Create, manage, source and publish all digital content in a variety of shareable and
downloadable formats

Build, manage and report on all cross-channel digital marketing efforts through various
campaign strategies and performance metrics

https://www.linkedin.com/in/mike-richardson-9048204/ (last visited August 23, 2018).

85.     None of Ascension Technologies' employees, referenced above, are members of the Tribe.

86.     Nearly all of the activities of Ascension Technologies, and thus Big Picture, are performed by these non-tribal members who are located off the reservation.

### 4.   Operations of Big Picture Loans

87.     Ascension Technologies provides all necessary services for Big Picture's operations, including consulting services, analytic services, business management, as well as the management of communications and interactions with Big Picture's vendors, commercials finance providers, and "other agents" of Big Picture.  Intratribal Servicing Agreement Between Big Picture and Ascension Technologies, §§ 3.1, 4.1, 4.2.1 (ECF 28-19 at 2-5).

88.     Big Picture Loans employs few Tribe members who perform little more than administrative tasks at near-minimum wage.  For loan applicants, such as Ms. Duggan, Big Picture employees on tribal lands have no part in the pre-screening of the loans, the marketing of the loans, or even customer support in execution of the loan agreement.  Big Picture's only role in the commencement of any loans is to administratively type and review information already provided by the borrower.  Any questions about the application are handled from a call center in the Phillipines that is supervised by personnel in the Virgin Islands and possibly Puerto Rico.

**C.    Chief Executive Officers' Authority and Control of Big Picture Loans and Ascension Technologies**

89.    At all times relevant to this suit, Defendant Brian McFadden has been the CEO of Ascension Technologies.

90.    As CEO of Ascension Technologies, McFadden controls the day-to-day operations of the company, including lead generation and data analytics for new loans, the drafting of loan agreements, the setting of interest rates, and business management for all services related to the lending operation. Thus, McFadden has the right and ability to direct Ascension Technologies to provide lending services that comply with state and federal laws.

91.    At all times relevant to this suit, Defendant Michelle Hazen has served as the CEO of Big Picture Loans.

92.    Despite serving as CEO of Big Picture Loans since the founding of the company, Hazen has exercised relatively little control over the company. The direction and operations of the lending enterprise are primarily controlled by non-tribal members employed by Ascension Technologies outside of the Tribal lands.  Nevertheless, Hazen has the right and ability to direct Big Picture Loans to cease its illegal lending enterprise and to offer loans that comply with state and federal laws.

93.    As a part of Martorello's and Eventide's control over the lending enterprise, McFadden and Hazen both serve at the discretion of Eventide;  neither CEO can be replaced without Eventide's approval.

**D.      Management of Big Picture Loans and Ascension Technologies**

94.      Defendants, James Williams, Jr. and Michelle Hazen, serve as the Co-Managers of Big Picture and Ascension Technologies.

95.      The companies' articles of organization specify that "[m]anagement of the Company shall be vested in Co-Managers as appointed by [Tribal Economic Development Holdings, LLC]."  First Amended Articles of Organization of Big Picture Loans, LLC, Article 6 (ECF 28-13 at 7); First Amended and Restated Articles of Organization of Ascension Technologies, LLC, Article 6 (ECF 28-14 at 21).

96.      Further, "[d]uties and responsibilities of the Co-Managers shall be defined by the Company's Operating Agreement."  *Id.*  The Operating Agreement specifies the control and responsibilities held by the company's managers:

> **[T]he Manager shall have the power and authority to do and perform all actions as may be necessary or appropriate to carry out the business of the Company** including but not limited to the power to open bank accounts, enter into contracts for services, to manage vendor relationships, to manage personnel issues - including the hiring and firing of all personnel- and **all other affairs of the Company**. Each Manager shall have the authority to bind the Company individually unless otherwise provided herein. Management of the Company's Business Affairs and objectives shall be vested solely in the Manager, except as specifically limited herein.

First Amended Operating Agreement of Big Picture Loans, LLC, ¶ 5.1(a) (ECF 28-13 at 12) (emphasis added); First Amended and Restated Operating Agreement of Ascension Technologies, LLC, ¶ 5.1(a) (ECF 28-14 at 26) (emphasis added).

97.      In actuality, though empowered to stop the illegal lending enterprise, the co-managers are merely a rubber stamp for the actual lending operations that occur off

of the Tribal land by non-Tribal members in Ascension Technologies' offices in Atlanta, Georgia, Puerto Rico, and the Virgin Islands.  The co-managers are not compensated for their approval of decisions made by Ascension Technologies' non-Tribal affiliated staff. The co-managers have never denied a single request for action by Ascension Technologies' management team.

**E.     Authority to Cease Operations of Big Picture Loans and Ascension Technologies**

98.     Defendants James Williams, Jr., Henry Smith, Andrea Russell, Alice Brunk, Tina Caron, Mitchell McGeshick, Jeffrey McGeshick, Roberta McGeshick, Roberta Ivey, and June Saad are members of the Tribal Council.

