## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**DANA DUGGAN,** *individually*
*and on behalf of persons similarly*
*situated,*

       *Plaintiff,*

   *v.*

**MATT MARTORELLO AND EVENTIDE**
**CREDIT ACQUISITIONS, LLC,**

      *Defendants.*

CIVIL ACTION NO. 18-12277

## SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.    Introduction ............................................................................................. 1

II.   Jurisdiction and Venue ............................................................................ 8

III.  Parties ..................................................................................................... 12

IV.   Factual Allegations ............................................................................... 14

   A.   Ms. Duggan's October 14, 2017 Loan ........................................ 15

   B.   Ms. Duggan's April 30, 2018 Loan ............................................ 16

V.    Class Allegations .................................................................................. 17

   A.   Massachusetts Licensing Requirements, Consumer Protection Statutes,
        and Equitable Considerations Protect Massachusetts Residents from
        Defendants' Predatory Lending Practices ..................................... 17

   B.   Overview of Defendants' Enterprise ............................................ 19

        1.   The predecessor operations ................................................ 19

        2.   Growing state and federal resistance to tribe-affiliated internet
             lending led Defendants to restructure the business operations...... 24

        3.   Seeking to bolster his deficient claims to "tribal sovereign
             immunity," Martorello nominally transferred ownership in
             Bellicose to Ascension while keeping the same fundamental
             business structure. .............................................................. 26

        4.   Martorello re-branded Red Rock as "Big Picture Loans" to avoid
             negative publicity from the government actions against Red
             Rock.................................................................................... 28

        5.   Following the restructuring of Bellicose as Ascension and Red
             Rock as Big Picture, the Tribe continued to receive only a small
             portion of the profits............................................................ 29

        6.   Martorello and the Tribe had no reason to believe or intend for the
             lending operations to continue through the seven-year payment
             term; the lending operations were only intended as a short-term
             source for revenue................................................................ 32

7.     Martorello, Eventide, and Ascension's non-tribal executives kept control over the lending operations. ........................................... 34

8.     Ascension operates without Tribal involvement. ............................. 34

9.     Ascension handles the majority of Big Picture's operations. .......... 35

10.    Martorello and Eventide manage the lending operations of Ascenstion Technologies and Big Picture through Brian McFadden.................................................................................... 36

11.    Through Eventide, Martorello exercises control over Big Picture's and Ascension's business operations.................................. 38

12.    Operations of Ascension Technologies................................................. 40

13.    Operations of Big Picture Loans ........................................................ 41

C.     Defendants' Lending Practices Violated Massachusetts Law .................... 42

D.     The Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions in Defendants' Loan Agreements Are Void and/or Unenforceable ........................................................................................ 44

E.     Class Definitions ........................................................................................ 51

VI.    Causes of Action......................................................................................... 55

VII.   Prayer for Relief......................................................................................... 74

VIII.  Demand for Jury Trial ............................................................................... 75

Certificate of Service................................................................................................. 76

## I.     INTRODUCTION

1.     This case involves the online payday lending industry,[1] which takes advantage of desperate Americans needing quick access to money by charging unconscionably high interest rates, often exceeding the 535% rate of Plaintiff Dana Duggan's operative loan. The usury law in Massachusetts, similar to statutes across the country, "is designed to protect the necessitous debtor from [such] outrageous demands by lenders."[2] In an attempt to operate an internet-based lending enterprise beyond the scrutiny of Massachusetts' and other states' usury laws, Matt Martorello created the business model and the entire lending platform of Big Picture Loans, LLC ("Big Picture" or "Big Picture Loans") and then affiliated the business with a Native American tribe. Lurking in the shadows, there is a complicated corporate management structure attempting to hide the fact that non-tribal members, namely Martorello, his family and

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks coinciding with the borrower's next payday, at a high rate of interest. Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to unlicensed loans of $6,000 or less made to Massachusetts borrowers at interest rates that exceed an annual percentage rate ("APR") of 12 percent. M.G.L. c. 140, § 96. Additionally, Massachusetts has codified criminal usury as any loan at an APR exceeding 20 percent unless the Massachusetts Attorney General has been placed on notice of the loan. M.G.L. c. 271, § 49.

[2] *Begelfer v. Najaran*, 381 Mass. 177, 182, 409 N.E.2d 167, 171-172 (1980) (addressing the criminal usury statute and also noting "the public policy against usury is clearly a matter for grave legislative concern").

companies, reap all the net revenue from the lending operation. The purpose of this litigation is to shed light on this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, and to obtain statutory damages in accordance with Massachusetts (as well as other states) and federal law.

2.    Attempting to insulate themselves from legal liability for their usurious lending practices, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a lender and/or lending service associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity.[3]

3.    In this instance, Defendant Matt Martorello used the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "LVD" or "Tribe") to set up a lending entity supposedly beyond the reach of state and federal licensing and lending laws. Under the rent-a-tribe model, Defendants created and controlled an enterprise to charge high-interest loans in the names of Castle Payday[4] and Big Picture, which both claim to be owned and operated by the Tribe.

---

[3] The term "rent-a-tribe" has been repeatedly used in federal indictments, actions by attorneys general, and private litigants to describe the subject "scheme" or business model. *See, e.g., Commonwealth of Pa. v. Think Finance, Inc.*, Case No. 14-cv-7139, 2018 WL 637656 *2, 5-7 (E.D. Pa. Jan. 31, 2018) (addressing motion to dismiss claims on grounds of personal jurisdiction and differentiating facts of "rent-a-bank" and "rent-a-tribe" claims on violations of state and federal laws by loan servicer and its related entities).

[4] Red Rock Tribal Lending, LLC ("Red Rock") was a tribe-affiliated limited liability company that offered payday loans under the name "Castle Payday." The history of Red Rock and its successor entity, Big Picture, are addressed in detail below.

4.      In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital") originally handled the marketing, prescreened potential borrowers for pre-approved loans, funded the loans, controlled the underwriting, and handled the day-to-day operations of the Castle Payday lending business. Management of the lending enterprise was then transferred from Bellicose Capital to Ascension Technologies, LLC ("Ascension Technologies") at roughly the same time that Big Picture was created as a new lending venture.

5.      Big Picture Loans and Ascension Technologies serve as a front to disguise Martorello's and his company Eventide Credit Acquisitions, LLC's ("Eventide") roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. Martorello, through Eventide, controls and oversees the lending operations.

6.      In return for the use of its name to exploit claims of tribal sovereign immunity, the Tribe initially received about two percent of the gross revenue from the loans. To attempt to bolster its groundless claims of sovereign immunity, the lending scheme was modified in recent years so that the Tribe receives as much as six percent of the gross revenues of the lending enterprise.

7.      In approximately January 2016, through a complex series of mergers and acquisitions, Bellicose Capital began operating as Ascension Technologies. Like Big Picture Loans, Ascension Technologies claims to be owned and operated by the Tribe. Despite the alleged tribal ownership, Ascension Technologies continues to conduct its business off of the tribal reservation and, as a crucial part of the lending enterprise, generates massive profits for Martorello through Eventide. The effort to shield Ascension

3

Technologies from liability as a Tribe-affiliated lender was a sham transaction that actually provided no financial benefit to the Tribe or its affiliated companies.[5] Martorello engineered the superficial changes to the structure of the operation—characterizing Martorello's interest as debt rather than equity—in a vain and misguided attempt to insulate the Defendants from liability for their ongoing oversight of the lending operation and blatant violations of state and federal lending laws.

8.     Eventide is not a mere creditor to Big Picture. Martorello, through Eventide, controls the business operations of Ascension Technologies, which in turn oversees and controls Big Picture's business operations. Martorello, through Eventide, receives 100% of the net revenue of the company. In other words, Martorello was the mastermind behind the lending scheme; he continues to control Big Picture's lending practices to Massachusetts consumers; and he is the primary beneficiary of the lending operation. At all times relevant to this litigation, the Tribe has had nothing more than nominal control over the income, expenses, or day-to-day operations of Bellicose Capital or Ascension Technologies.

9.     From her residence in Plymouth County, Massachusetts, Plaintiff, Dana Duggan, received a short-term installment loan in October 2017. Through online

---

[5] The Tribe and its affiliated companies claim to have acquired Bellicose Capital so that the successor entity, Ascension Technologies, could reduce expenses by providing the loan management services at cost. However, the Tribe and its affiliated companies are <u>not</u> compensated based on the *net* revenue for the lending operation. They are paid a small percentage of the *gross* revenue. Because the Tribe and its affiliated companies' compensation is not tied to net revenue, any cost savings actually goes to Eventide, *i.e.*, Martorello, which is the only recipient of net revenue of the business.

application and confirmation by telephone, Ms. Duggan obtained a $425 loan from Big Picture Loans with monthly payments of $191.52. The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 596%. Ms. Duggan was not given the opportunity to consider Big Picture Loans' agreement and was not informed that it would attempt to set aside her rights under Massachusetts law. Over six months, Ms. Duggan paid a total of $1,083.22 as principal and interest on the $425 loan.

10.     From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40. The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and the loan agreement was not explained to her, nor was she informed that the agreement would attempt to set aside her rights under Massachusetts law. Before initiating this suit, Ms. Duggan paid a total of $875 on her $775 loan, but based on its calculation of the usurious interest, Big Picture Loans currently claims that she owes at least $719.06.

11.     Plaintiff asserts a class claim for Defendants' violations of Massachusetts' lending statutes. Under Massachusetts law, any person who directly or indirectly engages in the business of making consumer loans of $6,000 or less at an interest rate exceeding 12 percent must be licensed by the commissioner of banks. M.G.L. c. 140, § 96. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110. Because Defendants received, directly or indirectly, usurious interest from the lending enterprise, the loans

also should be deemed void under Massachusetts' prohibition against criminal usury and in the interests of equity. M.G.L. c. 271, § 49. Plaintiff also asserts claims against Defendants for their violations of M.G.L. c. 93, § 101, which prohibits the waiver of consumer rights, and the Consumer Protection Act. M.G.L. c. 93A, §§ 2, *et seq.* Because Defendants directed the lending scheme with the intention of soliciting, funding, and collecting on usurious loans to Massachusetts consumers, Massachusetts law applies to the subject loans as well as Defendants' acts and interests.

12.     Defendants' conduct, as alleged herein, also violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants acted in concert and conspired with others to repeatedly violate state lending and consumer fraud statutes, resulting in the collection of an unlawful debt from Plaintiff and the Class members. In violation of the statute, Defendants sought to collect, and did collect on usurious, "unlawful debts" under 18 U.S.C. § 1961(6). Specifically, Defendants collected debts incurred in "the business of lending money" where the "usurious rate is at least twice the enforceable rate" under state or federal law. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962. Plaintiff asserts these claims for violation of RICO on behalf of a Class of all Defendants' borrowers nationwide and also on behalf of a Subclass of Massachusetts borrowers.

13.     In the alternative, Plaintiff also asserts a class claim for Defendants' unjust enrichment. Defendants were unjustly enriched by their receipt of payments on the usurious and illegal loans. It would be inequitable for the Defendants to accept or retain the benefit conferred by their unlicensed and usurious lending scheme, namely the

distribution of profits to Defendants as a result of the illegal lending enterprise. Plaintiff asserts these claims for unjust enrichment on behalf of a Class of all Defendants' borrowers nationwide and also on behalf of a Subclass of Massachusetts borrowers.

14.     In a judgment entered against Defendants Martorello and Eventide jointly and severally, the Court should order that Defendants must repay the principal and interest to Ms. Duggan and the Class arising out of the subject loan transactions. Plaintiff further seeks the collection of statutory damages, attorneys' fees, and costs to the extent permissible under state and federal law.