99.     The Tribal Council is empowered pursuant to Article IV, Section 1(f) of the Tribal Constitution to "manage the economic affairs, enterprises, property, both real and personal, and other interest of the [Tribe]."  Tribal Constitution (ECF 28-2 at 9).

100.     The Tribal Council approved the creation of Big Picture Loans.  Tribal Resolution T2014-066 (ECF 28-13).

101.     The Tribal Council approved the creation of Ascension Technologies. Tribal Resolution T2015-10 (ECF 28-14).

102.     The Tribal Council approved the creation of Tribal Economic Development Holdings, LLC ("TED"), which is the parent company of Big Picture Loans and Ascension Technologies.  Tribal Resolution T2015-08 (ECF 28-15).

103.     The Tribe is the sole member of TED.  *Id.*

104.     In accordance with the powers granted by its Constitution, the Tribal

Council has the discretion to limit, suspend, or dissolve the business operations of Big Picture Loans, Ascension Technologies and TED.

**F.     Defendants' Lending Practices Violated Massachusetts Law**

105.     At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that Massachusetts law prohibits unlicensed lenders from making loans for less than $6,000 at interest rates exceeding 12 percent. M.G.L. c. 140, § 96.

106.     At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that any loan made to Massachusetts borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110.

107.     Defendants have never applied to the Massachusetts Commissioner of Banks for a license permitting them to make loans to Massachusetts borrowers.

108.     The Tribe has never applied to the Massachusetts Commissioner of Banks for a license to be a lender to Massachusetts borrowers.

109.     Defendants have never had a consumer finance license permitting them to make loans to Massachusetts borrowers.

110.     Accordingly, Defendants' loans to Massachusetts residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiff.

111.     At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that Massachusetts law prohibits

criminal usury, as defined in M.G.L. c. 271, § 49.

112.    Defendants also were aware that their lending practices were at interest rates that constitute criminal usury, as defined in M.G.L. c. 271, § 49.

113.    Under the terms of the standard loan agreement, the interest rates charged by Defendants were significantly greater than the maximum legal rate that can be charged under Massachusetts law.

114.    For example, Defendants marketed loans to Dana Duggan and made two loans to her, one for $425 and the second for $775, with interest at an APR of 596% and 535.5%, respectively.

115.    Through advertising and marketing, Defendants targeted Massachusetts consumers for their lending practices, including the loans to Ms. Duggan.

116.    Defendants chose Massachusetts as a place where loans and collection efforts would ensue and participated in and knew of the actions of the other Defendants in Massachusetts.

117.    Martorello knew the subject loans were illegal under Massachusetts law, but pursued the scheme anyway through Big Picture Loans and Bellicose Capital.

118.    In order to qualify for Defendants' loan product, Massachusetts consumers were required to electronically sign a form contract created by Defendants—not created by the Tribe.

**G.    Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable**

119.    Because the loans were made and collected without a consumer finance

40

license and charged an interest rate in excess of the maximum rate permitted under

Massachusetts law, the agreements are unconscionable, void and unenforceable.

120.    Defendants' loan agreement not only violates Massachusetts's consumer

lending statutes and the public policy against usurious loans, but it also contains

unconscionable and unenforceable choice of law and forum selection provisions that

seek to disclaim laws and legal rights and ultimately deprive consumers of their day in

court.

121.    For example, Defendants' Loan Agreement with Plaintiff provides:

> **GOVERNING LAW AND FORUM SELECTION**: This
> Agreement will be governed by the laws of the Lac Vieux
> Desert Band of Lake Superior Chippewa Indians ("Tribal
> law"), including but not limited to the Code as well as
> applicable federal law. All disputes shall be solely and
> exclusively resolved pursuant to the Tribal Dispute
> Resolution Procedure set forth in Section 9 of the Code and
> summarized below for Your convenience.

> **SOVEREIGN IMMUNITY**: This Agreement and all related
> documents are being submitted by You to Big Picture Loans,
> LLC at its office on Tribal land. The Lender is an economic
> development arm, instrumentality, and limited liability
> company wholly owned and operated by the Tribe. The Tribe
> is a federally recognized Indian Tribe and is generally
> immune from suit as a sovereign nation unless such
> immunity is waived by the Tribe in accordance with Tribal
> law or abrogated by applicable federal law ("tribal sovereign
> immunity"). Because the Tribe and Lender are entitled to
> tribal sovereign immunity, You will be limited in what claims,
> if any, You may be able to assert against both the Tribe and
> Us. To encourage resolution of consumer complaints as well
> as provide an authorized method of dispute resolution for
> consumers, pursuant to Section 9 of the Code, all complaints
> lodged, filed, or otherwise submitted by You or on Your
> behalf must follow the Tribal Dispute Resolution Procedure,
> as described herein.