15.     Because Defendants seek to evade liability for their illegal acts by invoking provisions in the loan agreement, Plaintiff also seeks a declaratory judgment that the choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they violate applicable law. For example, the loan agreement seeks to disclaim all federal and state laws in favor of "tribal law." The choice of law, dispute resolution, and class action waiver provisions offer no forum for a just and fair adjudication of Plaintiff's rights and obligations. These unconscionable provisions are unenforceable as a matter of public policy.[6] Additionally, the terms of the agreement are unenforceable because they seek to

---

[6] For example, courts have repeatedly held that similar provisions were unenforceable for violating public policy. *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2nd Cir. 2019) ("Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law. Attempts to disclaim application of federal and state law in an arbitral forum subject to exclusive tribal court review fare no better."); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce

impose tribal law on non-member consumers who are not on tribal land.[7]

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

17.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiff is a citizen of Massachusetts, at least one Defendant is not a citizen of this state, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

18.     This Court may enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202.

19.     This Court has personal jurisdiction over the Defendants because they purposefully directed the lending operation at Massachusetts consumers and with the

---

wholesale the application of any federal law to plaintiffs' federal claims."); *see also Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("[W]e interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*."); *Brice v. Plain Green, LLC*, No. 18-cv-01200-WHO, 2019 WL 1500361 *17-18 (N.D. Ca. March 12, 2019) (finding choice of law provision "wholly unenforceable"); *Rideout v. CashCall, Inc.*, No. 16-02817, 2018 WL 1220565 *6 (D. Nev. Mar. 8, 2018) (in finding arbitration agreement unenforceable, holding that, "Plaintiff cannot, based upon the facts of this case, waive substantive federal rights through a choice of law or forum selection clause."); *Titus v. ZestFinance, Inc.*, No. 18-5373 RJB, 2018, WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018) ("[T]he arbitration agreement here uses a choice of law provision, which, when construed with the other provisions in the Loan Agreement, prospectively waives most federal statutory remedies. Although the language in this case is not as specific as it was in *Hayes*, it implicitly achieves the same results.").

[7] Tribal authority is limited to self-government and control of internal tribal relations. *Montana v. U.S.*, 450 U.S. 544, 564 (1981).

intent of availing themselves of the privileges of doing business in Massachusetts. As detailed below, Martorello designed and implemented the lending model and actively participated in the affairs of the enterprise. Martorello then created Eventide as a conduit for his supervision, control, and profits of the lending business. All of this was done with the intention of furthering a nationwide scheme which took advantage of Massachusetts consumers. Stated differently, the Defendants' management, oversight, and control over the usurious lending practices were undertaken with the intent to make and collect on loans to Massachusetts borrowers. Defendants purposefully availed themselves to the jurisdiction of this Court.

20.     Further, the Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and/or 1965(d). In accordance with 28 U.S.C. § 1965(b), this Court has jurisdiction over Defendants because one or more Defendants have minimum contacts with Massachusetts and the ends of justice require personal jurisdiction over the non-resident Defendants. Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Massachusetts consumers. As part of their scheme, acting in concert with the Settled Defendants,[8] Martorello and Eventide solicited thousands of Massachusetts consumers with direct mail, telephoned Plaintiff and thousands of other Massachusetts borrowers to confirm

---

[8] The term "Settled Defendants" includes Big Picture, Ascension Technologies, James Williams, Jr., Michelle Hazen, Brian McFadden, Henry Smith, Andrea Russell, Alice Brunk, Tina Caron, Mitchell McGeshick, Jeffrey McGeshick, Roberta McGeshick, Roberta Ivey, and June Saad. *See* ECF # 112, Notice by Dana Duggan of Voluntary Dismissal of Settling Defendants.

application information and to arrange electronic banking transactions, entered into thousands of contracts with Massachusetts borrowers in the state,[9] debited Massachusetts consumers' bank accounts through many thousands of banking transactions, and otherwise serviced the illegal loans of thousands of Massachusetts consumers. Such transactions were performed in the name of Big Picture with direction from Ascension Technologies, but the transactions also arose from and involve the participation of all Defendants as a part of the scheme. For example, Martorello through Bellicose Capital and later Eventide created the structure for the marketing and lending to Massachusetts consumers, and they oversee and approve the requisite operations for the lending scheme. This conduct constitutes an actionable conspiracy, and substantial acts in furtherance of the conspiracy were performed in Massachusetts.

21.     The table, attached as Exhibit 2, demonstrates Defendants' and/or their affiliates' lending services to Massachusetts borrowers for a snapshot of time and shows that 787 loans were pending with a total amount outstanding on those loans of $679,022.50. (Exh. 2.) It is undisputed that there have been thousands of such Big Picture

---

[9] Any suggestion that the loans were made at the reservation, rather than in the states where the consumers applied for the loans, has been rejected by other courts. *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2nd Cir. 2019). Big Picture's predecessor, Red Rock, filed suit against the New York Department of Financial Services for declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law, where the borrowers reside and applied for the subject loans. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2nd Cir. 2014). The district court denied Red Rock's request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id.* at 361.

loans to Massachusetts borrowers.

22.     Additionally, independent of this Court's jurisdiction under 28 U.S.C. § 1965, there exists no alternative forum with contacts by the Defendants and Settled Defendants such that a court could have exercised personal jurisdiction over all participants in the usurious lending enterprise. Matt Martorello is a resident of Texas. Martorello's company, Eventide, is a Delaware corporation with its principal place of business in Texas. Big Picture and Ascension Technologies are incorporated under the laws of the LVD. Big Picture's business headquarters is reportedly on the LVD reservation or in the neighboring town of Watersmeet, Michigan, but its principal places of operations are in Mexico and the Philippines. Ascension Technologies' corporate headquarters is reportedly on the LVD reservation or in the neighboring town of Watersmeet, Michigan, but its principal places of operations are in Atlanta, Georgia, the U.S. Virgin Islands, and Puerto Rico. The individual Settled Defendants are residents of Michigan with their contacts in the Western District of Michigan. (Dkt. 100 at 11.) The individual Settled Defendants are/were not subject to personal jurisdiction in a Texas court because they lack the requisite contacts with that jurisdiction. Martorello, on the other hand, is not subject to personal jurisdiction in the Western District of Michigan because he does not reside in or have specific contacts with that jurisdiction. The fact that Martorello owns a company that transacts business with others who reside in the Western District of Michigan does not subject him to suit in that jurisdiction. Similarly, Eventide is not subject to jurisdiction in the Western District of Michigan, because it lacks the requisite contacts with that forum. Because there is no single, alternative forum with

11

contacts warranting jurisdiction over each of the Defendants, including the Settled Defendants, to litigate Plaintiff's and the class claims, the ends of justice justify and require jurisdiction over the non-resident defendants before this Court pursuant to 28 U.S.C. § 1965(b).

23.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) as Plaintiff, Dana Duggan, is a resident of this District and a substantial part of Plaintiff's claims and damages occurred in this Division of the District of Massachusetts. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Through their design, implementation, and control of the nationwide scheme, Defendants have transacted their affairs and actively participated in the lending operation that collected millions of dollars from Massachusetts consumers. In conjunction with the conspiratorial efforts of the Settled Defendants, Defendants solicited Massachusetts consumers with direct mail, debited Massachusetts consumers' bank accounts, and serviced the illegal loans of thousands of Massachusetts consumers. The table, attached as Exhibit 2, demonstrates Defendants' and/or their affiliates' lending services to Massachusetts borrowers for a snapshot in time and shows that 787 loans were pending with a total amount outstanding on those loans of $679,022.50. (Exh. 2.) The Defendants did not contest that this district is a proper venue.

### III.   PARTIES

24.     Plaintiff Dana Duggan is a natural person and resident of Quincy, Norfolk

County, Massachusetts.

25.     Defendant Matt Martorello is a natural person and resident of Dallas, Texas. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Martorello was intimately involved with creating the complete business-ready package of the lending enterprise and related service company. Additionally, through his corporate shells, with Eventide of relevance here, Martorello has supervised and controlled Big Picture Loans and Ascension Technologies. As a result of such efforts, Martorello has made millions of dollars in profits from the predatory lending practices. In furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Martorello does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States. Martorello has entered an appearance in the case and may be served through counsel of record.

26.     Defendant Eventide Credit Acquisitions, LLC is a limited liability company. It was incorporated under the laws of Delaware in approximately February 2015. Based on available evidence, Eventide's principal place of business is in Dallas, Texas. Eventide is owned and managed by Liont, LLC through its president, Matt Martorello. Eventide served as the entity that transferred Bellicose Capital's operations to Ascension Technologies through a complex series of mergers and acquisitions. Through Martorello and almost exclusively for his benefit, Eventide schemed to continue the predatory

lending practices and, as a result, received the overwhelming majority of the profits from the lending enterprise. Eventide continues to oversee and control the illegal business operations, which charge illegal interest to borrowers in Massachusetts and across the United States, so that it may reap all of the net profits as detailed below. In furtherance of the illegal enterprise that defrauds Massachusetts borrowers, Eventide does business in Plymouth County, Norfolk County, and throughout the State of Massachusetts and the United States. Eventide has entered its appearance in the case and may be served through its counsel of record.

## IV.   FACTUAL ALLEGATIONS

27.     Dana Duggan has had two loans from and through the Defendants' lending scheme. From her residence in Scituate, Plymouth County, Massachusetts, she applied online for her first short-term loan on or about October 14, 2017. On or about April 30, 2018, she applied for the second loan from her new residence in Quincy, Norfolk County, Massachusetts.

28.     Ms. Duggan has never been to the Tribe's reservation. She applied for the loans from her residences in Massachusetts. Big Picture representatives sent the purported and fraudulent contract to Ms. Duggan in Massachusetts. Big Picture or Ascension Technologies wired the funds to Ms. Duggan's account in Massachusetts. As a part of Defendants' lending enterprise and conspiracy, Big Picture Loans and/or Ascension Technologies withdrew payments on the illegal loans from Ms. Duggan's bank account in Massachusetts by ACH withdrawal. In furtherance of the lending enterprise and conspiracy, Big Picture and Ascension Technologies had automatic access to Ms.

Duggan's bank account and continued to withdraw money from her account even after they had recouped the principal of the illegal loans and any lawful interest. Other than the administrative entry of details about the completed loan transaction, none of the loan activity actually occurred on the Tribe's reservation. Defendants have extended similar loans to, and collected on the fraudulent debts from, thousands of people in Massachusetts and across the United States.

**A.      Ms. Duggan's October 14, 2017 Loan**

29.     Shortly after completing her first online application, a Big Picture Loans representative called Ms. Duggan, informed her that she was eligible for a $425 loan, and noted that she would be making payments of $191.52 every month.

30.     The Big Picture Loans representative did not explain that the annual percentage rate for her loan would be 596% or that the anticipated finance charges for her loan would be a total of $724.19 (in addition to the repayment of the principal).

31.     During the same call, the Big Picture Loans representative sent Ms. Duggan an email with an internet link that would enable her to complete the loan application process. The Big Picture Loans representative made sure that Ms. Duggan digitally signed the loan document and returned/submitted it before she got off the phone.

32.     The Big Picture Loans representative did not explain the terms of the loan agreement and knew that Ms. Duggan could not have read the six-page document during their short call.

33.     The Big Picture Loans representative was operating under the instruction, direction, and/or supervision of the Defendants.

34.     Ms. Duggan was not aware that, according to the terms of her loan, she was purportedly waiving her rights as a Massachusetts consumer under the loan.