**PRESERVATION OF SOVEREIGN IMMUNITY**: It is the express intention of the Tribe and Lender, operating as an economic arm-of-the-tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges, and immunities, to which they are entitled including the tribal sovereign immunity of the Tribe and Lender. To protect and preserve the rights of the parties, no person may assume a waiver of immunity exists except by express written resolution of the Tribe's Tribal Council specifically authorizing such a waiver as required by Article XIII of the Tribe's Constitution specifically for the matter in question.

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You in the course of Your otherwise lawful and proper use of Lender's business believe Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination. The Authority may hold an administrative review hearing, if requested by You or Us, which will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice

> to You and Us when a request for a hearing is granted or denied. At any such hearing, You may be represented by legal counsel at Your own expense. You may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(Duggan Loan Agreement, attached as Exh. 1, at 4–5.)

122.    Based on the evidence available to date, the governing law and forum selection clauses were template language included in all loan agreements involving Big Picture Loans.

123.    Defendants' loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

124.    Defendants' choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

125.    Defendants' choice-of-law provision is unenforceable as a matter of Massachusetts law because it purports to disclaim the application of any state law.

126.    Likewise, the forum selection clause is also unenforceable because it deprives Massachusetts borrowers of *any* forum to bring state or federal law claims.

127.    The loan agreement disclaims that Plaintiff and the Class have any right to pursue either litigation or arbitration by a neutral third party. (March 6, 2018 Loan Agreement, attached as Exh. 1, at 5. ("NO LITIGATION OR ARBITRATION IS AVAILABLE") (emphasis in original).)

128.    Instead, the Tribal Dispute Resolution Procedure only purports to allow

consumers to follow a "Formal Dispute Resolution" with the Tribal Financial Services Regulatory Authority and the Tribal Court. (*Id.*)

129.    The Tribal Dispute Resolution Procedure states that consumers do not have "any binding procedural or substantive rights" against Big Picture Loans. (*Id.*)

130.    The Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.1(B)(4), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited August 13, 2018).

131.    Specifically, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." *Id.*, Reg. 1.1(B)(4)(b).

132.    Further, the Regulations only provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." *Id.*, Reg. 1.1(B)(4)(c) (emphasis added).

133.    The loans at issue are not related to on-reservation activity and are not necessary to protect tribal self-government or internal relations. *See, e.g., CashCall, Inc. v. Mass. Div. of Banks*, 33 Mass. L. Rptr. 5 (Mass. Sup. 2015), citing *Plains Commerce Bank v. Tong Family Land & Cattle Co.*, 554 U.S. 316, 327-37 (2008) and *Nev. v. Hicks*, 533 U.S. 353, 367 (2001).

134.    Defendants' loan agreement violates Tribal law, which requires that the

following provisions must be conspicuous: "Governing Law and Forum Selection,"

"Sovereign Immunity," and "Preservation of Sovereign Immunity." Specifically, under

Tribal law, each of these paragraphs must be included "**in bold or all caps and**

**conspicuously placed**." Tribal Cons. Fin. Servs. Reg. Code § 7.2(a); Tribal Fin. Servs.

Auth. Comm'n Regs., Reg. 1.5(B) (emphasis added), *available at*

http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited August 13, 2018).

None of the provisions were conspicuous in the subject loan.

135.    Defendants' governing law clause is unenforceable because it violates

public policy concerns in Massachusetts and was procured through fraud and

misrepresentations, including that Big Picture Loans was "wholly owned and operated

by the Tribe."

136.    These statements were false, misleading, and designed to create the

appearance that consumers were doing business with a neutral, government-like entity.

137.    In reality, the loans were owned and/or operated by non-tribal members,

including Ascension Technologies, who funded the loans, controlled the underwriting,

and handled the day-to-day operations of the businesses, including the interactions

with consumers and collections.

138.    Through the Tribal regulatory code and class action waiver provision,

Defendants also seek to deprive borrowers of any just and cost-effective means of

seeking redress for Defendants' wrongful acts.

139.    The Tribal regulatory code prohibits an award of attorneys' fees or costs to

the borrower, if she were to prevail in the Tribe's formal dispute resolution procedure. Tribal Cons. Fin. Servs. Regulatory Code § 9.3(i). Big Picture Loans, on the other hand, is permitted to recover attorneys' fees and reasonable costs for the collection of a debt. *Id.,* § 7.2(c).

140.    Similarly, the loan agreement seeks to strip Plaintiff of the opportunity to pursue her claims as a class action. (Duggan Loan Agreement, attached as Exh. 1, at 5 ("All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law.") (emphasis in original).)

141.    The class action waiver clause violates Plaintiff's statutory right to maintain a class action to redress unfair or deceptive acts or practices in accordance with Massachusetts law. M.G.L. c. 93A, § 9(2).

142.    The purported waiver of Plaintiff's statutory rights under Massachusetts laws which protect consumers' health, safety or welfare violates M.G.L. c. 93, § 101.