35.     On or about October 14, 2017, Ms. Duggan received a deposit into her account for $425.

36.     Over the next six months, Big Picture Loans deducted monthly payments of $191.52 from Ms. Duggan's bank account and deducted $125.62 for her final payment.

37.     Thus, over a period of approximately six months, Ms. Duggan paid a total of **$1,083.22** for repayment of the **$425** loan.

38.     If the October 2017 loan had been at an APR of 12%, Ms. Duggan would have paid approximately $450 in principal and interest. At an APR of 20%, Ms. Duggan would have paid approximately $468.

**B.     Ms. Duggan's April 30, 2018 Loan**

39.     From her new residence in Norfolk County, Massachusetts, Ms. Duggan received a second short-term installment loan in April 2018, immediately after repaying the first loan. Ms. Duggan received a $775 loan from Big Picture Loans with monthly payments of $366.40.

40.     The Big Picture Loans representative did not tell Ms. Duggan that the interest rate for her loan would exceed 535%, and the loan agreement was not explained to her, nor was she informed that the agreement would attempt to set aside her rights under Massachusetts law.

41.     The Big Picture Loans representative was operating under the instruction, direction, and/or supervision of the Defendants.

42.     Before initiating this suit, Ms. Duggan paid a total of $875 on the $775 loan.

43.      Big Picture Loans currently claims that Ms. Duggan owes $719.06 on the $775 loan. However, the account balance is premised on inaccurate data about payments that Ms. Duggan has made on her account. Big Picture Loans calculates that Ms. Duggan has paid $1,099.20, which is $224.20 more than she has actually paid as of the filing of this lawsuit.

44.     Ms. Duggan's bank credited her with two payments that were deducted from her account by Big Picture Loans, each for $366.40.

45.     On August 31, 2018, Ms. Duggan sent a payment of $508.60, which is not yet reflected on her Big Picture Loans account statement.

## V.     CLASS ALLEGATIONS

### A.     Massachusetts Licensing Requirements, Consumer Protection Statutes, and Equitable Considerations Protect Massachusetts Residents from Defendants' Predatory Lending Practices

46.     The Commonwealth of Massachusetts has taken aggressive measures to protect Massachusetts residents from predatory lending practices.

47.     Under the Massachusetts Small Loan Act, no person may directly or indirectly engage in the business of making loans of $6,000 or less, unless the APR does not exceed 12% percent or unless the person is issued a lending license by the commissioner of banks. M.G.L. c. 140, § 96.

48.     Any loan made without the requisite license is void, and the lender has no right to collect, receive, or retain any principal or interest. M.G.L. c. 140, §§ 96, 110.

49.     To effectuate the purposes of Massachusetts law, it is mandatory that the

loan by an unlicensed lender must be held void:

> Where the loan is by an unlicensed lender, the loan itself, and not merely the excessive interest offends the statute in respect to its goal to prohibit the unlicensed business of making small loans. The loan is invalid because the lender was precluded by law from making it. Such a lender cannot profit by his criminal conduct, and he is entitled to no return on his asset.

*Beach Assocs, Inc. v. Fauser*, 9 Mass. App. Ct. 386, 391, 401 N.E.2d 858, 862 (1980) (internal quotation omitted).

50.     Massachusetts courts have long recognized that the Small Loan Act does not permit predatory lending practices to take advantage of Massachusetts borrowers. *See, e.g., Cuneo v. Bornstein*, 269 Mass. 232, 236, 168 N.E. 810, 811 (1929) (noting statute's purpose is "to prohibit the unlicensed business of making small loans and to prevent an excessive rate of interest on such loans" and noting that the "statute was passed as a protection to the borrower").

51.     The charging of excessive interest serves as additional grounds for rendering the subject loan void and uncollectible. The contracting for, charging, or receipt (directly or indirectly) of interest and expenses that exceed an APR of 20% of the sum loaned constitutes criminal usury unless the lender/recipient has notified the Massachusetts Attorney General of its intent to make such a loan and abides by other restrictions not applicable in this case. M.G.L. c. 271, § 49(a), (d).

52.     When a lender/recipient commits criminal usury by its collection of excessive interest charges, the Court has discretion to invalidate the entire loan, including the repayment of principal as well as interest. M.G.L. c. 271, § 49(c).

53.     Even in the absence of Massachusetts consumer protection statutes, it is

well-established that unlicensed and usurious loans made under the guise of a legal enterprise are void. *Thomas v. Burnce*, 223 Mass. 311, 312, 111 N.E. 871, 873 (1916) (noting "courts of equity will grant relief against usurious contracts no matter what may be their form, and will permit no shift or devise of the creditor to shield him in taking more than legal interest on a loan").

54.     "Illegality, such as usury, is sufficient ground to justify application of the equitable remedy of cancellation of the contract." *Bernhardt v. Atlantic Fin. Corp.*, 311 Mass. 183, 187-88, 40 N.E.2d 713, 715 (1942). "The whole transaction was tainted with illegality[.]" *Id.*, 311 Mass. at 188, 40 N.E.2d at 716. "From considerations of public policy the [borrower] is not regarded as standing *in pari delicto.*" *Id.*

55.     The Defendants' payday loan contracts, which purport to waive the protections of these statutes, and of other laws or regulations which protect consumers' health, safety or welfare violate the statutory prohibition on such waivers contained in M.G.L. c. 93 § 101.

56.     Also, the Defendants' practices described in this complaint violate the most basic precepts of Chapter 93A.

**B.     Overview of Defendants' Enterprise**

**1.   The predecessor operations**

57.     Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The*

*Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

58.     Defendant Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and making high interest loans to desperate and vulnerable consumers, many of whom are Massachusetts residents.

59.     Through Bellicose Capital and its subsidiaries, Martorello established a rent-a-tribe business model with the Tribe, which began doing business as Red Rock. The declaration of Joette Pete, attached as Exhibit 3, addresses in detail the origins of the businesses and the absence of Tribal involvement. From the outset, the lending operation was structured to ensure Martorello's control of all material aspects of the lending business through Bellicose, a loan-servicing company which was the predecessor of Defendant Ascension. This lending enterprise was formed with no meaningful involvement of the Tribe, the Tribal Council, or Tribe-affiliated co-managers. (Exh. 3, Pete Declaration, at ¶¶ 2-4, 6-8.)

60.     In August 2011, the Tribe's lawyer and Martorello structured the business with only nominal tribal involvement through "co-managers" of the business: "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS.' THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." (Exh. 4, email exchange, at 52498 (caps in original).) "THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." (*Id.* (caps in original).) The purpose of this "cornerstone of the sovereign model" was to create the illusion of tribal oversight and also to falsely portray "loan

originations" as those of a tribal lending entity. (*Id.* at 52497.) Based on this framework, the corporate structures for the initial Tribe-affiliated lending operations, Red Rock and Duck Creek Tribal Financial, LLC ("Duck Creek") were drafted soon thereafter.[10]

61.   Red Rock and Duck Creek entered into servicing agreements with Bellicose, which Martorello owned and controlled.[11] Under these agreements, the tribe-affiliated entities received only two percent of the net revenue from the lending operations. (Exh. 5, Am. & Restated Serv. Agmt., at § 2.25.) Martorello's companies received the remaining 98% of revenue, as well as reimbursement for all advances and expenses. (*Id.*, §§ 2.22, 3.5.1.) From January 1, 2014 through August 31, 2015, the lending enterprise generated a net profit of $161.9 million. The lion's share of these profits went to Martorello and his investors, whom he had attracted with promises of 30% returns. Red Rock and the Tribe received less than $3.2 million dollars after payment of brokerage fees.

62.   Martorello's companies were contractually entitled to exercise pervasive control over Red Rock's operations. For example, a Bellicose affiliate operating in the U.S. Virgin Islands, SourcePoint VI, LLC ("SourcePoint"), had exclusive control over communications and dealings with service providers, lenders, and agents of Red Rock.

---

[10] On September 14, 2011, a month after approving TLM as its consultants, the Tribe established Red Rock. On October 25, 2011, the Tribe approved the creation of the company that later became known as Duck Creek.

[11] Duck Creek entered into a Servicing Agreement with Bellicose VI, LLC, a Virgin Islands subsidiary of a Delaware limited liability company, Bellicose Capital, LLC, which was owned and managed by other Martorello entities. Bellicose VI, LLC assigned its rights under the contracts to its affiliate, SourcePoint VI, LLC, another Virgin Islands subsidiary of Bellicose Capital, and the servicing agreements were amended to reflect the new business relationship. (Exh. 5, Am. & Restated Serv. Agmt. at 1470.)

(*Id.*, §§ 3.1, 4.2.1.) SourcePoint also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]." (*Id.*, § 4.9.) To exercise its control over the funds, SourcePoint held the "sole signatory and transfer authority over [Red Rock's] bank accounts" with a contractual right to "sweep" the funds from Red Rock's account. (*Id.*, §§ 3.5, 4.4.) Additionally, a restrictive covenant prohibited Red Rock from providing financial services "anywhere in the world" without SourcePoint. (*Id.*, § 3.3.) Martorello ensured that SourcePoint would not share with Red Rock or the Tribe's counsel the "intellectual property" of its handling of vendor agreements, analytics, or even the direct mail campaigns that were sent out in Red Rock's name.

63.     To create a misleading appearance of tribal control, the servicing agreement nominally designated Red Rock with the "[f]inal determination as to whether to lend to a consumer" and the ability "to approve the issuance of loans to the third parties." (*Id.*, § 4.1.) However, Red Rock's final approvals were based on pre-determined underwriting criteria established by SourcePoint, which handled the credit-modeling and risk assessment strategies. (*Id.*, § 4.2.1.) The decision whether to lend, therefore, was predetermined, and Red Rock's role was reduced to rubber-stamping, euphemistically termed "final verification," of the loan agreements. As addressed below, this "final verification" continues to be the primary and almost exclusive task that Big Picture's employees perform. Red Rock's nominal "co-managers," Tribe members Michelle Hazen and James Williams, lacked even the most basic knowledge about the lending operations. Reflecting on four years of the lending operation, Martorello noted that "[a]s far as I

know, the [Tribe-affiliated managers] don't really do anything." (See Exh. 6, email exchange, at 43978.) This is consistent with former Vice Chairwoman Joette Pete's declaration, attached as Exhibit 3.

64.     Although the Tribe held itself out as the actual lender, the Tribe is merely a front. The Tribe allowed Defendants to use its name and, in return, received a nominal percentage of the revenue.[12] Bellicose Capital provided the infrastructure and investment capital to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

65.     Moreover, nearly all activities performed on behalf of Red Rock were performed by officers and employees of Bellicose Capital, now Ascension Technologies, who were located outside the Lac Vieux Reservation. Bellicose Capital employees were located in the Virgin Islands and Puerto Rico, and they contracted for a call center in the Philippines.

66.     Bellicose Capital handled the lead generation used to identify and solicit potential consumers.[13] Bellicose Capital's lead generation procedures were developed by

---

[12] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("[Matt Martorello's] company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue….").

[13] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. *Pew Charitable Trust, Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/-

Martorello.

67.     If a consumer called the number on Defendants' marketing materials, he or she would reach a call center in the Philippines, which took direction and instructions from Bellicose Capital and not the Tribe. A second call center was later opened in Mexico.

**2.     Growing state and federal resistance to tribe-affiliated internet lending led Defendants to restructure the business operations.**

68.     As early as November 2012, Martorello knew that the tribal payday lending business's days were numbered, writing "this industry is going to be living in the grey area of its legality for another year or two," as they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." (Exh. 7, email exchange, at 38991.) In his view, there was "no business with such risk to it," and the "bottom line" was that "this business will simply not exist in 2 or 3 years." (*Id*. at 38991-92.) In addition to the monetary risks, Martorello acknowledged that his legal counsel had advised him that he could be liable for "aiding and abetting felony crime[s]." (*Id*.)