143.    In essence, Defendants use the forum selection and choice of law clauses to convert the terms of the loan agreement into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

## H.    Class Definitions

144.    Plaintiff bring this action on her own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class and Subclass:

**The Class**

46

All persons: (1) who executed a loan with Big Picture Loans, (2) while residents of the United States (except Alabama, Delaware, Idaho, Missouri, New Mexico, and Utah), and (3) where the loan was originated and/or any payment was made on or after October 31, 2014.

**The Massachusetts Subclass**
All persons: (1) who executed a loan with Big Picture Loans, (2) while residents of Massachusetts, (3) where the loan was originated and/or any payment was made on or after October 31, 2014.

145.     The Class and Subclass definitions exclude members of the Tribe, persons residing on Tribal lands, and any person, if any, who applied for a loan in person on Tribal land.

146.     **Numerosity**.  Fed R. Civ. P. 23(a)(1). The Class and Subclass members are so numerous that joinder of all is impractical.  Although there are thousands of Class members, Plaintiffs do not know the exact number of Class and Subclass members because such information is in the exclusive control of Defendants Big Picture Loans and Ascension Technologies.  The names and addresses of the Class and Subclass members are identifiable through the internal business records maintained by Defendants, and the Class and Subclass members may be notified of the pendency of this action by published and/or mailed notice.  The Class and Subclass is so numerous that joinder of all members is impracticable.

147.     **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P. 23(a)(2) & (b)(3). Common questions of law and fact exist as to all members of the Class and Subclass. These questions predominate over the questions affecting only individual Class members. These common questions include, as to the Class:

(a)     whether the choice-of-law, forum selection, dispute resolution, and class action waiver provisions in Defendants' loan agreement violate Massachusetts  and other states' laws, offend public policy interests, and should be deemed unenforceable;

(b)     whether Defendants were licensed to make loans to Massachusetts residents by the Massachusetts Commissioner of Banks;

(c)     whether the failure to obtain the license renders the loans to Plaintiff and the class members void and/or unenforceable;

(d)     whether Defendants were authorized by the Massachusetts Attorney General to charge interest at an APR that exceeds 20%;

(e)     whether Defendants' acts and/or practices in the conduct of commerce were unfair and/or deceptive;

(f)     whether Defendants participated in an enterprise under RICO;

(g)     whether the loans to United States and Massachusetts residents included interest rates at more than twice the legal maximum APR, in violation of Massachusetts and other states' usury laws;

(h)     whether Defendants engaged, or are engaging, in the collection of an unlawful debt in violation of 18 U.S.C. § 1962;

(i)     whether Defendants engaged, or are engaging, in a pattern of racketeering in violation of 18 U.S.C. § 1962(c);

(j)     whether Plaintiff and the class members conferred a benefit on Defendants because of their payments of principal and interest on Defendants' void and uncollectible loans;

(k)     whether Defendants knew or should have known of the benefit conferred;

(l)     whether Defendants retained an unjust benefit because the loan was void;

(m)     whether Defendants violated the elements of 18 U.S.C. § 1962(c), as previously alleged;

(n)     whether Defendants entered into a series of agreements to violate § 1962(c);

(o)     whether Defendants conspired or endeavored to collect on an unlawful debt through a pattern of racketeering activity;

(p)     what is the proper recovery for Plaintiff and the Class members against each Defendant; and

(q)     whether equitable injunctive relief should be granted against Defendants.

148.    **Typicality**. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each Class and Subclass member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class and Subclass. All are based on the same facts and legal theories.

149.    **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class and Subclass because her interests coincide with, and are not antagonistic to, the interests of the members of the Class and Subclass she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has prosecuted and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class and Subclass. Neither Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this action.

150.    **Superiority**. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the Class and Subclass members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Class and Subclass individually to effectively redress the wrongs done to them. Even if the members of the Class and Subclass themselves could afford

such individual litigation, it would be an unnecessary burden on the Courts.

Furthermore, individualized litigation presents a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and to the

court system presented by the legal and factual issues raised by Defendants' conduct.

By contrast, the class action device will result in substantial benefits to the litigants and

the Court by allowing the Court to resolve numerous individual claims based upon a

single set of proof in a case.

151.     **Injunctive Relief Appropriate for the Class**. Fed. R. Civ. P. 23(b)(2). Class

certification is also appropriate because Defendants have acted on grounds generally

applicable to the Class and Subclass, making appropriate equitable, injunctive relief

with respect to Plaintiff and the Class and Subclass members. Plaintiff, the Class, and

the Subclass seek an injunction prohibiting Defendants from collecting any further

amounts from Massachusetts consumers in connection with their loans, requiring

Defendants to provide notice to consumers that the loans are unenforceable, and

requiring Defendants to delete any derogatory reporting on tradelines to the credit

bureaus or other consumer reporting agencies, as well as ordering Defendants to divest

themselves of any interest in any enterprise pled herein, including the receipt of

racketeering profits; prohibiting Defendants from continuing to engage in any

enterprise pled herein; and ordering the dissolution of each Defendant that has engaged

in any enterprise pled herein.