69.     In August 2013, Red Rock received a cease and desist letter from the New York Department of Financial Services ("DFS") asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement

---

/media/assets/2014/10/payday-lending-report/ fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf (last visited August 23, 2018). Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id*.

action. (Resolution No. T2013-054 of the Tribe, 2 (ECF 28-12).) Weeks later, Red Rock and the Tribe filed suit against the DFS seeking to enjoin the State from its regulation of the tribe-affiliated lending enterprise. *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*, 974 F. Supp. 3d 353, 357 (S.D. N.Y. 2013), *aff'd* 769 F.3d 105 (2nd Cir. 2014). Noting that the DFS has a right to protect its consumers from predatory loans in New York, the district court found that the lending operation that "the State seeks to regulate is taking place in New York, off of the Tribes' lands." *Id.* at 361. Further, the court found that the tribe-affiliated companies "are subject to the State's non-discriminatory anti-usury laws." *Id.* Because Red Rock and the Tribe "failed to demonstrate a likelihood of success on the merits or even a sufficiently serious question going to the merits of their underlying claims," the district court denied the injunctive relief. *Id.* The Second Circuit affirmed the district court's findings. *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*, 769 F.3d 105, 117-18 (2nd Cir. 2014).

70.     The loss in *Otoe-Missouria* was not the only problem for Martorello's scheme.[14] As Martorello noted, the risk of "class actions" and "personal threats of enforcement actions against individuals by regulators" has "everyone spooked," causing "several of the biggest servicers" to "shut down." (Exh. 8, email exchange, at 45573.)

---

[14] See, *e.g.*, *In Re Cashcall, Inc.*, 2013 WL 3465250, at *1 (NH Banking Dept. 2013) ("it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."); *Consumer Fin. Protection Bureau v. CashCall, Inc.*, No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013); *In re Moses*, No. 12-05563-8-RDD, 2013 WL 53873, at *4 (Bankr. E.D.N.C. Jan. 3, 2013).

Additionally, changes to CFPB rules and litigation, FTC enforcement actions, and growing pressures on banking institutions threatened to close the tribal lending industry. (See, *e.g.*, Exh. 9, email exchange, at 44602 (noting "the 'end' is always around each corner with the FTC and CFPB and the banks/ACH providers getting heavily influenced to stop serving lenders").) Meanwhile, state attorneys general sent more than a dozen warnings to Red Rock threatening enforcement action. In January 2014, the U.S. Department of Justice announced a consent decree with a major ACH provider, which the Tribe's counsel described as "the most disastrous result we have seen yet"; this caused the lending operation to lose its only ACH processor. (Exhs. 10 & 11, emails.)

### 3. Seeking to bolster his deficient claims to "tribal sovereign immunity," Martorello nominally transferred ownership in Bellicose to Ascension while keeping the same fundamental business structure.

71.     In the wake of the district court's *Otoe-Missouria* opinion, Martorello recognized the risk of "significant liability" and the "potential investigation and prosecution of us personally." (Exh. 12, email exchange, at 6304-05.) Martorello forecasted that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims." (Exh. 13, email exchange, at 52787.) Instead of complying with the law, however, Martorello attempted to paper over his operation so that he could retain control of the usurious lending enterprise, continue to reap most of the profits, and only nominally surrender corporate ownership of the lending services provider to present a misleading appearance of tribal control. Two weeks after the district court's opinion in *Otoe-Missouria*, Martorello proposed to the Tribe's counsel that the Tribe take ownership of Bellicose through a new

entity—the entity that is now Defendant Ascension. (Exh. 14, email.)

72.    In what would become the central theme of one-sided negotiations, Martorello proposed that the Tribe take a "controlling interest" in the company but Martorello would receive "100% profits" for over four years, *i.e.* a period longer than the business model was projected to survive. (*Id.*) The Tribe's counsel then circulated a legal memorandum on the nominal transfer to evaluate whether the proposal would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." (Exh. 15, email exchange, at 52248; *see also* Exh. 16, email, at 48497 ("Let's zero in asap on minimizing my risk for being individually liable….").) In other words, the entire purpose of the restructuring was to allow Martorello to continue to receive the overwhelming majority of the profits while using tribal sovereign immunity to shield the usurious business practices from litigation and enforcement actions. (See, *e.g.*, Exh. 14, email (noting that the business would be ostensibly "structured to provide all entities sovereign immunity").)

73.    The other theme for Martorello's restructuring of the business was that management of the enterprise was going to remain "status quo," explaining "[a]ll the investors (institutional, personal, and myself) won't allow the deal to occur without being 100% certain adequate Management resources are in control," implying that management could not rest with the Tribe, but instead needed to remain with Martorello and his team. (Exh. 15, email exchange, at 052247.) Thus, Martorello, not the Tribe, was the central driving force behind this restructuring of the business so that he could continue to maximize his profits from the illegal lending enterprise.

**4.   Martorello re-branded Red Rock as "Big Picture Loans" to avoid negative publicity from the government actions against Red Rock.**

74.     During the same time period that he was calling for the restructure of Bellicose as Ascension, Martorello also proposed that the tribal lending entity, Red Rock d/b/a Castle Payday, be rebranded "Big Picture Loans" and restructured with a new image. Martorello explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. (Exh. 17, email exchange, at 58409.) He further added that "it's time to get away from the word 'payday' and the black mark of RRTL before rules come out and things get hotter." (*Id*.) Thus, he suggested "forming ASAP a new LLC with a new domain/brand." (*Id*.) If the Tribe would create the entities, Bellicose would "facilitate the work." (*Id*.)

75.     Martorello was the source of the "Big Picture Loans" brand and business model. Roughly one year earlier, Martorello had developed the "Big Picture" brand with a plan to launch the lending business on behalf of the Fort Belknap Indian reservation. Martorello already had fully developed the brand, logo, and website. (Exh.18, email and Site Designs screenshots, at 43438-57.) On August 25, 2014, Martorello introduced the Tribe's counsel to "BigPictureLoans.com," which is "another really great brand with just as much energy, money and time spent into developing." (*Id*. at 43437.) The Tribe's counsel deferred to Martorello's choice of "Big Picture Loans" as the new Tribe-affiliated lender. (*Id*. at 43435.) The next day, the Tribe's counsel presented articles for organization and an operating agreement for "Big Picture Loans." The Tribe merely rubber-stamped its approval of Martorello's proposal and his developed brand.

**5.    Following the restructuring of Bellicose as Ascension and Red Rock as Big Picture, the Tribe continued to receive only a small portion of the profits.**

76.    Martorello's strategy was to nominally divest himself from the lending enterprise in a seller-financed transaction but use highly restrictive loan covenants and inflated "loan repayments" to in effect maintain control of the enterprise and continue to reap the vast majority of the profits. To make the scheme work, Ascension, the new loan-servicing entity nominally owned by the Tribe, had to vastly overpay for Bellicose Capital. Bellicose was worth, at best, a small fraction of the value of the lending enterprise. In a valuation of Bellicose entities in July 2014, which was the time period during which Martorello and the Tribe were negotiating the restructuring, an independent accounting firm valued Bellicose Capital and its subsidiary, Sourcepoint, at $11.7 million.

77.    Martorello, however, engineered a transaction which valued Bellicose at $300 million. (Exh. 19, Agmt. & Plan of Merger, § 2.7 at 12514; Exh. 20, Sale of Bellicose Capital, LLC.) Essentially, he secured the Tribe's agreement to pay Eventide and him far more than Bellicose could ever have been sold for in an arm's-length transaction, especially for a business that was on the brink of being shut down by government regulators and law enforcement authorities. Martorello repeatedly addressed the risks of immediate closure that would render the business valueless. (Exh. 21, email, at 9845-46 (listing reasons business has low fair market value); Exh. 22, email exchange, at 5530-31 (addressing governmental efforts to "shut down tribal lenders"); Exh. 23, email exchange, at 5387 (acknowledging risks that "may end the business or seriously shrink the

business"); Exh. 24, email exchange, at 11671 (noting "end of days").) The Tribe conducted no independent valuation of the company. Instead, the Tribe accepted Martorello's valuation based on his projections of the profits of the entire lending enterprise through six years of operation (despite the likelihood that the business would fail within six years and overlooking the fact that Bellicose Capital itself was just a servicing entity and not the entire lending operation).

78.     Martorello nominally "sold" Bellicose and its subsidiaries, including SourcePoint, to Tribe-affiliated companies created to facilitate the transaction, including Tribal Economic Development Holdings, LLC ("TED"), LVD Tribal Acquisition Company, LLC ("TAC"), Big Picture, and Ascension. Martorello also created a new company, Eventide, a Delaware company 85% owned by him, as a vehicle for him to receive payments from the transaction. (Exh. 25, Operating Agmt. of Eventide Credit Acquisitions, LLC). TAC acquired Bellicose and its affiliates, and TED subsequently acquired TAC through a $300 million promissory note to Eventide. (Exh. 19, Agmt. & Plan of Merger, § 2.7 at 12514; Exh. 26, Promissory Note).

79.     Martorello intentionally introduced additional layers of complexity into the transaction in an effort to shield the new entities from liability for their blatant disregard for state usury laws. For example, Defendants created TAC as a vehicle to insulate TED from the legal consequences of merging with Bellicose. Defendants created TAC because acquiring Bellicose, a Delaware corporation, would subject TAC to Delaware's laws for consolidating businesses. But after the acquisition, TAC assigned the acquired assets to TED so that it "never had a direct nexus with [Delaware] and the tribal entity that does

is immediately dissolved." TAC was also designed so that the successor entity would never have a direct nexus with Bellicose or SourcePoint, which Martorello hoped would shield the Tribe from any pre-acquisition claims against Bellicose and SourcePoint. (Exh.27, email re: sale model, at 876 (noting that TED would serve "as additional layer of protection from liability for the Tribe").)

80.     As an initial result of the reconfiguration of Bellicose as Ascension, the Tribe, through TED, contracted to receive two percent of the gross revenue (reduced by "bad debt") plus a no-interest reinvestment of an additional two percent. (Exh. 26, Promissory Note, at § 1.2(a)-(b)(1).) Thus, TED and Eventide's financial relationship initially mirrored the financial payments involving Red Rock and Sourcepoint. (*Id.* at § 1.2(b)(2).) In fact, the Tribe-affiliated entities initially projected that its income from Big Picture would be no more than what it had been projected to make through Red Rock; the change in the operational structure served only to maintain the status quo.

81.     On January 1, 2017, the parties entered into an addendum to the Promissory Note, amending the "monthly distribution to the Tribe" to "three percent of the Gross Revenues." On August 13, 2018, after the Eastern District of Virginia issued its opinion noting the paltry distributions to the Tribe as evidence that Big Picture was not entitled to tribal sovereign immunity, Eventide agreed to restructure the deal so that the Tribe could receive six percent of the gross revenues and eliminated the reinvestment requirement. After payments from the gross revenues, Eventide receives all of the net revenue of the lending business. Despite Eventide's agreements to increase Tribal distributions in order to improve the optics of the lending enterprise, Eventide received

**83.5%** (**$43,116,468.52**) of Big Picture's revenue from February 2016 through April 2019. (Exh. 28, accounting spreadsheet, at 3213.) Only $8,511,290.63 (16.5%) was distributed to the Tribe. (*Id.*)

82.     This restructuring of Bellicose Capital as Ascension, therefore, did not change the fundamental substance of the lending operation: Martorello, now using Eventide as the vehicle for his profit-taking, continued to reap all of the net profits from the lending operation and continued paying the Tribe only as much as might be necessary to attempt protection of the illegal enterprise through an anticipated sovereign immunity defense. Martorello and the Tribe hoped that these superficial changes to the form of the operation—*characterizing Martorello's interest as debt rather than equity*—would insulate them from liability for their ongoing blatant violations of state and federal lending laws. In truth, Martorello, through Eventide, continued to control the operations and receive all of the net revenue of the lending operation – nothing changed.