## VI.     CAUSES OF ACTION

### COUNT I - DECLARATORY JUDGMENT

152.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

153.    Big Picture Loans' loan agreement contains illegal and unconscionable choice of law, forum selection, class action waiver, and dispute resolution provisions that violate Massachusetts law and are void and unenforceable for public policy concerns.

154.    The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the Loan Agreement as well as the validity, if any, of the choice of law, forum selection, class action waiver, and dispute resolution provisions.

155.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

156.    Accordingly, Plaintiff, on behalf of herself and all others similarly situated, seek a declaratory judgment that the choice of law, forum selection, class action waiver, and dispute resolution provisions are void and unenforceable as to Massachusetts residents because such terms (a) violate Massachusetts law, and (b) are unconscionable and contrary to matters of public policy.

## COUNT II - VIOLATIONS OF MASSACHUSETTS SMALL LOANS ACT
## MASS. GEN. LAWS c. 140, §§ 96, 110

### MASSACHUSETTS SUBCLASS

157.    Plaintiff incorporates each of the allegations in the preceding paragraphs

as if restated here.

158.     In the furtherance of the Defendants' commercial lending enterprise, Defendant Big Picture Loans made loans to Massachusetts consumers even though they are not licensed by the Commissioner of Banks to make loans in the State of Massachusetts.

159.     Defendants' unlicensed lending to Massachusetts consumers was, and remains, a violation of Massachusetts consumer protection laws.

160.     Plaintiff and the Massachusetts Subclass seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

161.     Because the loans at issue are void and unenforceable, Plaintiff and the Massachusetts Subclass request that the Court enter judgment against the Defendant Big Picture Loans for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

162.     Additionally, Plaintiff and the Massachusetts Subclass request that the Court permanently enjoin Defendants from the unlicensed practice of lending less than $6,000 to Massachusetts borrowers, including but not limited to:

1.      engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $6,000.00 or less at an interest rate that exceeds 12% APR in the State of Massachusetts;

2.      advertising, marketing, or soliciting in the State of Massachusetts for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $6,000.00 or less at an interest rate that exceeds 12% APR through any media, including but not limited to the Internet, television, print, and radio;

3.      collecting or attempting to collect payment of interest or principal pursuant to any loan agreement with any person in the State of Massachusetts for a loan of $6,000.00 or less at an interest rate that exceeds 12% APR;

4.      enforcing or attempting to enforce any loan agreement for a loan of $6,000.00 or less at an interest rate that exceeds 12% APR with any person in the State of Massachusetts in any court or other tribunal, including but not limited to the Tribal authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

5.      selling or assigning any agreement for a non-mortgage loan of $6,000.00 or less at an interest rate that exceeds 12% APR between any Defendant and any person residing in the State of Massachusetts to any third party.

163.    Plaintiff further requests the Court enter an injunction prohibiting Defendants from collecting any further amounts from Massachusetts consumers in connection with their loans of $6,000.00 or less at an interest rate that exceeds 12% APR, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants Big Picture Loans and Ascension Technologies to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## COUNT III - PROHIBITION OF CRIMINAL USURY
## MASS. GEN. LAWS c. 271, § 49

## MASSACHUSETTS SUBCLASS

164.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

165.    In their loans to Massachusetts consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Massachusetts law.

166.    Defendants did not notify the Massachusetts Attorney General of their lending practices at interest rates that exceed 20% APR.

167.    Plaintiff and the Massachusetts Subclass Members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

168.    Because the loans at issue are void and unenforceable, Plaintiff and the Massachusetts Subclass request that the Court enter judgment against the Defendants Big Picture Loans, Ascension Technologies, Martorello, and Eventide jointly and severally for the recovery of all principal and interest paid to the Big Picture Loans under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees

and costs as well as all other relief which may be due and owing under Massachusetts

law.

169.    Additionally, Plaintiff and the Massachusetts Subclass request that the

Court permanently enjoin Defendants from the unlicensed practice of lending less than

$6,000 to Massachusetts borrowers, including but not limited to:

1.    engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $6,000.00 or less at an interest rate that exceeds 20% APR in the State of Massachusetts;

2.    advertising, marketing, or soliciting in the State of Massachusetts for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $6,000.00 or less at an interest rate that exceeds 20% APR through any media, including but not limited to the Internet, television, print, and radio;

3.    collecting or attempting to collect payment of interest or principal pursuant to any loan agreement with any person in the State of Massachusetts for a loan of $6,000.00 or less at an interest rate that exceeds 20% APR;

4.    enforcing or attempting to enforce any loan agreement for a loan of $6,000.00 or less at an interest rate that exceeds 20% APR with any person in the State of Massachusetts in any court or other tribunal, including but not limited to the Tribal authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

5.    selling or assigning any agreement for a non-mortgage loan of $6,000.00 or less at an interest rate that exceeds 20% APR between any Defendant and any person residing in the State of Massachusetts to any third party.