**6.     Martorello and the Tribe had no reason to believe or intend for the lending operations to continue through the seven-year payment term; the lending operations were only intended as a short-term source for revenue.**

83.     Over the course of negotiations in the summer of 2014, Martorello and the Tribe negotiated a seven-year term for payout on the agreement with the expectation that regulatory actions and other litigation would bring the tribe-affiliated lending enterprise to a conclusion long before seven years of payments. Any suggestion that the Tribe negotiated the restructuring of the business so that it could "own" the tribal servicing entity overlooks the fact that the that the lending operations were never expected to survive until 2023.

84.     In an independent valuation effective July 2014, an accounting firm employed by Martorello concluded that the tribe-affiliated payday lending industry "would not be able to operate in a sustainable manner beyond the next few years." In fact, due to "increasing regulatory pressure," Sourcepoint's operations were expected to be "loss making" and "shut down" by December 2016.

85.     In a subsequent report effective June 2015, the accounting firm noted that Bellicose Capital faced "an imminent liquidation." For that same time frame, a second independent accounting firm determined that Bellicose Capital was likely to "cease operations at the end of 2019" due to FTC regulatory pressures and anticipated changes to CFPB rules.

86.     Even as regulatory actions evolved in early 2016, an independent accounting firm noted effective January 2016 that the CFPB "could enforce actions on [tribe-affiliated lending entity] financiers over the next five years." Finally, in addition to the subject suit, lawsuits against Tribal officials present a threat to the future of the enterprise.[15] In other words, Martorello and the Tribe knew, or should have known, that

---

[15] *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 785 (2014) (permitting "legal actions against the responsible individuals" and "suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction"); *Ex Parte Young*, 209 U.S. 123 (1908) (holding that plaintiffs may seek prospective, injunctive relief in suit against state government officials for violations of federal law); *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2nd Cir. 2019) ("[The tribe-affiliated lender] is a payday lending entity cleverly designed to enable[] Defendants to skirt federal and state consumer protection laws under the cloak of tribal sovereign immunity. That immunity is a shield, however, not a sword. It poses no barrier to plaintiffs seeking prospective equitable relief for violations of state or federal law. Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law."); *Alabama*

the business model would never operate independent of Martorello and would not survive beyond Martorello's seven years of receiving the vast majority of profits.

### 7. Martorello, Eventide, and Ascension's non-tribal executives kept control over the lending operations.

87.     During negotiations to restructure the business with the creation of Ascension, Martorello noted his intent to continue controlling the operations: "the seller [Eventide/Martorello] will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." (Exh. 29, email exchange, at 45272.) Indeed, Martorello made it clear that the corporate restructuring would only result in cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive." (*Id.*) Martorello insisted that existing management remain in place with "the company remaining substantially the same" so that it would continue "to be run in the same format it is today." (See, *e.g.*, Exh. 30, email, at 40179.) Martorello insisted that he and his business interests, which became Eventide, control business decisions for the benefit of the company and its investors – noting "take it or leave it." (Exh. 31, email exchange, at 43996.)

### 8. Ascension operates without Tribal involvement.

88.     Ascension and Big Picture were structured to create the appearance of tribal control, but such control is merely illusory. Two Tribe members are designated as "co-managers" of the business, but they are unpaid positions with no day-to-day control over

---

*v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) (holding that "tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands").

the business. Other than changing the name and the jurisdiction of formation, Ascension continues to operate in the same manner and by the same individuals who ran Bellicose—none of whom are members of the Tribe on the reservation. Further, the Tribe admittedly has "no involvement" with the day-to-day operations of Ascension.

### 9.   Ascension handles the majority of Big Picture's operations.

89.    Ascension is the backbone of the enterprise, with control over the fundamental operations of Big Picture and the lending business. Through the Intratribal Servicing Agreement, Big Picture relinquished to Ascension the right to control the vast majority of the responsibilities for its operation. (Exh. 32, Intratribal Serv. Agmt.) Ascension performs all accounting, marketing, compliance, risk and analytics, information technology, call center monitoring and training, vendor identification, contract negotiations with vendors, and assistance with the solicitation of investors. By extension, given Eventide's and his control over Ascension, Martorello had control over the entire lending operation.

90.    Because of Eventide's de facto control of Ascension, Defendants designated Ascension to handle the vast majority of responsibilities associated with Big Picture's operations—no different than the relationship between SourcePoint and Red Rock. (See generally, Exh.32, Intratribal Serv. Agmt.) Indeed, Ascension and Big Picture entered into an "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. (*Id.*, compare with Exh. 5, Am. & Restated Serv. Agmt., at § 4.2.1.) This agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated

responsibilities previously designated to SourcePoint. (Exh. 32, Intratribal Serv. Agmt. at § 4.2.1; compare with Exh.5, at § 4.2.1.) Further, TED cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million promissory note. (Exh. 33, Loan & Security Agmt., at § 5.12.)

91.     Eventide and Ascension also control the process for distributing the money to the Tribe. As in the prior structure, Big Picture assigned the right to control its bank accounts to McFadden and Liang, non-tribal members who are close associates of Martorello. At the end of every month, Liang performs the accounting and then e-mails detailed spreadsheets Martorello for his approval of the monthly distributions. In these emails, Liang consistently writes "[w]ith your approval, the following fund transfers will be initiated" and lists the amounts to be transferred to TED, Eventide, and Big Picture.

**10. Martorello and Eventide manage the lending operations of Ascension Technologies and Big Picture through Brian McFadden.**

92.     Martorello installed his childhood friend, Brian McFadden, as a surrogate to handle the day-to-day operations of Ascension. Martorello and McFadden had been friends since riding bicycles together in the fourth grade. Martorello insisted that Ascension be operated by McFadden, due to the fact that "[l]enders care about the person who runs the business." (Exh. 6, email exchange, at 43978 ("Brian was appointed at Matt [Martorello]'s direction as President.").) McFadden had been serving as the president of Bellicose under Martorello's direction, and his management responsibilities did not change as he transitioned to his role as president of Ascension. McFadden plays an integral part of the financial underwriting, collections, the data analytics for the lending

operations, vendor management, employee management, and direction of the company.

93.     Under the Loan Agreement, Martorello, through Eventide, holds authority to approve or reject replacement of McFadden as the president of Ascension. (*See* Exh. 33, Loan & Security Agmt., at § 5.14.) Eventide also has the authority to approve five percent increases in Ascension's budget, which can materially affect McFadden's salary at Ascension. For example, in August 2016, when Martorello felt that McFadden was "getting too big for [his] britches," Martorello noted that Eventide would not "support a crazy bonus package" for McFadden – "$1mm a year buys a lot of very capable replacements."

94.     Also, McFadden is a two percent owner of Eventide, so he has a financial incentive to maximize the payments to the company. (Exh. 25, Eventide Operating Agmt., at 4598.) If Martorello is not satisfied with McFadden's performance, Martorello holds the unilateral right to buy-out McFadden's interest in Eventide. (*Id.* at § II(I).)

95.     In a contractual Delegation of Authority Policy, which was executed to divest the Tribe of control over Ascension, non-tribal member McFadden is empowered to: (1) handle Ascension's "strategic direction, goals and targets," (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs, and (5) "authority regarding all matters necessary for the day to day management of Ascension." (Exh. 34, Delegation of Auth. Policy, at § 1.4(a)-(e).) McFadden also possesses the exclusive authority to handle "verbal communications with media, regulatory bodies, or other entities" and must approve any written communications with the media, regulatory bodies, and other entities. (*Id.* at § 3.1-3.2.)

McFadden has authority to operate and control the company with no tribal oversight except approval of contracts (1) with annual expenditures of over $100,000, (2) that adopt a new major employee benefits plan, or (3) waive the Tribe's sovereign immunity. (*Id*. at § 1.2.)

**11. Through Eventide, Martorello exercises control over Big Picture's and Ascension's business operations.**

96.     Additionally, despite the nominal sale of the business operations, Martorello, through Eventide, continues to control the lending enterprise. Big Picture and Ascension Technologies cannot terminate or replace any manager, director, or officer of the companies without Eventide/Martorello's consent. (Exh. 33, Loan & Servicing Agmt., § 5.14.) This means that Ascension or its Tribe-affiliated "managers" cannot replace Brian McFadden; this further solidifies Martorello's control over Ascension. Likewise, Martorello, through Eventide, must consent in order for Big Picture and its affiliated companies to amend, modify, or terminate the servicing agreement with Ascension Technologies. (*Id*. at § 5.12.) Also, Big Picture, Ascension Technologies, and their affiliated companies cannot dissolve, modify, or amend their articles of organization or operating agreement without Eventide/Martorello's consent. (*Id*. at § 5.15.)

97.     Eventide granted Big Picture permission to relocate its office, and similarly, Ascension had to have Eventide's permission to open its Atlanta office. Ascension has to ask Eventide's permission for the creation of new employment positions within the company. If Big Picture proposes to take on new debt or investors, it needs Eventide's consent. Perhaps most importantly for this litigation, if Big Picture or Ascension were

interested in making large changes to their business model, such as lowering interest rates to within the legal limits under states' laws, they would need Eventide's permission.

98.     Eventide (*i.e.*, Martorello) must approve any changes to Big Picture's budget, if it seeks to make a change that would increase labor costs by more than five percent (5%); similarly, any expansion of the lending enterprise must be approved by Eventide/Martorello. (Exh. 26, Secured Promissory Note, § 1.2(b)(4)(b).) Further, Big Picture, Ascension, and their corporate holding company have a fiduciary duty to maximize the cash flow to Martorello, through Eventide. (*Id.*)

99.     Martorello also remained involved in operations even after he created the corporate fiction of Eventide to oversee the operations. For example, in February 2016, after the restructuring and Martorello's purported sale of Bellicose for the formation of Ascension, Martorello remained involved in the business. Concerned that tribe members should object to being used as a rented sovereign, the Tribe's Vice Chairwoman, Joette Pete-Baldwin, had "rallied support that it is 'rent a tribe' in the community." Martorello got involved to work on a "community outreach message" to quiet the Tribe members' apparent unhappiness with the Tribe's limited control and lack of benefits to the community. (See also Exh. 3, Pete Declaration.)