170.    Plaintiff further requests the Court enter an injunction prohibiting

Defendants from collecting any further amounts from Massachusetts consumers in

connection with their loans of $6,000.00 or less at an interest rate that exceeds 20% APR,

requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## COUNT IV - MASS. GEN. LAWS c. 93, § 101

### MASSACHUSETTS SUBCLASS

171.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

172.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

173.    Defendants' choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they purport to waive rights granted to Plaintiff and Massachusetts Subclass members by M.G.L. c. 140, §§ 96, 110, c. 271, § 49, and c. 93A.

## COUNT V - UNFAIR OR DECEPTIVE ACTS OR PRACTICES
## MASS. GEN. LAWS c. 93A

### MASSACHUSETTS SUBCLASS

174.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

175.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

176.    None of the Defendants maintain a place of business within Massachusetts, so no demand letter is required of Plaintiff under Chapter 93A.

177.    As detailed in the preceding paragraphs, Defendants established the

subject corporate entities to circumvent and systematically violate state lending laws and regulations, including but not limited to the Massachusetts Small Loans Act and the Massachusetts criminal usury statute.

178.    Based on the facts previously stated, Defendants' marketing and lending to Massachusetts residents constituted unfair or deceptive acts or practices because they (a) make loans to Massachusetts residents without the requisite license; (b) commit criminal usury by extending credit to Massachusetts residents at interest rates that exceed the maximum permissible rate of interest under Massachusetts law; and/or (c) require Massachusetts borrowers to agree to illegal and unconscionable contract terms pertaining to choice of law, jurisdiction, forum selection, and class actions.

179.    Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of statutory damages, attorneys' fees, and costs as well as all other relief which may be due and owing under Massachusetts law.

## COUNT VI - VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)

### CLASS CLAIMS

180.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

181.    At all relevant times, Defendants were members and associates of an internet payday lending enterprise, whose members and associates engaged in the

collection of unlawful debt.

182.    The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.  The Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

183.    The enterprise is engaged in, and its activities affect, interstate commerce. The Defendants' leadership is based in Dallas, Texas, Atlanta, Georgia, Denver, Colorado, Chattanooga, Tennessee, and other locations as addressed in preceding paragraphs. Defendants' enterprise operates throughout the United States, including the District of Massachusetts, as well as in Puerto Rico and the Philippines. Additionally, Defendants claim to do business on Tribal lands.

184.    The lending enterprise operates through ACH transactions, such as those involving the payments by Ms. Duggan.  The ACH transactions involve interstate commerce because they flow through Big Picture's bank account in Wisconsin, Ms. Duggan's bank account in Massachusetts, and through different intermediaries across the United States.

185.    The lending enterprise operates through a website at www.bigpictureloans.com.  The website furthers the illegal financial transactions.  The website allows individuals to enter information to execute ACH wire transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt.  The website involves transactions in interstate commerce.

186.     The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

187.     In their positions as chief executive officers of Ascension Technologies and Big Picture Loans, McFadden and Hazen preside over the lending enterprise with direction of the companies' illegal lending operations.

188.     In his position as the manager of Eventide, Martorello presides over the lending enterprise with authority to influence the direction of the companies' leadership structures.  Martorello established the plan to create Ascension Technologies and Big Picture Loans.

189.     Acting in concert, Defendants created the Big Picture Loans enterprise with essential lending services provided by Ascension Technologies so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

190.     Acting in concert, Defendants defined the types of loans that Big Picture would offer to customers and the illegal terms on which the loans would be created.

191.     Defendants knowingly marketed the loans via the Internet and through pre-screened marketing solicitations to borrowers who reside across the United States and off of Tribal lands.

59

192.    As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

193.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

194.    The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Massachusetts, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

195.    In addition to legal limits of interest that may be charged under Massachusetts law, most other jurisdictions in the United States have limits on the amounts of interest that a lender may charge.  *See, e.g.,* Ariz. Rev. Stat. §§ 6-603, *et seq.*; Ark. Const. amend. 89, § 3; Ark. Code Ann. §§ 4-57-104, 4-57-105; Conn. Gen. Stat. § 36a-563; Fla. Stat. §§ 516.01(2), 516.03, 516.031, 687.071(3); Ga. Code Ann. §§ 7-3-6; 7-3-14, 7-4-2, 7-4-18, and 16-17-1, *et seq.*; Md. Code Ann. Com. Law §§ 12-306, 12-313, 12-314; N.C. Gen. Stat. §§ 53-173, 53-176; N.H. Rev. Stat. Ann. § 399-A12; N.J. Stat. Ann. §§ 2C:21-

19(a), 17:11C-3, 17:11C-41; N.Y. GEN. OBLIG. LAW § 5-501; N.Y. BANKING LAW § 14-a(1); N.Y. PENAL LAW § 190.40; OR. REV. STAT. § 725.045; VT. STAT. ANN. tit. 8, § 2230; VT. STAT. ANN. tit. 9, § 41a. All of the loans made to Class members in the United States and collected by Defendants included an interest rate far in excess of twice the enforceable rate.  Each of the Defendants was associated with the enterprise through the collection of unlawful debt.