100.     Recent correspondence between counsel for the Tribe and Eventide demonstrate Eventide's efforts to exercise pervasive control over the lending operation. A nationwide group of plaintiffs, including Plaintiff Dana Duggan, reached a settlement with Tribe-affiliated persons and entities (and others); the settlement did not include a resolution of the claims against Martorello, Eventide, or affiliated parties. Among the

terms of the settlement, Big Picture and the other Tribe-affiliated entities agreed to release past due debts and to reduce the interest collected on pending debts. Defendants Eventide and Martorello attempted to object to and impede the terms of the settlement. (Exh. 35, Objection of Eventide.) By letter dated December 12, 2019, Eventide's counsel asserted to the Tribe's general counsel that the Tribe or its affiliated entities are in material breach of their contracts with Eventide. (Exh. 36.) Specifically, Eventide claims that it has numerous controls and related rights to oversee Big Picture's and Ascension's business operations based on the terms of the subject Secured Promissory Note, the Loan and Security Agreement, and the Parental Guarantee. (*Id.* at 3-12.) In response, the Tribe's counsel wrote that Eventide was demonstrating efforts to serve "as the *de facto* lender" and to "unduly exert control of Big Picture." (Exh. 37.) According to the Tribe, Eventide's "exercise of the remedies Mr. Martorello seeks will cause the complete destruction of Big Picture's business and expose your client to a civil RICO claim." (*Id.*)

### 12. Operations of Ascension Technologies

101.     And while it is now purportedly organized under the laws of the Tribe, Ascension Technologies continues to operate in the same manner and with several of the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

102.     Ascension Technologies operates under the direction and control of its president, Brian McFadden. Despite the service of two Tribe members as co-managers of Ascension Technologies, the Tribe does not participate in the day-to-day operations of Ascension Technologies, and the activities associated with Ascension Technologies occurred off the Tribe's reservation, such as the office management, technology services,

business development, internet marketing, call centers, payment processing, and most of the servicing of the loans.

103.    None of Ascension Technologies' employees are members of the Tribe. Nearly all of the activities of Ascension Technologies, and thus Big Picture, are performed by non-tribal members who are located off the reservation.

**13.  Operations of Big Picture Loans**

104.    Ascension Technologies provides all necessary services for Big Picture's operations, including consulting services, analytic services, business management, as well as the management of communications and interactions with Big Picture's vendors, commercial finance providers, and "other agents" of Big Picture. (Exh. 33, Intratribal Serv. Agmt. Between Big Picture & Ascension, §§ 3.1, 4.1, 4.2.1.

105.    Big Picture Loans employs few Tribe members, who perform little more than administrative tasks at near-minimum wage. Other than Michelle Hazen, Big Picture's current tribal employees are all customer service representatives with two main responsibilities. First, they perform a final verification of the applicant's information in the loan agreement, and absent any issues, they type in the date to disburse the funds, which causes the loan proceeds to be electronically sent to the consumer. Second, the customer service representatives respond to consumer emails.

Contrary to claims that loans originate on the reservation, loans are handled by automated processes with customer support from call centers in Mexico and the Philippines. Loan applications originate on the internet and are evaluated by an automated process. If a prospective borrower has a question about lending services, the

telephone number on the company website rings at a third party's call center in Mexico or the Philippines; quality control of the call center is handled from the Virgin Islands. After automated review of the application, customers receive a computer-generated email that their loan application has been accepted. After that acceptance, customer service representatives, which may involve Big Picture's 17 employees on the tribal reservation, briefly review 10,000 applications per month to confirm that the application was completed correctly. There have been in excess of 200 customer service representatives handling calls and account verification outside of the country, which contrasts to the 17 representatives working on tribal land. If additional information is needed, which is most likely to involve incomplete banking information, the application is returned to the call centers so that someone in the Philippines or Mexico can get additional information and complete the documentation. The loan agreements are then generated by computer software. For loan applicants, such as Ms. Duggan, Big Picture employees on tribal lands have no part in the pre-screening of the loans, the marketing of the loans, or even customer support in execution of the loan agreement. Big Picture's only role in the commencement of any loans is to administratively type and review information already provided by the borrower. Any questions about the application are handled from a call center in the Philippines that is supervised by personnel in the Virgin Islands and possibly Puerto Rico.

**C.      Defendants' Lending Practices Violated Massachusetts Law**

106.    At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that Massachusetts law prohibits unlicensed

lenders from making loans for less than $6,000 at interest rates exceeding 12 percent. M.G.L. c. 140, § 96.

107.    At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that any loan made to Massachusetts borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. c. 140, § 110.

108.    Defendants have never applied to the Massachusetts Commissioner of Banks for a license permitting them to make loans to Massachusetts borrowers.

109.    The Tribe has never applied to the Massachusetts Commissioner of Banks for a license to be a lender to Massachusetts borrowers.

110.    Defendants have never had a consumer finance license permitting them to make loans to or receive payments from Massachusetts borrowers.

111.    Accordingly, the loans to Massachusetts residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiff.

112.    At the time that Big Picture Loans made its purported loans to Ms. Duggan and the Subclass, Defendants were aware that Massachusetts law prohibits criminal usury, as defined in M.G.L. c. 271, § 49.

113.    Defendants also were aware that their lending practices were at interest rates that constitute criminal usury, as defined in M.G.L. c. 271, § 49.

114.    Under the terms of the standard loan agreement, the interest rates charged by Big Picture and paid to Defendants were significantly greater than the maximum legal

rate that can be charged under Massachusetts law.

115.    For example, Big Picture marketed loans to Dana Duggan and made two loans to her, one for $425 and the second for $775, with interest at an APR of 596% and 535.5%, respectively.

116.    Through their supervision and control over advertising and marketing, Defendants targeted Massachusetts consumers for their lending practices, including the loans to Ms. Duggan.

117.    Defendants chose Massachusetts as a place where loans would be made and collection efforts would occur, and they participated in and knew of the actions of the other Defendants in Massachusetts. For example, Defendants were involved in the decision not to make loans to new customers in certain states, such as New York.

118.    Martorello knew the subject loans were illegal under Massachusetts law, but pursued the scheme anyway through his ownership of Bellicose Capital and his and Eventide's supervision and control over Ascension.

**D.    The Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions in Defendants' Loan Agreements Are Void and/or Unenforceable**

119.    Because the loans were made and collected without a consumer finance license and charged an interest rate in excess of the maximum rate permitted under Massachusetts law, the agreements are unconscionable, void and unenforceable.

120.    The subject loan agreement not only violates Massachusetts's consumer lending statutes and the public policy against usurious loans, but it also contains unconscionable and unenforceable choice of law and forum selection provisions that seek

to disclaim laws and legal rights and ultimately deprive consumers of their day in court. Massachusetts courts consistently recognize the "importance of the public policy against usury" for addressing the enforcement of loan provisions.[16] Enforcement of the choice of law and forum selection clauses in the subject adhesion contract with unsophisticated borrowers would work against these public policy interests, and thus, the contract terms should be found void and unenforceable.

121.    For example, Defendants' Loan Agreement with Plaintiff provides:

> **GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

> **SOVEREIGN IMMUNITY**: This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and is generally immune from suit as a sovereign nation unless such immunity is waived by the Tribe in accordance with Tribal law or abrogated by applicable federal law ("tribal sovereign

---

[16] *Begelfer v. Najarian*, 381 Mass. 177, 189, 409 N.E2d 167, 175 (1980) (finding that "[t]he public policy against usury is clearly a matter for grave legislative concern"); see also *In re Stone Street Capital, LLC*, No. NOCV2012-01891, 31 Mass. L. Rptr. 171 *2 (Mass. Super. Ct. – Norfolk Cty. May 10, 2013) ("The Legislature enacted the usury statute to protect people from patently unfair interest rates when they try to leverage their assets or future earnings into cash in hand."). Indeed, the governor recommended the passage of Massachusett's criminal usury law "to provide an effective tool against organized crime and the vicious offense of loansharking." *Begelfer*, 381 Mass. at 182, quoting Message of the Governor, 1970 House Doc. No. 5439, at 3. The state has a similar interest in preventing the present lending scheme.

immunity"). Because the Tribe and Lender are entitled to tribal sovereign immunity, You will be limited in what claims, if any, You may be able to assert against both the Tribe and Us. To encourage resolution of consumer complaints as well as provide an authorized method of dispute resolution for consumers, pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

**PRESERVATION OF SOVEREIGN IMMUNITY**: It is the express intention of the Tribe and Lender, operating as an economic arm-of-the-tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges, and immunities, to which they are entitled including the tribal sovereign immunity of the Tribe and Lender. To protect and preserve the rights of the parties, no person may assume a waiver of immunity exists except by express written resolution of the Tribe's Tribal Council specifically authorizing such a waiver as required by Article XIII of the Tribe's Constitution specifically for the matter in question.

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You in the course of Your otherwise lawful and proper use of Lender's business believe Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You

are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination. The Authority may hold an administrative review hearing, if requested by You or Us, which will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied. At any such hearing, You may be represented by legal counsel at Your own expense. You may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(Duggan Loan Agreement, attached as Exh. 1, at 4–5.)

122.    Based on the evidence available to date, the governing law and forum selection clauses were template language included in all loan agreements involving Red Rock and Big Picture Loans.

123.    The loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

124.    The choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

125.    The choice-of-law provision is unenforceable as a matter of Massachusetts law because it purports to disclaim the application of any state law.

126.    Likewise, the forum selection clause is also unenforceable because it deprives Massachusetts borrowers of *any* forum to bring state or federal law claims.

127.    The loan agreement disclaims that Plaintiff and the Class have any right to pursue either litigation or arbitration by a neutral third party. (March 6, 2018 Loan Agreement, attached as Exh. 1, at 5. ("NO LITIGATION OR ARBITRATION IS AVAILABLE") (emphasis in original).)

128.    Instead, the Tribal Dispute Resolution Procedure only purports to allow consumers to follow a "Formal Dispute Resolution" with the Tribal Financial Services Regulatory Authority and the Tribal Court. (*Id.*)

129.    The Tribal Dispute Resolution Procedure states that consumers do not have "any binding procedural or substantive rights" against Big Picture Loans. (*Id.*)

130.    The Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.1(B)(4), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited August 13, 2018).

131.    Specifically, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." *Id.*, Reg. 1.1(B)(4)(b).

132.    Further, the Regulations only provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." *Id.*, Reg. 1.1(B)(4)(c) (emphasis added).

133.    The loans at issue are not related to on-reservation activity and are not necessary to protect tribal self-government or internal relations. *See, e.g., CashCall, Inc. v. Mass. Div. of Banks*, 33 Mass. L. Rptr. 5 (Mass. Sup. 2015), citing *Plains Commerce Bank v. Tong Family Land & Cattle Co.*, 554 U.S. 316, 327-37 (2008) and *Nev. v. Hicks*, 533 U.S. 353, 367 (2001). Absent statutory authorization to the contrary, tribal authority is limited to self-government and control of internal tribal relations. *Montana v. U.S.*, 450 U.S. 544, 564 (1981).

134.    The subject loan agreement violates Tribal law, which requires that the following provisions must be conspicuous: "Governing Law and Forum Selection," "Sovereign Immunity," and "Preservation of Sovereign Immunity." Specifically, under Tribal law, each of these paragraphs must be included "**in bold or all caps and conspicuously placed**." Tribal Cons. Fin. Servs. Reg. Code § 7.2(a); Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.5(B) (emphasis added), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited August 13, 2018). None of the provisions were conspicuous in the subject loan.

135.    The governing law clause is unenforceable because it violates public policy concerns in Massachusetts and was procured through fraud and misrepresentations, including that Big Picture Loans was "wholly owned and operated by the Tribe."

136.    These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

137.    In reality, the loans were owned and/or operated by non-tribal members, including Ascension Technologies, who funded the loans, controlled the underwriting,

and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

138.     Through the Tribal regulatory code and class action waiver provision, the loan agreement also seeks to deprive borrowers of any just and cost-effective means of seeking redress for Defendants' wrongful acts.

139.     The Tribal regulatory code prohibits an award of attorneys' fees or costs to the borrower, if she were to prevail in the Tribe's formal dispute resolution procedure. Tribal Cons. Fin. Servs. Regulatory Code § 9.3(i). Big Picture Loans, on the other hand, is permitted to recover attorneys' fees and reasonable costs for the collection of a debt. *Id.,* § 7.2(c).