196.    In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.  For example, two percent (2%) of the revenue from the lending enterprise is invested back into the operations on behalf of the Tribe.

197.    The predicate acts of collection of unlawful debt are described herein. The debts incurred by Plaintiff and all other members of the Class are unlawful and unenforceable.

198.    Defendants have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiff's and Class members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the Big Picture Loans enterprise.  18 U.S.C. §§ 1341, 1343.  The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

199.   Martorello, through his company Eventide, acted in concert with Tribal council, Hazen, and McFadden and operated in the names of Big Picture Loans and Ascension Technologies to plan or scheme to defraud thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates while at the same time claiming that the business operations were legitimate and in compliance with the law.  To advance this scheme, Martorello worked with the Individual Defendants to create the Big Picture Loans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme.  Martorello attempted to dodge liability by claiming to have sold the lending services operation, but in reality Martorello dictated the terms of his continued reaping of almost all profits from the entire lending enterprise while continuing to exercise control over the operations.  Defendants knowingly intended to defraud the victims of the lending scheme.

200.   The racketeering activity at issue is related and continuous.  The thousands of ACH transactions served and continue to serve the central scheme created and developed by the Defendants to make illegal loans at extortionate interest rates.  The thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – primarily for not-Tribal members.  The scheme to evade state laws was designed, implemented, and/or maintained by Defendants through Big Picture Loans.

201.   The Defendants' leadership, management, and participation in the

enterprise began at some point as early as 2011, following the formation of Red Rock, continued with the formation of Defendant Big Picture Loans in 2014, continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Massachusetts consumers.

202.    Plaintiff and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants Big Picture Loans, Ascension Technologies, Martorello, and Eventide are jointly and severally liable to Plaintiff and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Against the Individual Defendants, as previously defined, Plaintiff only seeks prospective equitable relief, as well as costs and fees to the extent permissible by law.

**COUNT VII - VIOLATIONS OF RICO
18 U.S.C. § 1962(d)**

**CLASS CLAIMS**

203.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth here.

204.    Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and

knowingly conspiring and entering into a series of agreements to violate § 1962(c) and states' usury laws—that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and engaged in overt acts to further the business interests of the enterprise.

205.    Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants, including their predecessors in interest, Red Rock and Bellicose Capital, to create the necessary legal frameworks and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants to investigate and solicit investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants to generate high-interest loans to desperate borrowers, including residents of Massachusetts; (e) agreements between and among Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

206.    Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt

in the conduct and furtherance of the affairs of the enterprise.

207.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants Big Picture Loans, Ascension Technologies, Martorello, and Eventide are jointly and severally liable to Plaintiff and the Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c). Against the Individual Defendants, as previously defined, Plaintiff only seeks prospective equitable relief, as well as costs and fees to the extent permissible by law.

**COUNT VIII - VIOLATIONS OF RICO**
**18 U.S.C. § 1962(c)**

**MASSACHUSETTS SUBCLASS**

208.    Plaintiff incorporates each of the allegations in the preceding paragraphs, including the allegations stated in Count VI and VII, as if restated here.

209.    At all relevant times, Defendants were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

210.    The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

211.    The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

212.    As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

213.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

214.    The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the internet lending operation of lending money at usurious rates according to Massachusetts law, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Massachusetts law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

215.    All of the loans made to Massachusetts residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Massachusetts.

216.    In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

217.    The debts incurred by Plaintiff and all other members of the Subclass are

unlawful and unenforceable.

218.    The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, following the formation of Red Rock, continued with the formation of Defendant Big Picture Loans in 2014, continues to date, and will occur repeatedly in the future to the detriment of Massachusetts consumers.

219.    Plaintiff and the Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants Big Picture Loans, Ascension Technologies, Martorello, and Eventide are jointly and severally liable to Plaintiff and the putative members of the Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c). Against the Individual Defendants, as previously defined, Plaintiff only seeks prospective equitable relief, as well as costs and fees to the extent permissible by law.

## COUNT IX - VIOLATIONS OF RICO
## 18 U.S.C. § 1962(d)

## MASSACHUSETTS SUBCLASS

220.    Plaintiff incorporates each of the allegations in the preceding paragraphs, including the allegations stated in Count VI, VII, and VIII,  as if set forth here.

221.    Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other

participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and

knowingly conspiring and entering into a series of agreements to violate § 1962(c) and

Massachusetts's usury laws—that is, to conduct and participate, directly and indirectly,

in the collection of unlawful debt. In addition, Defendants knowingly entered into

agreements to facilitate the development and management of the enterprise and

engaged in overt acts to further the business interests of the enterprise.