140.     Similarly, the loan agreement seeks to strip Plaintiff of the opportunity to pursue her claims as a class action. (Duggan Loan Agreement, attached as Exh. 1, at 5 ("All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law.") (emphasis in original).)

141.     The class action waiver clause violates Plaintiff's statutory right to maintain a class action to redress unfair or deceptive acts or practices in accordance with Massachusetts law. M.G.L. c. 93A, § 9(2).

142.     The purported waiver of Plaintiff's statutory rights under Massachusetts laws which protect consumers' health, safety or welfare violates M.G.L. c. 93, § 101.

143.     In essence, the forum selection and choice of law clauses seek to convert the

terms of the loan agreement into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

144.    Because these contractual provisions are unenforceable as to the contracting parties and inapplicable to Defendants, Defendants cannot rely upon the provisions to limit the rights and remedies of consumers.

**E.      Class Definitions**

145.    Plaintiff bring this action on her own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class and Subclass:

> **The Class**
> All persons: (1) who executed a loan with Red Rock or Big Picture Loans, (2) while residents of the United States (except Alabama, Delaware, Idaho, Missouri, New Mexico, and Utah), and (3) where the loan was originated and/or any payment was made on or after October 31, 2014.
>
> **The Massachusetts Subclass**
> All persons: (1) who executed a loan with Red Rock or Big Picture Loans, (2) while residents of Massachusetts, (3) where the loan was originated and/or any payment was made on or after October 31, 2014.

146.    The Class and Subclass definitions exclude members of the Tribe, persons residing on Tribal lands, and any person, if any, who applied for a loan in person on Tribal land.

147.    **Numerosity**. Fed R. Civ. P. 23(a)(1). The Class and Subclass members are so numerous that joinder of all is impractical. Although there are thousands of Class members, Plaintiff does not know the exact number of Class and Subclass members because such information is in the exclusive control of Big Picture Loans and Ascension Technologies; however, Plaintiff has a commitment from the Settled Defendants to

provide information and data pertaining to Class and Subclass membership. The names and addresses of the Class and Subclass members are identifiable through the internal business records maintained by Big Picture Loans and/or Ascension Technologies, and the Class and Subclass members may be notified of the pendency of this action by published and/or mailed notice. The Class and Subclass are so numerous that joinder of all members is impracticable.

148. **Predominance of Common Questions of Law and Fact**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common questions of law and fact exist as to all members of the Class and Subclass. These questions predominate over the questions affecting only individual Class members. These common questions include, as to the Class and Subclass:

(a) whether the choice-of-law, forum selection, dispute resolution, and class action waiver provisions in the subject loan agreement violate Massachusetts and other states' laws, offend public policy interests, and should be deemed unenforceable;

(b) whether Defendants were licensed by the Massachusetts Commissioner of Banks to directly or indirectly engage in the business of making loans of $6,000 or less at an interest rate in excess of 12% to Massachusetts residents;

(c) whether the failure to obtain the license renders the loans to Plaintiff and the class members void and/or unenforceable;

(d) whether Defendants were authorized by the Massachusetts Attorney General to charge, take, or receive, directly or indirectly, interest at an APR that exceeds 20%;

(e) whether Defendants' acts and/or practices in the conduct of commerce were unfair and/or deceptive;

(f) whether Defendants participated in an enterprise under RICO;

(g) whether the loans to United States and Massachusetts residents included interest rates at more than twice the legal maximum APR, in violation of Massachusetts and other states' usury laws;

(h)     whether Defendants engaged, or are engaging, in the collection of an unlawful debt in violation of 18 U.S.C. § 1962;

(i)     whether Defendants engaged, or are engaging, in a pattern of racketeering in violation of 18 U.S.C. § 1962(c);

(j)     whether Plaintiff and the class members conferred a benefit on Defendants because of their payments of principal and interest on the void and uncollectible loans;

(k)     whether Defendants knew or should have known of the benefit conferred;

(l)     whether Defendants retained an unjust benefit because the loan was void;

(m)     whether Defendants violated the elements of 18 U.S.C. § 1962(c), as previously alleged;

(n)     whether Defendants entered into a series of agreements to violate § 1962(c);

(o)     whether Defendants conspired or endeavored to collect on an unlawful debt through a pattern of racketeering activity;

(p)     what is the proper recovery for Plaintiff and the Class members against each Defendant; and

(q)     whether equitable injunctive relief should be granted against Defendants.

149.     **Typicality**. FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of the claims of each Class and Subclass member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class and Subclass. All are based on the same facts and legal theories.

150.     **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff is an adequate representative of the Class and Subclass because her interests coincide with, and are not antagonistic to, the interests of the members of the Class and Subclass she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has prosecuted and intends to continue to prosecute the action vigorously.

Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class and Subclass. Neither Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this action.

151. **Superiority**. FED. R. CIV. P. 23(b)(3). Questions of law and fact common to the Class and Subclass members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement and the Defendants' wrongful conduct would prove burdensome and expensive. It would be virtually impossible for members of the Class and Subclass individually to effectively redress the wrongs done to them. Even if the members of the Class and Subclass themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

152. **Injunctive Relief Appropriate for the Class**. FED. R. CIV. P. 23(b)(2). Class certification is also appropriate because Defendants have acted on grounds generally applicable to the Class and Subclass, making appropriate equitable, injunctive relief with respect to Plaintiff and the Class and Subclass members. Plaintiff, the Class, and the Subclass seek an injunction prohibiting Defendants from collecting any further amounts

from consumers in connection with their loans, as well as ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

## VI.    CAUSES OF ACTION

### COUNT I - DECLARATORY JUDGMENT

153.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

154.    Big Picture Loans' loan agreement contains illegal and unconscionable choice of law, forum selection, class action waiver, and dispute resolution provisions that violate Massachusetts law and are void and unenforceable for public policy concerns.

155.    The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the validity of the choice of law, forum selection, class action waiver, and dispute resolution provisions.

156.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan provisions as to the claims against Defendants.

157.    Accordingly, Plaintiff, on behalf of herself and all others similarly situated, seeks a declaratory judgment that the choice of law, forum selection, class action waiver, and dispute resolution provisions are void and unenforceable as to Massachusetts consumers because such terms (a) violate Massachusetts law, and (b) are unconscionable

and contrary to matters of public policy.

## COUNT II - VIOLATIONS OF MASSACHUSETTS SMALL LOANS ACT
## MASS. GEN. LAWS ch. 140, §§ 96, 110

### MASSACHUSETTS SUBCLASS

158.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

159.    In the furtherance of the Defendants' commercial lending enterprise, Big Picture Loans in conjunction with other participants in the scheme made loans to Massachusetts consumers even though they are not licensed by the Commissioner of Banks to make loans in the State of Massachusetts.

160.    Defendants directly or indirectly engaged in the business of making unlicensed loans of $6,000 or less at an interest rate greatly exceeding 12%.

161.    Defendants' unlicensed collection of usurious interest from Massachusetts consumers was, and remains, a violation of Massachusetts consumer protection laws. Chapter 140, section 96 of the Massachusetts General Laws specifically provides that "[n]o person shall directly or indirectly engage in the business of making loans of six thousand dollars or less" at rates in excess of 12 percent without the requisite license. MASS. GEN. LAWS ch. 140, § 96. Each of the Defendants was directly and/or indirectly engaged in the subject Big Picture lending operation at interest rates greatly exceeding 12 percent.

162.    Plaintiff and the Massachusetts Subclass request that the Court enter judgment against the Defendants for the recovery of all principal and interest paid to the

Defendants, directly or indirectly, out of proceeds from the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

## COUNT III - PROHIBITION OF CRIMINAL USURY
## MASS. GEN. LAWS ch. 271, § 49

### MASSACHUSETTS SUBCLASS

163. Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

164. As a result of the loans to Massachusetts consumers, Defendants received directly or indirectly interest at a rate greater than the maximum legal rate of interest under Massachusetts law. Chapter 271, section 49 of the Massachusetts General Laws specifically provides that "[w]hoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury." MASS. GEN. LAWS ch. 271, § 49. Each of the Defendants directly and/or indirectly contracted for, charged, took, or received interest and expenses from the subject Big Picture lending operation at annual rates greatly exceeding 20 percent.

165. Defendants did not notify the Massachusetts Attorney General of the subject lending practices at interest rates that exceed 20% APR.

Plaintiff and the Massachusetts Subclass request that the Court enter judgment against

the Defendants Martorello and Eventide jointly and severally for their recovery of all principal and interest paid to the Big Picture Loans under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

## COUNT IV - MASS. GEN. LAWS ch. 93, § 101

## MASSACHUSETTS SUBCLASS

166.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

167.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

168.    Defendants' choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they purport to waive rights granted to Plaintiff and Massachusetts Subclass members by M.G.L. ch. 140, §§ 96, 110, ch. 271, § 49, and ch. 93A.

## COUNT V - UNFAIR OR DECEPTIVE ACTS OR PRACTICES
## MASS. GEN. LAWS ch. 93A

## MASSACHUSETTS SUBCLASS

169.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

170.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

171.    None of the Defendants maintain a place of business within Massachusetts, so no demand letter is required of Plaintiff under Chapter 93A.

58

172. As detailed in the preceding paragraphs, Defendants established the subject corporate entities to circumvent and systematically violate state lending laws and regulations, including but not limited to the Massachusetts Small Loans Act and the Massachusetts criminal usury statute.

173. Based on the facts previously stated, Defendants' marketing and lending to Massachusetts residents constituted unfair or deceptive acts or practices because they (a) make loans to Massachusetts residents without the requisite license; (b) commit criminal usury by extending credit to Massachusetts residents at interest rates that exceed the maximum permissible rate of interest under Massachusetts law; and/or (c) require Massachusetts borrowers to agree to illegal and unconscionable contract terms pertaining to choice of law, jurisdiction, forum selection, and class actions.

174. Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff further seeks the recovery of statutory damages, attorneys' fees, and costs as well as all other relief which may be due and owing under Massachusetts law.

## COUNT VI - VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)

### CLASS CLAIMS

175. Plaintiff incorporates each of the allegations in the preceding paragraphs, as well as the allegations stated in Count VII, VIII, and IX, as if restated here.

176. At all relevant times, Defendants were members and associates of an

internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

177.     The Defendants, including their leadership, membership, and associates, as well as the Settled Defendants, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact. The Defendants and Settled Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

178.     The enterprise is engaged in, and its activities affect, interstate commerce. The enterprise's leadership is based in Dallas, Texas, Atlanta, Georgia, Watersmeet, Michigan, and other locations as addressed in preceding paragraphs. The enterprise operates throughout the United States, including the District of Massachusetts, as well as in Puerto Rico and the Philippines.

179.     The lending enterprise operates through ACH transactions, such as those involving the payments by Ms. Duggan. The ACH transactions involve interstate commerce because they flow through Big Picture's bank account in Wisconsin, Ms. Duggan's bank account in Massachusetts, and through different intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to Defendants in Texas.

180.     The lending enterprise operates through a website, created and overseen by Defendants, at www.bigpictureloans.com. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire

transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

181.    The Defendants, in conjunction with the Settled Defendants, work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

182.    In his position as the manager of Eventide, Martorello presides over the lending enterprise with authority to influence the direction of the companies' leadership structures. Martorello established the plan to create Ascension Technologies and Big Picture Loans, he supervises the business operations, and he receives all of the net revenue from the business enterprise.

183.    Acting in concert, Defendants created the Big Picture Loans enterprise with essential lending services provided by Ascension Technologies so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

184.    Acting in concert with the Settled Defendants, Defendants defined the types of loans that Big Picture would offer to customers and the illegal terms on which the loans would be created.