222.    Defendants, along with other participants not yet known to Plaintiff,

violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. §

1962(c). These agreements, include, *inter alia*: (a) agreements between and among

Defendants, including their predecessors in interest, Red Rock Tribal Lending, LLC and

Bellicose Capital, to create the necessary legal frameworks and entities to conduct the

affairs of the lending enterprise; (b) agreements between and among Defendants to

provide the necessary funds to conduct and expand the affairs of the lending enterprise;

(c) agreements between and among Defendants to investigate and solicit investors in

furtherance of the affairs of the lending enterprise; (d) agreements between and among

Defendants to generate high-interest loans to desperate borrowers, including residents

of Massachusetts; (e) agreements between and among Defendants to refinance the

lending enterprise, including the agreement for the acquisition of Bellicose Capital and

the continued payments to Martorello; and (f) agreements between and among the

Defendants and unknown third parties to further conduct the affairs of the Defendants'

lending enterprise.

223.    Each of the agreements identified in the preceding paragraph

contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise.

224.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants Big Picture Loans, Ascension Technologies, Martorello, and Eventide are jointly and severally liable to Plaintiff and the Subclass members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c). Against the Individual Defendants, as previously defined, Plaintiff only seeks prospective equitable relief, as well as costs and fees to the extent permissible by law.

## COUNT X - UNJUST ENRICHMENT

## CLASS CLAIMS

225.     Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

226.     The loans made by Defendants to Plaintiff and the Class members were void and illegal.

227.     Plaintiff and the Class members conferred a benefit on Defendants when they repaid principal and interest on the void loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

228.     The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate

provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

229.     Accordingly, Plaintiff seeks to recover from Defendants, jointly and severally, all principal and interest repaid on Defendants' loans by Plaintiff and the Class members.

## COUNT XI - UNJUST ENRICHMENT
## MASSACHUSETTS SUBCLASS

230.     Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

231.     The loans made by Defendants to Plaintiff and the Subclass members were void and illegal.

232.     Plaintiff and the Subclass members conferred a benefit on Defendants when they repaid principal and interest on the void loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

233.     The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

234.     Accordingly, Plaintiff seeks to recover from Defendants, jointly and

severally, all principal and interest repaid on Defendants' loans by Plaintiff and the Subclass members.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of herself and the Class and Subclass she seeks to represent against Defendants for:

(a)     Certification for this matter to proceed as a class action;

(b)     Declaratory relief against all Defendants, as pled herein;

(c)     Injunctive relief barring Defendants from providing, collecting on, and servicing illegal loans, as pled herein;

(d)     Such other injunctive relief as the Court deems appropriate;

(e)     Equitable relief returning all interest charged on loans above a reasonable and lawful rate of interest;

(f)     Actual damages, statutory damages, treble damages (under 18 U.S.C. § 1964), and punitive damages, from Defendants Big Picture Loans, Ascension Technologies, Eventide, Matt Martorello, as pled herein and/or to the extent permissible under applicable laws;

(g)     Attorney's fees and costs of suit to the extent permissible under applicable laws; and

(h)     Such other and further relief as the Court deems proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

This 16th day of July 2019.

Respectfully submitted,

*/s/ Michael A. Caddell*
Michael A. Caddell *(pro hac vice)*
mac@caddellchapman.com

Cynthia B. Chapman *(pro hac vice)*
cbc@caddellchapman.com
Amy E. Tabor *(pro hac vice)*
aet@caddellchapman.com
John B. Scofield *(pro hac vice)*
jbs@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
713-751-0400
713-751-0906 (fax)

*/s/   John Roddy*
John Roddy, BBO # 424240
jroddy@baileyglasser.com
Elizabeth Ryan, BBO # 549632
eryan@baileyglasser.com
BAILEY & GLASSER LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Jonathan R. Marshall *(pro hac vice)*
jmarshall@baileyglasser.com
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) as well as to the following counsel of record via Electronic Mail on this 16th day of July, 2019.

Jonathan P. Boughrum
Michael C. Witsch
Richard L. Scheff
ARMSTRONG TEASDALE, LLP
1500 Market Street
12th Floor, East Tower
Philadelphia, PA 19102
Telephone:  (484) 222-1316
Email: jboughrum@armstrongteasdale.com
      mwitsch@armstrongteasdale.com
      rlscheff@armstrongteasdale.com

Ian D. Roffman
Michael J. Leard
Nutter, McClennen & Fish LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 439-2000
Fax: (617) 310-9000
Email: iroffman@nutter.com
      mleard@nutter.com

Justin A. Gray
Anna Marek Bruty
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Email:  abruty@rosettelaw.com
      jgray@rosettelaw.com

David N. Anthony
Timothy St. George
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-5410
Email: david.anthony@troutman.com
      tim.stgeorge@troutman.com

Michael T. Grant
LECLAIRRYAN PLLC
60 State Street, Twenty-Third Floor
Boston, MA 02109
Telephone: (617) 502-8200
Email: michael.grant@leclairryan.com

*/s/ Michael A. Caddell*
Michael A. Caddell