185.    Acting in concert with the Settled Defendants, Defendants knowingly marketed the loans via the Internet and through pre-screened marketing solicitations to

borrowers who reside across the United States and off of Tribal lands.

186.    As alleged above, Defendants, along with the Settled Defendants and other participants not yet known to Plaintiff, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

187.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

188.    The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Massachusetts, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

189.    In addition to legal limits of interest that may be charged under Massachusetts law, most other jurisdictions in the United States have limits on the amounts of interest that a lender may charge. *See, e.g.,* ARIZ. REV. STAT. §§ 6-603, *et seq.*; ARK. CONST. amend. 89, § 3; ARK. CODE ANN. §§ 4-57-104, 4-57-105; CONN. GEN. STAT. § 36a-563; FLA. STAT. §§ 516.01(2), 516.03, 516.031, 687.071(3); GA. CODE ANN. §§ 7-3-6; 7-

3-14, 7-4-2, 7-4-18, and 16-17-1, *et seq.*; MD. CODE ANN. COM. LAW §§ 12-306, 12-313, 12-314; N.C. GEN. STAT. §§ 53-173, 53-176; N.H. REV. STAT. ANN. § 399-A12; N.J. STAT. ANN. §§ 2C:21-19(a), 17:11C-3, 17:11C-41; N.Y. GEN. OBLIG. LAW § 5-501; N.Y. BANKING LAW § 14-a(1); N.Y. PENAL LAW § 190.40; OR. REV. STAT. § 725.045; VT. STAT. ANN. tit. 8, § 2230; VT. STAT. ANN. tit. 9, § 41a. All of the loans made to Class members in the United States and collected by Defendants included an interest rate far in excess of twice the enforceable rate. Each of the Defendants was associated with the enterprise through the collection of unlawful debt.

190.    In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. For example, during the first two years of Big Picture Loans' operations, two percent (2%) of the gross revenue from the lending enterprise was invested back into the operations on behalf of the Tribe. Defendants Martorello and Eventide contracted for this reinvestment into the lending operation.

191.    The predicate acts of collection of unlawful debt by Defendants are described herein. The debts incurred by Plaintiff and all other members of the Class are unlawful and unenforceable.

192.    Defendants, in conjunction with the Settled Defendants, established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiff's and Class members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent

lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the Big Picture Loans enterprise. 18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

193.    Martorello, through his company Eventide, acted in concert with the Settled Defendants and operated in the names of Big Picture Loans and Ascension Technologies to plan or scheme to defraud thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates while at the same time claiming that the business operations were legitimate and in compliance with the law. To advance this scheme, Martorello worked with the Settled Defendants to create the Big Picture Loans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Martorello attempted to dodge liability by claiming to have sold the lending services operation, but in reality Martorello dictated the terms of his continued reaping of all net profits from the entire lending enterprise while continuing to exercise control over the operations. Defendants knowingly intended to defraud the victims of the lending scheme. Martorello performed all of the foregoing illegal acts through his company, Eventide.

194.    The racketeering activity at issue is related and continuous. The thousands of ACH transactions served and continue to serve the central scheme created and developed by the Defendants to make illegal loans at extortionate interest rates. The

thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – primarily for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by Defendants through Big Picture Loans.

195.   The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, during and following the formation of Red Rock, continued with the formation of Defendants Big Picture Loans and Eventide in 2014, continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Massachusetts consumers. Each of the Defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include casting Martorello and Eventide as "mere creditors" when, in fact, they created and coordinated the lending model and subject entities, and they oversee and approve of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, Martorello and Eventide induced Plaintiff and the Class to repay unlawful debts. The foregoing record demonstrates that Martorello, through Eventide, and in concert with the Settled Defendants, created the entire lending structure in a failed effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to address.

196.   Plaintiff and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal,

on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants Martorello and Eventide are jointly and severally liable to Plaintiff and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT VII - VIOLATIONS OF RICO**
**18 U.S.C. § 1962(d)**

**CLASS CLAIMS**

197.    Plaintiff incorporates each of the allegations in the preceding paragraphs, as well as the allegations stated in Count VI, VIII, and IX, as if set forth here.

198.    Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with the Settled Defendants and other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of agreements to violate § 1962(c) and states' usury laws—that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and engaged in overt acts to further the business interests of the enterprise.

199.    Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). In addition to the documents cited above and/or attached to this Complaint, these agreements, include, *inter alia*: (a) the service agreements, promissory notes, agreements, and addenda negotiated for Defendants' control over the enterprise,

including agreements between and among Defendants and Settled Defendants, including their predecessors in interest, Red Rock and Bellicose Capital, to create the necessary frameworks, oversight, and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants and Settled Defendants, to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants and Settled Defendants to investigate, solicit, and/or consent to investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants and Settled Defendants to generate high-interest loans to desperate borrowers; (e) agreements between and among Defendants and Settled Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants, Settled Defendants, and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

200.    Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise. For example, Martorello and Eventide created and coordinated the lending model and subject entities, and they oversee and approve of the collection of thousands of unlawful debts; for these efforts, Eventide, *i.e.*, Martorello, receives all of the net revenue of the lending enterprise.

201.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants Martorello and Eventide are jointly and severally liable to Plaintiff and the Class members for their actual damages, treble damages, costs, and attorneys' fees

pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII - VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)

### MASSACHUSETTS SUBCLASS

202.     Plaintiff incorporates each of the allegations in the preceding paragraphs, including the allegations stated in Count VI, VII, and IX, as if restated here.

203.     At all relevant times, Defendants were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

204.     The Defendants, including their leadership, membership, and associates, as well as the Settled Defendants, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Defendants and Settled Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

205.     The Defendants, in conjunction with the Settled Defendants, work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

206.     As alleged above, Defendants, along with Settled Defendants and other participants not yet known to Plaintiff, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the

"collection of unlawful debt." 18 U.S.C. § 1962(c).

207.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

208.   The means and methods by which the Defendants, the Settled Defendants, and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the internet lending operation of lending money at usurious rates according to Massachusetts law, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Massachusetts law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

209.   All of the loans made to Massachusetts residents and collected by Defendants, in conjunction with the Settled Defendants, included an interest rate far in excess of twice the enforceable rate in Massachusetts.

210.   In operating and conducting the affairs of the enterprise, the Defendants and Settled Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

211.   The debts incurred by Plaintiff and all other members of the Subclass are unlawful and unenforceable.

212.   The Defendants' leadership, management, and participation in the

69

enterprise began at some point as early as 2011, during and following the formation of Red Rock, continued with the formation of Defendants Big Picture Loans and Eventide in 2014, continues to date, and will occur repeatedly in the future to the detriment of Massachusetts consumers. Each of the Defendants, working in concert with themselves and the Settled Defendants, participated in the scheme through a coordinated pattern of racketeering; such efforts include casting Martorello and Eventide as "mere creditors" when, in fact, they created and coordinated the lending model and subject entities, and they oversee and approve of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, Martorello and Eventide coerced Plaintiff and the Class to repay unlawful debts. The foregoing record demonstrates that Martorello, through Eventide, and in concert with the Settled Defendants, created the entire lending structure in a failed effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to address.

213.    Plaintiff and the Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants Martorello and Eventide are jointly and severally liable to Plaintiff and the putative members of the Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IX - VIOLATIONS OF RICO

**18 U.S.C. § 1962(d)**

**MASSACHUSETTS SUBCLASS**

214.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth here.

215.    Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with Settled Defendants and other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of agreements to violate § 1962(c) and Massachusetts's usury laws—that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and engaged in overt acts to further the business interests of the enterprise.

216.    Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). In addition to the documents cited above and/or attached to this Complaint, these agreements, include, *inter alia*: (a) the service agreements, promissory notes, other agreements, and addenda negotiated for Defendants' control over the enterprise, including agreements between and among Defendants and Settled Defendants, including their predecessors in interest, Red Rock and Bellicose Capital, to create the necessary legal frameworks, oversight, and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants and Settled Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise;

71

(c) agreements between and among Defendants and Settled Defendants to investigate, solicit, and/or consent to investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants and Settled Defendants to generate high-interest loans to desperate borrowers, including borrowers in Massachusetts; (e) agreements between and among Defendants and Settled Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants, Settled Defendants, and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

217.    Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise. For example, Martorello and Eventide created and coordinated the lending model and subject entities, and they oversee and approve of the collection of thousands of unlawful debts; for these efforts, Eventide, *i.e.*, Martorello, receives all of the net revenue of the lending enterprise.

218.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants Martorello and Eventide are jointly and severally liable to Plaintiff and the Subclass members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT X - UNJUST ENRICHMENT
## CLASS CLAIMS

219.    Plaintiff incorporates each of the allegations in the preceding paragraphs as

if restated here.

220.    Plaintiff and the Class members conferred a benefit on Defendants when they repaid principal and interest on the usurious loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of approximately $43 million in revenue in connection with the unlawful loans.

221.    The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

222.    Accordingly, Plaintiff seeks to recover from Defendants, jointly and severally, all net revenue that Defendants' received as a result of loans to Plaintiff and the Class members.

**COUNT XI - UNJUST ENRICHMENT**

**MASSACHUSETTS SUBCLASS**

223.    Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

224.    Plaintiff and the Subclass members conferred a benefit on Defendants when they repaid principal and interest on the usurious loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of revenue in connection with the unlawful loans.

73

225.    The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

226.    Accordingly, Plaintiff seeks to recover from Defendants, jointly and severally, all net revenue that Defendants' received as a result of loans to Plaintiff and the Subclass members.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of herself and the Class and Subclass she seeks to represent against Defendants for:

(a)    Certification for this matter to proceed as a class action;

(b)    Declaratory relief against Defendants, as pled herein;

(c)    Such other injunctive relief as the Court deems appropriate;

(d)    Equitable relief returning Defendants' net revenue generated from loans above a reasonable and lawful rate of interest;

(e)    Actual damages, statutory damages, treble damages (under 18 U.S.C. § 1964), and punitive damages, as pled herein and/or to the extent permissible under applicable laws;

(f)    Attorney's fees and costs of suit to the extent permissible under applicable laws; and

(g)    Such other and further relief as the Court deems proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

This 15th day of January 2020.

Respectfully submitted,

*/s/ Michael A. Caddell*
Michael A. Caddell *(pro hac vice)*
mac@caddellchapman.com
Cynthia B. Chapman *(pro hac vice)*
cbc@caddellchapman.com
Amy E. Tabor *(pro hac vice)*
aet@caddellchapman.com
John B. Scofield *(pro hac vice)*
jbs@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
713-751-0400
713-751-0906 (fax)

*/s/   John Roddy*
John Roddy, BBO # 424240
jroddy@baileyglasser.com
Elizabeth Ryan, BBO # 549632
eryan@baileyglasser.com
BAILEY & GLASSER LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Jonathan R. Marshall *(pro hac vice)*
jmarshall@baileyglasser.com
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) as well as to the following counsel of record via Electronic Mail on this 15th day of January 2020.

Jonathan P. Boughrum
Michael C. Witsch
Richard L. Scheff
ARMSTRONG TEASDALE, LLP
1500 Market Street
12th Floor, East Tower
Philadelphia, PA 19102
Telephone: (484) 222-1316
Email: jboughrum@armstrongteasdale.com
 mwitsch@armstrongteasdale.com
 rlscheff@armstrongteasdale.com

Ian D. Roffman
Michael J. Leard
Nutter, McClennen & Fish LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 439-2000
Fax: (617) 310-9000
Email: iroffman@nutter.com
 mleard@nutter.com

*/s/ Michael A. Caddell*
Michael A. Caddell