UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANA DUGGAN, individually and on behalf  )
of persons similarly situated,                        )
                                                                     )
                        Plaintiff,                              )
           v.                                                     )          CIVIL ACTION
                                                                     )          NO. 18-12277-JGD
MATT MARTORELLO and EVENTIDE       )
CREDIT ACQUISITIONS, LLC,                     )
                                                                     )
                        Defendants.                         )

## MEMORANDUM OF DECISION AND ORDER
## ON MATT MARTORELLO'S MOTION TO DISMISS

March 30, 2022

DEIN, U.S.M.J.

### I.  INTRODUCTION

Plaintiff Dana Duggan ("Duggan"), a Massachusetts resident, has brought this putative

class action against Matt Martorello ("Martorello") and his company, Eventide Credit

Acquisitions, LLC ("Eventide"), alleging that the defendants engaged in an internet-based

predatory lending scheme in which they charged Duggan and other consumers unconscionably

high interest rates, often exceeding 500%, for short-term loans.  According to Duggan,

Martorello and Eventide sought to evade state and federal laws prohibiting usurious lending

practices by partnering with the Lac Vieux Desert Band of Lake Superior Chippewa Indians

("LVD" or the "Tribe") to set up a lending entity.  Under this so-called "rent-a-tribe" scheme,

LVD, through a company known as Big Picture Loans, LLC ("Big Picture Loans"), allegedly acted

as the nominal lender while Martorello and Eventide operated and exercised actual control

over the lending business under the cloak of the Tribe's sovereign immunity.  Duggan claims

that this arrangement enabled the defendants to take advantage of the privileges and

immunities available to Native American tribes to carry out their fraudulent enterprise and

enrich themselves at the expense of borrowers.  By her Second Amended Class Action

Complaint, Duggan has asserted claims against Martorello and Eventide for violations of

Massachusetts lending, licensing and consumer protection laws, violations of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"), unjust enrichment

and declaratory judgment.  Additionally, Duggan is seeking to certify a class and a subclass of

similarly situated borrowers residing in Massachusetts and in other states around the country.

The matter is before the court on "Matt Martorello's Motion to Dismiss Plaintiff's

Second Amended Class Action Complaint" (Docket No. 124).  By his motion, Martorello

contends that all of Duggan's claims against him must be dismissed for lack of personal

jurisdiction under Fed. R. Civ. P. 12(b)(2) because none of the conduct complained of that

occurred in Massachusetts was carried out or directed by him, and because Duggan has failed

to show that it would be appropriate for this court to exercise personal jurisdiction over him

under RICO's nationwide service of process provision.   In addition, Martorello contends that

Duggan's claims against him must be dismissed under Fed. R. Civ. P. 12(b)(6) because her

allegations are conclusory, speculative and inconsistent with relevant documents, a choice of

law provision contained in Duggan's loan agreement with Big Picture Loans defeats her claims

in this action, and Duggan has otherwise failed to state a claim against Martorello with respect

to any alleged theory of liability.  After consideration of the parties' written submissions and

oral arguments, and for all the reasons described below, Martorello's motion to dismiss the Second Amended Complaint is DENIED.

## II.  <u>STATEMENT OF FACTS</u>

### <u>Standard of Review of Record</u>

"On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." <u>Astro-Med, Inc. v. Nihon Kohden Am., Inc.</u>, 591 F.3d 1, 8 (1st Cir. 2009), and cases cited.  "When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination." <u>United States v. Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 618 (1st Cir. 2001).  Thus, to meet its burden, the plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." <u>Id.</u> (quotations and citation omitted).  Under this standard, the court will look to the facts alleged in the pleadings and the parties' supplemental filings, including affidavits. <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1385 (1st Cir. 1995). The court will accept the plaintiff's properly documented "facts as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." <u>N. Laminate Sales, Inc. v. Davis</u>, 403 F.3d 14, 24 (1st Cir. 2005) (quoting <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 51 (1st Cir. 2002)) (additional quotations and citations omitted).  It will "then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." <u>Id.</u> (quoting <u>Daynard</u>, 290 F.3d at 51) (additional quotations and citation omitted).  Notwithstanding the liberality of this approach,

the court is not required to "credit bald allegations or unsupported conclusions." Carreras v. PMG Collins, LLC, 660 F.3d 549, 552 (1st Cir. 2011).

Similarly, when ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). In doing so, the court may consider "documents central to [the] plaintiff['s] claim" and "documents sufficiently referred to in the complaint" without converting the motion into one for summary judgment. Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). Additionally, "[w]hen 'a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).'" Gustavsen v. Alcon Labs., Inc., 272 F. Supp. 3d 241, 246 (D. Mass. 2017) (quoting Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)), aff'd, 903 F.3d 1 (1st Cir. 2018). To the extent any "such documents contradict an allegation in the complaint, the document trumps the allegation." Id. See also Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).

Applying these standards to the instant case, the relevant facts are as follows.[1]

---

[1] The facts are derived from the Duggan's Second Amended Complaint (Docket No. 118) ("Compl.") and the exhibits attached thereto. While the defendant has urged this court to adopt the factual findings described by the Fourth Circuit in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019), (Def. Mem. (Docket No. 125) at 2-3), it would be inappropriate to do so. The Fourth Circuit's decision is not binding on this court and does not alter this court's obligation to treat the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in her favor.

**Overview of the Alleged Scheme**

This case arises out of an allegedly illegal lending operation involving short-term, high interest loans known as "payday" loans, which were made by Big Picture Loans and its predecessor, Red Rock Lending LLC ("Red Rock"), to Massachusetts residents and others over the internet.  Duggan claims that Martorello, a resident of Texas, created and carried out this operation by partnering with the LVD Tribe in what is commonly known as a "rent-a-tribe" lending scheme.  (Compl. ¶¶ 1-2, 5, 25).  According to the plaintiff, the scheme was designed to evade state lending and consumer protection laws, and enable Martorello and Eventide to charge exorbitant interest rates far exceeding the rates authorized under state anti-usury laws, by exploiting the protections of the Tribe's sovereign immunity.  (See id. ¶¶ 1-5).  Specifically, as Duggan describes in the Introduction to her Second Amended Class Action Complaint ("Complaint"):

> In an attempt to operate an internet-based lending enterprise beyond the scrutiny of Massachusetts' and other states' usury laws, Matt Martorello created the business model and the entire lending platform of Big Picture Loans, LLC ("Big Picture" or "Big Picture Loans") and then affiliated the business with a Native American tribe.  Lurking in the shadows, there is a complicated corporate management structure attempting to hide the fact that non-tribal members, namely Martorello, his family and companies, reap all the net revenue from the lending operation.  The purpose of this litigation is to shed light on this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, and to obtain statutory damages in accordance with Massachusetts (as well as other states) and federal laws.

(Id. ¶ 1).  Thus, Duggan claims that Big Picture Loans was merely "a front to disguise Martorello's and [Eventide's] roles" in controlling and overseeing the lending operations and "to ostensibly shield the scheme by exploiting tribal sovereign immunity."  (Id. ¶ 5).  In exchange for allowing Martorello to use its name and status, "the Tribe initially received about

two percent of the gross revenue from the loans." (Id. ¶ 6).  However, in an alleged "attempt

to bolster its groundless claims of sovereign immunity, the lending scheme was modified in

recent years so that the Tribe receives as much as six percent of the gross revenues of the

lending enterprise." (Id.).

### Origins of the Alleged Scheme

The alleged scheme at the center of this litigation began in 2011, when Martorello

approached LVD's Tribal Council with an opportunity to participate in a lending business.

(Compl., Ex. 3 ¶ 2).  According to the plaintiff, Martorello proposed that one of his companies,

Bellicose Capital LLC ("Bellicose"), would run the business if the Tribe would allow him to claim

that tribal law applied to the loans.  (Id.).  He also proposed that LVD receive 2% of the gross

revenue from the loans.  (Id.).   The Tribe agreed and the business began operating under the

name "Red Rock Lending LLC" ("Red Rock").  (See id. ¶¶ 3-4).  As described below, Red Rock is

the predecessor of Big Picture Loans, the entity through which the plaintiff obtained the loans

giving rise to this case.  Duggan claims that "[f]rom the outset, the lending operation was

structured to ensure Martorello's control of all material aspects of the lending business through

Bellicose[.]"  (Compl. ¶ 59).  She also claims that the "lending enterprise was formed with no

meaningful involvement of the Tribe, the Tribal Council, or Tribe-affiliated co-managers."  (Id.).

Specifically, Duggan asserts that in August 2011, Martorello and the Tribe created a

business structure under which the Tribe would have nominal involvement in the lending

operations through the appointment of two "co-managers" who received no compensation and

did not participate in any lending activities.  (Comp. ¶¶ 60, 63 & Ex. 3 ¶ 7).  They also created

two Tribe-affiliated entities-- Red Rock and Duck Creek Tribal Financial, LLC ("Duck Creek")—

that were allegedly established to give the false appearance that loan originations were coming from a tribal entity.  (Id. ¶ 60).  Both Red Rock and Duck Creek entered into servicing agreements with Bellicose under which the Tribe-affiliated entities received 2% of the net revenue from the lending operations and Martorello's companies received the remaining 98%, along with reimbursement for all advances and expenses.  (Id. ¶ 61).  Duggan claims that during the period from January 1, 2014 through August 31, 2015, the lending operations generated a net profit of $161.9 million.  (Id.).  She further claims that Martorello and his investors reaped the bulk of these profits, while Red Rock and the Tribe received less than $3.2 million after payment of brokerage fees.  (Id.).

Allegedly, the servicing agreements between Martorello's companies and the Tribe enabled Martorello to exercise pervasive control over Red Rock's lending business.  (Id. ¶ 62).  For instance, the plaintiff claims that Bellicose assigned the servicing rights to SourcePoint VI, LLC ("SourcePoint"), a Bellicose affiliate located in the U.S. Virgin Islands, and that SourcePoint had exclusive control over all communications and interactions with Red Rock's service providers, lenders and agents.  (See Compl. ¶¶ 61 n.11, 62).  She also claims that SourcePoint had authority to "collect all gross revenues and other proceeds connected with or arising from" Red Rock's operations, held the "sole signatory and transfer authority over [Red Rock's] bank accounts" and obtained the contractual right to "sweep" funds from Red Rock's account into its own account as a means of collecting its servicing fees.  (Id. ¶ 62 (quoting Compl., Ex. 5 §§ 3.5, 4.4, 4.9)).  Additionally, under the terms of a restrictive covenant contained in its servicing agreement, Red Rock was prohibited from engaging in lending activities "anywhere in the world" without using SourcePoint to provide management and consulting services.  (Id. ¶ 62 &

Ex. 5 § 3.3.1).  Meanwhile, Martorello took steps to ensure that SourcePoint would not share with Red Rock or the Tribe any "intellectual property" related to SourcePoint's handling of vendor agreements, analytics or even direct mail campaigns that were distributed using Red Rock's name.  (Id. ¶ 62).

Duggan asserts that in an effort to create the appearance of tribal control over the lending business, SourcePoint and the Tribe nominally designated Red Rock as the entity with the final authority to approve loans to consumers and third parties.  (Id. ¶ 63).  In reality, however, all of Red Rock's final approvals were based on underwriting criteria that had been pre-established by SourcePoint, and Red Rock's actual role in the lending process was limited to "rubber-stamping" the consumer loan agreements by way of a "final verification."  (Id.).  Allegedly, Martorello's companies were the entities that actually "provided the infrastructure and investment capital to market, fund, underwrite and collect the loans[.]"  (Id. ¶ 64).  Thus, they handled all lead generation activities, technology platforms, payment processing and loan collection activities.  (Id.).

### Threats to the Tribal Lending Model

By late 2012, Martorello allegedly recognized that the tribal payday lending model was facing an existential threat due to government pressure to cap interest rates and curb tribal lending, regulatory investigations of tribal lenders, state enforcement actions against industry participants and class action lawsuits, among other things.  (Compl., Ex. 7 at Bates No. 038990-92).  In addition to the monetary risks, Martorello was advised by his counsel that certain states deem it a felony "to make loans over a certain rate or without a license[,]" and there was some risk that Martorello could be accused of "aiding and abetting felony crime" in those

states.  (Id. at Bates No. 038991 (emphaisis omitted)).  The record establishes that by December

2012, Martorello had already received cease and desist orders from a number of State Attorney

Generals.  (Id.).

       In August 2013, the New York Department of Financial Services ("DFS") issued a cease

and desist letter to Red Rock in which it asserted that the Tribe's lending practices violated New

York civil and criminal laws and threatened to initiate an enforcement action.  (Compl. ¶ 69).

Thereafter, Red Rock and the Tribe filed suit against DFS in the District Court for the Southern

District of New York claiming that New York State's effort to regulate tribal lending was an

affront to their inherent sovereignty and violated the Indian Commerce Clause of the U.S.

Constitution.  (Id.).  See also Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.,

974 F. Supp. 2d 353, 357 (S.D.N.Y. 2013), aff'd, 769 F.3d 105 (2d Cir. 2014).  They also moved for

a preliminary injunction prohibiting the State from interfering with their lending activities.  Id.

at 355.  The District Court denied the motion for injunctive relief on the grounds that Red Rock

and the Tribe had "failed to demonstrate a likelihood of success on the merits or a sufficiently

serious question going to the merits" of their claims.  Id. at 361.  The ruling was subsequently

upheld on appeal.  Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d

105, 118 (2d Cir. 2014).

**Restructuring of the Lending Operations**

       In the wake of the ruling from the Southern District of New York, Martorello expressed

concern regarding the risk of "significant potential liability" and "potential investigation and

potential prosecution of us personally and our companies" if they continued to service New

York loans.  (Compl., Ex. 12 at Bates No. 006304-05).  He also predicted that SourcePoint was

"about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims to come[.]" (Compl., Ex. 13 at Bates No. 052787). Consequently, Martorello allegedly embarked on an effort to restructure Red Rock's lending operations in a manner that would shield the business from liability by taking advantage of LVD's sovereign immunity. (See Compl. ¶¶ 71-82). Duggan claims that "[i]nstead of complying with the law, however, Martorello attempted to paper over his operation so that he could retain control of the usurious lending enterprise, continue to reap most of the profits, and only nominally surrender corporate ownership of the lending services provider to present a misleading appearance of tribal control." (Id. ¶ 71).

Duggan alleges that within two weeks after the District Court issued its opinion in Otoe-Missouria, Martorello proposed that the Tribe take ownership of Bellicose through a new entity known as Ascension Technologies, LLC ("Ascension"). (Id.). Under this proposal, the Tribe would obtain "a 'controlling interest'" in Ascension, but Martorello would receive 100% of the profits for a period of over four years—longer than the business was projected to survive. (Id. ¶ 72). The Tribe's legal counsel evaluated whether the proposed new business structure would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." (Compl., Ex. 15 at Bates No. 052248). Additionally, on December 31, 2013, Martorello stated in an email that the management of the new enterprise should remain "status quo" to ensure that Martorello, not the Tribe, would remain in control. (Id.; see also Compl. ¶ 73). Thus, according to Duggan, "the entire purpose of the restructuring was to allow Martorello to continue to receive the overwhelming majority of the profits while

using tribal sovereign immunity to shield the usurious business practices from litigation and enforcement actions." (Compl. ¶ 72).

During the period when he was seeking to restructure Bellicose as Ascension, Martorello allegedly proposed that LVD rebrand Red Rock as "Big Picture Loans," a brand that Martorello had developed earlier in connection with a plan to launch a lending business with a different tribal entity. (Id. ¶¶ 74-75). The plaintiff contends that Martorello introduced his proposal to the Tribe's counsel on August 25, 2014, and the next day, the Tribe's counsel presented articles of organization and an operating agreement for Big Picture Loans. (Id. ¶ 75). Allegedly, therefore, "[t]he Tribe merely rubber-stamped its approval of Martorello's proposal and his developed brand." (Id.).

The Tribe also agreed to Martorello's proposal that it acquire ownership of Bellicose through Ascension, the Tribe's new loan servicing entity. (See id. ¶ 76). At the time of the acquisition, Bellicose was allegedly facing a significant risk of being shut down by government regulators and law enforcement authorities, and an independent accounting firm had valued Bellicose and SourcePoint at $11.7 million. (Id. ¶¶ 76-77, 84-85). Nevertheless, Martorello allegedly engineered a transaction which valued Bellicose at $300 million. (Id. ¶ 77). The plaintiff claims that the Tribe accepted Martorello's valuation and Martorello nominally "sold" Bellicose and its subsidiaries to Tribe-affiliated companies that had been created to facilitate the sale. (Id. ¶¶ 77-78). Those companies included Big Picture Loans and Ascension, as well as Tribal Economic Development Holdings, LLC ("TED") and LVD Tribal Acquisition Company, LLC ("TAC"). Martorello also created Eventide, a Delaware company in which Martorello held an 85% ownership stake, to use as a vehicle through which he would receive payments from the

sale.  (Id. ¶ 78).  Pursuant to the deal, TAC acquired Bellicose and its affiliates, and TED

subsequently acquired TAC through a $300 million Promissory Note to Eventide.[2]  (Id.).  Duggan

asserts that Martorello intentionally added layers of complexity to the transaction in an effort

to shield the new entities from liability for violations of state usury laws.  (Id. ¶ 79).

Under the terms of the Promissory Note, the Tribe was initially entitled to receive 2% of

the gross revenue from the lending operations, plus a no-interest reinvestment amount equal

to 2% of gross revenues.  (Id. ¶ 80).  This arrangement was modified in January 2017 to reflect

Eventide's agreement to distribute 3% of gross revenues to the Tribe.  (Id. ¶ 81).  On August 13,

2018, after the District Court in Williams v. Big Picture Loans, LLC, 329 F. Supp. 3d 248 (E.D. Va.

2018), cited the paltry distributions to the Tribe as evidence to support its conclusion that Big

Picture Loans was not entitled to sovereign immunity,[3] Eventide agreed to restructure the deal

once again to allow the Tribe to receive 6% of gross revenues from the lending operations and

to eliminate the reinvestment requirement.  (Id.).  Accordingly, Eventide receives all of the net

revenue from the business after payment to the Tribe from the gross revenue.  (Id.).  Duggan

claims that from February 2016 through April 2019, Eventide received over $43 million from the

lending enterprise while the Tribe received approximately $8.5 million.  (Id.).

---

[2] Duggan claims that Martorello and the Tribe agreed to a seven-year term for payout of the $300 million promissory note even though both parties expected that regulatory actions and litigation would force the lending business to cease operations well before the end of the term.  (Compl. ¶ 83). Therefore, according to the plaintiff, "[a]ny suggestion that the Tribe negotiated the restructuring of the business so that it could 'own' the tribal servicing entity" after the promissory note was paid off is inaccurate.  (Id.).

[3] On July 3, 2019, the Fourth Circuit Court of Appeals issued a decision in which it held that Big Picture Loans and Ascension were "entitled to sovereign immunity as arms of the Tribe and therefore reverse[d] the district court's decision."  Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

**Martorello's Continuing Control Over the Lending Business**

Duggan contends that "Ascension and Big Picture were structured to create the appearance of tribal control, but such control is merely illusory." (Id. ¶ 88). As in the case of the prior business structure, two LVD Tribe members are designated as "co-managers" of Ascension, but they allegedly receive no compensation and have no day-to-day control over the lending enterprise. (Id.). Instead, Ascension continues to operate in the same manner and with the same individuals as Bellicose. (Id.). According to the plaintiff, none of those individuals are members of the Tribe and nearly all of Ascension's activities take place outside the reservation. (Id. ¶ 103). Furthermore, under an Intratribal Servicing Agreement ("Servicing Agreement") between Ascension and Big Picture Loans, which is virtually identical to the servicing agreement between SourcePoint and Red Rock, Big Picture Loans granted Ascension the right to control the fundamental aspects of the lending business. (Id. ¶¶ 89-90). In particular, Ascension is responsible for all accounting, marketing, compliance, risk and analytics, information technology, call center monitoring and training, vendor identification, contract negotiations with vendors, and assistance with the solicitation of investors. (Id. ¶ 89).

Duggan further asserts that Martorello, through Eventide, exercises control over Ascension's operations and that he does so by using Brian McFadden ("McFadden"), Ascension's president, "as a surrogate to handle the day-to-day operations of Ascension." (Id. ¶ 92; see also id. ¶ 93, 96-98). McFadden is Martorello's childhood friend and the former president of Bellicose. (Id. ¶ 92). He is also a two percent owner of Eventide. (Id. ¶ 94). After Ascension was created, Martorello allegedly insisted that McFadden serve as president of Ascension. (Id. ¶ 92). Duggan claims that McFadden plays a significant role in the financial

underwriting, collections, data analytics, vendor management, employee management and direction of the lending business.  (Id.).  Furthermore, under an agreement entitled "Delegation of Authority Policy," the LVD co-managers of Ascension expressly delegated authority over a range of company matters to McFadden.  (Id. ¶ 95 & Ex. 34 § 1.4).  These matters include, but are not limited to, the authority to "(1) handle Ascension's 'strategic direction, goals and targets,' (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs, and (5) [exercise] 'authority regarding all matters necessary for the day to day management of Ascension.'"  (Id. ¶ 95 (quoting Compl., Ex. 34 § 1.4)).  Accordingly, Martorello's close friend and partner controls Ascension's daily operations.

The Complaint details additional methods by which Martorello and Eventide exert control over McFadden, Ascension and Big Picture Loans.  For example, Duggan alleges that Big Picture Loans assigned the right to control its bank accounts to McFadden and another close associate of Martorello, and that Martorello controls the process for distributing funds to the Tribe.  (Id. ¶ 91).  She also claims that under the terms of the Loan Agreement between Eventide and the Tribe, Martorello, through Eventide, has authority to approve or reject the replacement of McFadden.  (Id. ¶ 93).  He also has the unilateral right to buy out McFadden's interest in Eventide, and Eventide has the authority to approve 5% increases to Ascension's budget, which in turn can impact McFadden's salary.  (Id. ¶¶ 93-94).  Neither Ascension nor Big Picture Loans can terminate or replace any manager, director or officer of its company without Eventide's permission.  (Id. ¶ 96).  Nor can they amend, modify or terminate the Servicing Agreement between Big Picture Loans and Ascension, or dissolve, modify or amend their own

articles of organization or operating agreement, without Eventide's/Martorello's consent.  (Id.).

In addition, Eventide's permission is necessary for Big Picture Loans and Ascension to relocate

or open a new office, for Ascension to create new employment positions or for Big Picture

Loans to take on new debt or investors.  (Id. ¶ 97).  If either entity wishes to make a significant

change to its business model, such as lowering interest rates to the levels permitted under

states' laws, they must first obtain Eventide's permission.  (Id.).

      Allegedly, Martorello and Eventide also exert control over the lending operations

pursuant to the terms of the Promissory Note.   For instance, under the Note, Big Picture Loans

must seek Eventide's approval to expand its lending operation or alter its budget in a manner

that would increase labor costs more than 5%.  (Id. ¶ 98).  Big Picture Loans, Ascension and TED

also "have a fiduciary duty" to "maximize the cash flows" to Eventide.  (Id. & Ex. 26 §

1.2(b)(4)(b)).

      Duggan claims that Martorello and Eventide have maintained their efforts to assert

control over the lending business even in the context of class action litigation challenging the

legality of the alleged rent-a-tribe scheme under state and federal law.  (See id. § 100).

Specifically, in 2019, a nationwide group of plaintiffs, including Duggan, reached a settlement

with Big Picture Loans, Ascension, the Tribe and various tribal officials in Galloway v. Williams,

No. 3:19-cv-470 (E.D. Va.) ("Galloway III"), a case involving nearly the same claims and

allegations as those asserted in this case.  See Galloway III, No. 3:19-cv-470, 2020 WL 7482191,

at *1-2 (E.D. Va. Dec. 18, 2020).  As part of the settlement, Big Picture Loans and other Tribe-

affiliated parties agreed to release past due debts and reduce the interest collected on

outstanding loans.  (Compl. ¶ 100).  Although Martorello and Eventide were not parties to the

settlement, they objected to these terms and to court approval of the settlement.  (Id. & Ex.

35).  They also notified the Tribe that Eventide has numerous controls and related rights to

oversee Big Picture Loans' and Ascension's business operations under the terms of the

Promissory Note, the Loan Agreement, a Security Agreement and a Parental Guarantee,

thereby indicating their intent to maintain control of all decisions associated with the tribal

lending business.  (Compl. ¶ 100).

### Big Picture Loans' Lending Operations

Although Ascension provides the services necessary to operate the lending business,

loans to consumers are made in the name of Big Picture Loans.  (See id. ¶¶ 3, 9-10, 104).  Big

Picture Loans allegedly employs only about 17 Tribe members who work on the reservation,

and all except one of those employees work as customer service representatives whose job

consists of administrative tasks.  (Id. ¶ 105).  The loan applications originate on the internet and

are evaluated using an automated process.  (Id.).  Customer support, including questions from

prospective borrowers, account verification and efforts to track down any missing information,

is allegedly handled by customer service representatives located at call centers in Mexico or the

Philippines.  (Id.).  Quality control for the call centers is handled from the Virgin Islands.  (Id.).

Allegedly, over 200 customer service representatives handle calls and account verification

responsibilities for Big Picture Loans outside the United States.  (Id.).   Employees located on

tribal lands have no responsibility for pre-screening loans, marketing the loans or customer

support in connection with the execution of the loan agreements.  (Id.).  According to Duggan,

their only role is to provide the final verification of information provided by the borrower, type

information into a computer in order to trigger the automatic disbursement of funds, and

respond to consumer emails.  (Id.).  Therefore, most of the activities related to the lending

process are performed by non-tribal employees located outside the reservation.

### Duggan's Loan Agreements

Duggan claims that she fell victim to the defendants' usurious lending scheme on two

separate occasions when she obtained short-term loans from Big Picture Loans.  (Id. ¶¶ 9-10,

27-45).  The first loan, which Duggan received in October 2017, was for $425 and the second

loan, which she received in April 2018, was for $775.  (Id. ¶¶ 9-10).  The plaintiff obtained the

loans after filling out application materials on the internet and speaking with a representative

of Big Picture Loans from her home in Massachusetts.  (Id.).  Duggan claims that Big Picture

Loans' representative failed to explain the terms of the loans or provide her with an

opportunity to review the loan agreement before she digitally signed the agreement and

submitted it over the internet.  (Id. ¶¶ 30-32, 40).  As a result, Duggan was unaware that the

interest rate on each of the loans would exceed 500 percent or that the loan agreement

contained provisions that allegedly required her to relinquish her rights as a consumer under

Massachusetts law.  (Id. ¶¶ 30, 34, 40, 120-21).  Specifically, according to the plaintiff, the loan

agreements used by Big Picture Loans, including the agreement that controlled Duggan's loans,

contained choice of law, forum selection, class action waiver and dispute resolution provisions

that allegedly sought "to disclaim federal and state laws in favor of Tribal law[,]" "deprive[ ]

Massachusetts borrowers of *any* forum [in which] to bring state or federal law claims" and

violate the borrower's "statutory right to maintain a class action to redress unfair or deceptive

acts or practices in accordance with Massachusetts law."[4] (Id. ¶¶ 121-23, 126 140-41 & Ex. 1 at

4-5 (emphasis in original)).

The plaintiff alleges that she repaid the $425 over the course of six months, with Big

Picture Loans and/or Ascension using the Automated Clearing House ("ACH") system to

electronically deduct $191.52 per month from her bank account during the first five months

and deducting $125.62 in the final month.  (Id. ¶¶ 28, 35-36).  Accordingly, the plaintiff's

repayments on the first loan totaled $1,083.22.  (Id. ¶ 37).  Prior to filing this lawsuit, Duggan

paid a total of $875 on the $775 loan.  (Id. ¶ 42).  Big Picture Loans contends that she owes it at

least an additional $719.06 in repayments on that loan.  (Id. ¶ 43).  Duggan alleges that the

interest rate charged on each of her loans was usurious and violated Massachusetts lending

laws.  (See id. ¶¶ 9-11).  She also claims that "[t]he Big Picture Loans representative was

operating under the instruction, direction, and/or supervision" of Martorello and Eventide, and

that the defendants' conduct violated both federal and state law.  (Id. ¶¶ 11-13, 33, 41).

Duggan is not the only Massachusetts resident who allegedly entered into a usurious

loan agreement with Big Picture Loans.  According to the plaintiff, Martorello and Eventide

intentionally directed their lending operation to Massachusetts consumers for the purpose of

---

[4] The choice of law and forum selection provision of Duggan's loan agreement calls for the agreement to
be governed by tribal law, "including but not limited to the Code as well as applicable federal law."
(Compl., Ex. 1 at 4).  It also provides that "[a]ll disputes shall be solely and exclusively resolved pursuant
to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for
Your convenience." (Id.).  The dispute resolution provision requires the borrower to submit any
complaints arising from the loan agreement to the lender for an investigation and response.  (Id.).  Any
appeal from the lender's decision must be submitted to the Tribal Financial Services Regulatory
Authority for administrative review and a possible hearing, and any appeal from the Authority's decision
must be submitted to the Tribal Court for a final review.  (Id. at 4-5).

making and collecting on loans to Massachusetts borrowers.  (Id. ¶ 19).  Acting in concert with

Ascension, Big Picture Loans and various individuals, they allegedly

> solicited thousands of Massachusetts consumers with direct mail, telephoned
> Plaintiff and thousands of other Massachusetts borrowers to confirm application
> information and to arrange electronic banking transactions, entered into
> thousands of contracts with Massachusetts borrowers in the state, debited
> Massachusetts consumers' bank accounts through many thousands of banking
> transactions, and otherwise serviced the illegal loans of thousands of
> Massachusetts consumers.

(Id. ¶ 20 (footnote omitted)).  While the transactions were conducted in the name of Big Picture

Loans with direction and support from Ascension, Duggan claims that they were part of the

overall rent-a-tribe lending scheme.  (Id.).  As described above, she also claims that Martorello

masterminded and directed that scheme for his own illegal gain.

Additional factual details relevant to this court's analysis are set forth below.

### III.   ANALYSIS – PERSONAL JURISDICTION

Duggan has asserted claims against Martorello and Eventide for a declaratory judgment

declaring that the choice of law, forum selection, class action waiver and dispute resolution

provisions of Big Picture Loans' loan agreements are void and unenforceable as to

Massachusetts consumers (Count I); violations of Massachusetts anti-usury and consumer

protection laws (Counts II-V); RICO violations (Counts VI-IX); and unjust enrichment (Counts X-

XI).  Martorello has moved to dismiss all of these Counts on the grounds that they fail to state a

claim upon which relief may be granted and that this court lacks personal jurisdiction over him.

The Supreme Court has instructed that "a federal court generally may not rule on the merits of

a case without first determining that it has jurisdiction over the category of claim in suit

(subject-matter jurisdiction) and the parties (personal jurisdiction)."  Sinochem Int'l Co. Ltd. v.

Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 1191, 167 L. Ed. 2d 15

(2007).  Accordingly, this court turns first to the question of personal jurisdiction.  Martorello

argues that as "an individual residing in Texas with no property or connection to

Massachusetts, [he] is not subject to the personal jurisdiction of this Court."  (Def. Mem.

(Docket No. 125) at 7).   For the reasons that follow, this court disagrees and finds that

Martorello has sufficient contacts with Massachusetts to support this court's exercise of

specific personal jurisdiction over him.  Accordingly, his motion to dismiss on this basis must be

denied.

### A.     Personal Jurisdiction – Generally

Subject matter jurisdiction in this case is premised on diversity of citizenship.  (See

Compl. ¶ 16).  To exercise personal jurisdiction over a defendant in such cases, the court must

"find sufficient contacts between the defendant and the forum to satisfy both that state's long-

arm statute and the Fourteenth Amendment's Due Process Clause."  Sawtelle, 70 F.3d at 1387.

"Personal jurisdiction may be either general or specific."  Cossaboon v. Me. Med. Ctr., 600 F.3d

25, 31 (1st Cir. 2010).  Specific jurisdiction exists "where the cause of action arises directly out

of, or relates to, the defendant's forum-based contacts."  Id. (quoting Pritzker v. Yari, 42 F.3d

53, 60 (1st Cir. 1994)).  "General jurisdiction broadly subjects the defendant to suit in the forum

state's courts 'in respect to all matters, even those that are unrelated to the defendant's

contacts with the forum.'"  Id. (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196

F.3d 284, 288 (1st Cir. 1999)).  In the instant case, Duggan alleges only specific personal

jurisdiction over Martorello.  (See Compl. ¶ 19; Pl. Opp. Mem. (Docket No. 136) at 8-15).  To

establish such jurisdiction, the Massachusetts long-arm statute must grant such jurisdiction and

"the exercise of jurisdiction pursuant to that statute [must] comport[] with the strictures of the Constitution." Pritzker, 42 F.3d at 60.

In support of his motion to dismiss, Martorello has focused solely on the due process analysis without challenging personal jurisdiction under the Massachusetts long-arm statute.[5] (See Def. Mem. at 7-9.)  Where, as here, "a defendant limits its jurisdictional objection to either statutory grounds or constitutional grounds, the court need only consider those particular grounds." Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 122 (1st Cir. 2022).  Because Martorello objects to jurisdiction only on constitutional grounds, it is appropriate for this court to limit its analysis accordingly.  Id.

B.     **Specific Jurisdiction Over Martorello**

"To determine whether specific jurisdiction exists, [the court must] look to three criteria: relatedness, purposeful availment, and reasonableness." Id.  As the First Circuit has explained:

> First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum.  Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state.  Finally, the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.

---

[5] Both Duggan and Martorello rely on case law in which the First Circuit ruled that Massachusetts' long-arm statute extends personal jurisdiction to the limits allowed by the federal Constitution.  (Def. Mem. at 7 (citing Daynard, 290 F.3d at 52); Pl. Opp. Mem. at 8 (citing Daynard)).  Courts following this ruling have routinely determined that it is appropriate to dispense with the long-arm analysis and focus on "the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards." Sawtelle, 70 F.3d at 1388.   However, the Massachusetts Supreme Judicial Court has since ruled explicitly that the state long-arm statute "does not purport to extend jurisdiction as far as due process would allow" and that "[t]he requirements of [that statute] may not be circumvented by restricting the jurisdictional inquiry to due process considerations." SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 328-30, 85 N.E.3d 50, 55-56 (2017).  Therefore, unless a challenge under the long-arm statute has been waived, it is necessary to determine whether jurisdiction is appropriate under that statute before engaging in a constitutional analysis.

Id. (internal quotations and citations omitted).  Where, as here, the alleged claims are akin to intentional torts, the question of specific jurisdiction focuses on "the relationship among the defendant, the forum, and the litigation."  Walden v. Fiore, 571 U.S. 277, 291, 134 S. Ct. 1115, 1126, 188 L. Ed. 2d 12 (2014) (quoting Calder v. Jones, 465 U.S. 783, 788, 104 S. Ct. 1482, 1486, 79 L. Ed. 2d 804 (1984)).

The essence of Martorello's challenge to personal jurisdiction is that "the only allegations of the Second Amended Complaint touching upon Massachusetts are the acts of other individuals and entities—not Martorello[,]"and that those acts were performed on tribal land by entities owned by the LVD Tribe.  (Def. Mem. at 8-9; see also Def. Reply Mem. (Docket No. 143) at 13-16).  Thus, the defendant argues that the "Plaintiff's claims as to Martorello are limited to acts taken by others, specifically acts by Big Picture and Ascension, which affirmatively occurred **on the reservation**, and thus cannot arise out of, or relate to, forum-state activities."  (Def. Mem. at 8 (emphasis in original)).  These arguments are unpersuasive.

As an initial matter, Martorello's assertion that the lending activities at issue occurred on the reservation, and do not arise out of or relate to activities in Massachusetts, is undermined by the facts alleged in the Complaint.  As detailed above, Duggan has alleged that as part of the nationwide payday lending scheme, Big Picture Loans, with direction from Ascension, "solicited thousands of Massachusetts consumers with direct mail, telephoned Plaintiff and thousands of other Massachusetts borrowers to confirm application information and to arrange electronic banking transactions, entered into thousands of contracts with Massachusetts borrowers in the state, debited Massachusetts consumers' bank accounts through many thousands of banking transactions, and otherwise serviced the illegal loans of

[22]

thousands of Massachusetts consumers." (Compl. ¶ 20 (footnote omitted)).  She has also

submitted a table that lists 787 loans from Big Picture Loans to Massachusetts borrowers that

remained outstanding at a single point in time for purposes of providing a snapshot illustrating

the extent of the tribal entities' numerous contacts with Massachusetts. (Id. ¶ 21 & Ex. 2).

These allegations show that the tribal entities' lending activities occurred outside the

reservation. Gingras v. Think Fin., Inc., 922 F.3d 112, 121 (2d Cir. 2019) (finding that tribal

defendants in allegedly illegal payday lending scheme "engaged in conduct outside of Indian

lands when they extended loans to the Plaintiffs in Vermont"). They also establish that Big

Picture Loans' and Ascension's contacts with Massachusetts would be considered sufficient to

subject those entities to specific personal jurisdiction in this forum. See, e.g., Access Now, Inc.

v. Sportswear, Inc., 298 F. Supp. 3d 296, 301-03 (D. Mass. 2018) (concluding that defendant was

subject to specific personal jurisdiction in Massachusetts where defendant marketed and sold

sportswear to Massachusetts consumers over the internet and plaintiff's claim arose out of

defendant's activities in Massachusetts). Gingras v. Rosette, No. 5:15-cv-101, 2016 WL

2932163, at *2-3, *9 (D. Vt. May 18, 2016) (finding that tribal lending entity's contacts with

Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in

Vermont" for purposes of claims for violations of state and federal law, including state usury

laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent

emails and loan applications to Vermont consumers and transferred loan principal to

consumers' Vermont bank accounts), aff'd sub nom. Gingras v. Think Fin., Inc., 922 F.3d 112 (2d

Cir. 2019).

Martorello's argument that the actions of Big Picture Loans and Ascension "cannot be ascribed to [him] for jurisdictional purposes" is equally unavailing.  (Def. Mem. at 9).  Under the law of this Circuit, a party's "contacts with a particular forum may be imputed to another [party] for purposes of establishing specific personal jurisdiction where a sufficient relationship exists between the two [parties]."  Winne v. Nat'l Collegiate Student Loan Trust 2005-1, 228 F. Supp. 3d 141, 150 (D. Me. 2017), and cases cited.  Notably, "[t]he relationship at issue need not fit precisely within the confines of a specific agency doctrine[.]"  Id.  See also Daynard, 290 F.3d at 56-57 (in determining whether one party's contacts with the forum state may be attributable to another party, the question is "not whether a partnership, joint venture, or other particular agency relationship between the two [parties] exists").  Rather, the question for the court "is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction[.]"  Daynard, 290 F.3d at 56-57.  The First Circuit has determined that due process is satisfied where the defendant in question exercises "substantial influence" or "control" over another party's "decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'"  Donatelli v. Nat'l Hockey League, 893 F.2d 459, 469 (1st Cir. 1990).  In the instant case, Duggan has alleged sufficient facts to show that Martorello exerts substantial influence and control over Big Picture Loans' and Ascension's activities, including their activities in marketing and lending to consumers in Massachusetts.

As detailed above, the plaintiff's allegations demonstrate that Martorello was the mastermind and driving force behind the creation and implementation of the alleged rent-a-tribe lending scheme, including the creation of Big Picture Loans and the restructuring of Bellicose as Ascension.  (See Compl. ¶¶ 1, 3, 8, 71-75 & Ex. 3 ¶ 2).  They also demonstrate that

Martorello took affirmative steps to organize the business in a manner that would hide his involvement from state regulators and others while enabling him to receive the vast majority of the net revenue derived from the lending operations.  (Id. ¶¶ 76-82).  Moreover, the record reveals that Martorello, through Eventide and Ascension, directed and maintained control over all material aspects of the lending operations, including but not limited to, the marketing, extension and collection of payday loans to thousands of consumers located in Massachusetts. (See id. ¶¶ 19-20, 89-98).  "This conduct constitutes sufficient suit-related contacts with [Massachusetts] to support specific jurisdiction."  Pennsylvania by Shapiro v. Think Fin., Inc., No. 14-cv-7139, 2018 WL 637656, at *5 (E.D. Pa. Jan. 31, 2018) (finding that defendants had sufficient contacts with the forum state to support specific personal jurisdiction where defendants "actively participated in the design, implementation, and direction of a scheme that targeted customers located in [the forum] with the payday loans" at issue in the litigation).  See also Smith v. Martorello, No. 3:18-cv-01651-AC, 2021 WL 1257941, at *9-10 (D. Or. Jan. 5, 2021) (finding specific personal jurisdiction over Martorello in Oregon based on nearly identical facts alleged by Duggan with respect to his role in the alleged rent-a-tribe lending scheme), adopted as modified, 2021 WL 981491 (D. Or. Mar. 16, 2021).

Martorello nevertheless insists that the tribal entities' actions cannot be attributed to him because the Fourth Circuit determined otherwise in the case of Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019),[6] and because Duggan's own exhibits show that he lacks

---

[6] In Williams, the Fourth Circuit held that Big Picture Loans and Ascension are arms of the Tribe entitled to tribal sovereign immunity, thereby reversing the district court's ruling to the contrary and remanding the matter with instructions to grant Big Picture Loans' and Ascension's motion to dismiss for lack of subject matter jurisdiction.  Williams, 929 F.3d at 185.  In connection with its analysis, the Fourth Circuit concluded in significant part that the evidence in that case "does not support the district court's

control over the Tribe or its lending entities.  (Def. Reply Mem. at 13-16).  Again, this court

disagrees.  As stated in footnote 1 above, Martorello has not presented any legal basis to

suggest that the Fourth Circuit's decision in Williams should be binding on this court or that it

would be appropriate for this court to adopt the factual findings of another court in a different

forum based on evidence developed in a separate proceeding.  This is especially true given the

questions raised since the Fourth Circuit's decision about the integrity of the underlying

evidence.  See Note 6 supra.  Moreover, in rendering a decision on the issue of personal

jurisdiction under the prima facie standard, this court is obliged to "take the facts from the

pleadings and whatever supplemental filings ... are contained in the record, giving credence to

the plaintiff's version of genuinely contested facts."  Baskin-Robbins Franchising LLC v.

Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016).  When accepted as true, Duggan's

allegations and the accompanying evidence are sufficient to support personal jurisdiction over

Martorello in Massachusetts.

---

conclusion that the creation of the [tribal] Entities was only or primarily intended to benefit Martorello
or that the creation of Big Picture and Ascension was solely the product of Martorello's design and
urging." Id. at 178.  It also agreed with the district court's underlying factual determinations that "the
evidence 'does not indicate that Martorello himself has received any substantial economic benefit from
Big Picture'" and "that the Tribe has a substantial role in the operations of Big Picture," which "'conducts
all of its operations on the Reservation.'" Id. at 179, 182 (citations omitted).  Notably, following the
issuance of the Fourth Circuit's decision, the plaintiffs "asserted, inter alia, that Martorello and others
made material misrepresentations" to both the district court and the Fourth Circuit regarding the
relevant facts "and that, as a result, the Fourth Circuit's decision on [the issue of sovereign immunity]
cannot be relied on by Martorello."  Williams v. Big Picture Loans, LLC, Nos. 3:17cv461, 3:18cv406, 2020
WL 6784352, at *1 (E.D. Va. Nov. 18, 2020).  Following briefing and an evidentiary hearing, the district
court issued a decision in which it concluded that Martorello did make misrepresentations, which
"strongly suggest that the Fourth Circuit's decision … is open to question." Id. at *14.  Because
Martorello's attempt to file an interlocutory appeal from the district court's decision has been denied,
matters addressed in the Fourth Circuit's sovereign immunity decision remain in dispute.  See Williams
v. Big Picture Loans, LLC, Nos. 3:17cv461, 3:18cv406, 2021 WL 2004788, at *1-2 (E.D. Va. May 19, 2021)
(denying Martorello's motion to certify opinion for interlocutory appeal).

The defendant's assertion that "[p]laintiff's allegations of 'influence and control' are gutted by the exhibits to the Second Amended Complaint" is similarly unpersuasive. (See Def. Reply Mem. at 13). Not only does Martorello mischaracterize the exhibits, but also his arguments, at most, raise disputed issues of fact. Such disputes are not properly resolved at the motion to dismiss stage. For example, but without limitation, Martorello points to email correspondence that he had with one of the Tribe's agents, Flint Richardson, to argue that Duggan misrepresented Martorello's role when she claimed he structured the lending business to ensure that he maintained control over all materials aspects of the lending enterprise. (Def. Reply Mem. at 7-9). He interprets these communications as proof that the Tribe controlled the lending business and that his company, Bellicose, was merely a servicer. According to the defendant, his communications directly contradict Duggan's arguments that Martorello was the party who approached the Tribe about the prospect of setting up a lending business and that he created the business structure so as to ensure his control over its operations. (Def. Reply Mem. at 7).

The communications cited by Martorello, however, can be read to support Duggan's allegations that Martorello and the Tribe created a business structure under which the Tribe had nominal involvement in the lending operations through the appointment of two "co-managers" and established two Tribe-affiliated entities, Red Rock and Duck Creek, in order "to create the illusion of tribal oversight and also to falsely portray 'loan originations' as those of a tribal lending entity." (Compl. ¶ 60; see also Compl. ¶ 63). As Martorello stated in one of his emails to Mr. Richardson, while representatives from the Tribe were designated as the lending entity's "managers," Bellicose, not the Tribe, "operates the business completely." (Id., Ex. 4 at

Bates No. 052498 (emphasis omitted)).  Furthermore, Duggan has submitted additional evidence, in the form of documents and affidavit testimony, that directly supports her allegations regarding the structure of the lending business.  (See, e.g., id., Ex. 3 ¶¶ 2-4 (describing how Martorello approached the Tribe with the proposal to participate in a lending business that would be run by Martorello without any substantive involvement by the Tribe and would require Red Rock to "originate" the loans even though it would be doing so in accordance with Martorello's lending criteria), Ex. 5 §§ 3.1, 3.3.1, 3.5.1, 4.4, 4.9 (contractual provisions describing SourcePoint's control over communications with Red Rock's service providers, lenders and other agents; prohibition on Red Rock's ability to engage in lending activities "anywhere in the world" without using SourcePoint's management and consulting services; SourcePoint's authority to collect all proceeds arising from Red Rock's operations; SourcePoint's status as sole signatory with transfer authority over Red Rock's bank accounts; and SourcePoint's right to "sweep funds from Red Rock's account into its own account")).  The fact that Martorello challenges the veracity of Duggan's allegations does not warrant dismissal of the Complaint.  As described above, on a motion to dismiss for lack of personal jurisdiction, the court must "[give] credence to the plaintiff's version of genuinely contested facts."  Baskin-Robbins Franchising LLC, 825 F.3d at 34.  Applying this standard to the allegations and evidence presented in this case supports the conclusion that Duggan has made out a prima facie case for exercising specific personal jurisdiction over Martorello.

Martorello's remaining challenges to the evidence are similarly unpersuasive and do not raise issues that are appropriately resolved at this stage of the case.  For example, but without limitation, Martorello disputes the allegation that "his legal counsel had advised him that he

could be liable for 'aiding and abetting felony crime[s]." (Def. Reply Mem. at 9-11; Compl. ¶ 68). However, the evidence shows that on December 10, 2012, Martorello sent an email to his accountants asking for advice regarding valuation in which he acknowledged that he had been advised by counsel that it was "possible the state will come after you for helping the tribe lend against their laws and charge YOU for aiding and abetting as a felony crime in their state (in some instances penalty could be jail time), but we don't think it's going to happen." (Compl., Ex. 7 at Bates No. 038991 (emphasis in original)). Thus, there is evidentiary support for the plaintiff's factual allegation. Even assuming a factual dispute, it will have to be resolved on a fuller record and it is not relevant to the issue of personal jurisdiction.

Finally, Martorello argues that Duggan misrepresented the negotiations regarding the sale of Bellicose to Ascension by suggesting that Martorello proposed restructuring the lending business in response to the district court's decision in the case of Otoe-Missouria when, in reality, his decision was driven by economic concerns. (Def. Reply Mem. at 12). Again, however, the evidence submitted by Duggan supports rather than contradicts her allegations. Specifically, Duggan alleges in relevant part that

> [i]n the wake of the district court's *Otoe-Missouria* opinion, Martorello recognized the risk of "significant liability" and the "potential investigation and prosecution of us personally." (Exh. 12, email exchange, at 6304-05). Martorello forecasted that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims." (Exh. 13, email exchange, at 52787.) Instead of complying with the law, however, Martorello attempted to paper over his operation so that he could retain control of the usurious lending enterprise, continue to reap most of the profits, and only nominally surrender corporate ownership of the lending services provider to present a misleading appearance of tribal control. Two weeks after the district court's opinion in *Otoe-Missouria*, Martorello proposed to the Tribe's counsel that the Tribe take ownership of Bellicose through a new entity – the entity that is now ... Ascension. (Exh. 14, email.)

(Compl. ¶ 71).  A review of the cited exhibits reveals that the language quoted in paragraph 71 is consistent with the underlying evidence.  Accordingly, Martorello's assertion that Duggan "makes no effort to reconcile her allegations with ... her own exhibits" is belied by the record. (Def. Reply Mem. at 14).  In any case, this court finds that even if Martorello's true motivation for restructuring the lending business was entirely financial, this would not alter the alleged fact that he continued to maintain control over the lending enterprise.  His motion to dismiss for lack of personal jurisdiction must therefore be denied. [7]

### IV.   ANALYSIS – MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

This court turns next to Martorello's motion to dismiss Duggan's claims for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  As described above, Martorello is seeking to dismiss all of Duggan's claims, pursuant to Rule 12(b)(6), on the grounds that the allegations against him are conclusory, speculative and inconsistent with relevant documents; the choice of law provision contained in Duggan's loan agreement "mandate[s] application of tribal law and a swift end to Plaintiff's accusations" against him; and the plaintiff has failed to state claims against him for violations of RICO, Massachusetts lending laws, unjust enrichment or a declaratory judgment.  (Def. Mem. at 11-30).  For the reasons that follow, Martorello's motion to dismiss under Rule 12(b)(6) is denied as well.

---

[7] Because this court finds that Duggan has shown that Martorello has sufficient contacts with Massachusetts to justify personal jurisdiction over him in this forum, it is not necessary for this court to consider the plaintiff's argument that personal jurisdiction over Martorello is also appropriate under RICO's nationwide service of process provision.  (See Pl. Opp. Mem. at 15-17).

A.  **Standard of Review**

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  See Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane."  Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted). This second step requires the reviewing court to "draw on its judicial experience and common sense."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl., 550 U.S. at 555, 127 S. Ct. at 1964-65 (citations omitted).  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere

[31]

conjecture, the complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)).

### A. Sufficiency of Duggan's Factual Allegations

Martorello's first challenge to Duggan's claims focuses on the sufficiency of the Complaint's factual allegations. The defendant argues that the plaintiff has "failed to plead facts demonstrating Martorello's personal participation in the acts causing her harm" and that her allegations against him are too conclusory to state a plausible claim for relief. (Def. Mem. at 11-15). He also argues that Duggan's "allegations regarding the alleged scheme are directly contrary to relevant documents in the public record– including the Fourth Circuit's opinion in Williams[.]" (Id. at 14). As described in detail above, this court finds that Martorello's latter arguments lack merit. For the reasons that follow, his assertion that Duggan's allegations are too conclusory to withstand his motion to dismiss is similarly unavailing.

Under the notice pleading requirement set forth in Rule 8 of the Federal Rules of Civil Procedure, "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this Rule "is to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Phelps v. Local 0222, No. 09–11218–JLT, 2010 WL 3342031, at *5 (D. Mass. Aug. 20, 2010) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (quotations and citations omitted)). In addition, the pleadings "must afford the defendants a meaningful opportunity to mount a defense." Benyamin v. Commonwealth Med. UMass Med. Ctr., Inc., No. 11–40126–FDS, 2011 WL 2681195, at *2 (D. Mass. July 6, 2011) (quoting Díaz-Rivera v. Rivera–Rodríguez, 377 F.3d 119,

123 (1st Cir. 2004) (internal punctuation and additional citations omitted)).  Thus, at a

minimum, "the complaint should at least set forth minimal facts as to who did what to whom,

when, where, and why."  Id. (quoting Educadores Puertorriqueños en Acción v. Hernández, 367

F.3d 61, 68 (1st Cir. 2004)).  "While a court may dismiss a pleading that does not comply with

the notice pleading requirements of Rule 8, the exercise of this power is generally reserved for

a pleading that is 'so confused, ambiguous, vague, or otherwise unintelligible that its true

substance, if any, is well disguised.'"  Black v. UNUMProvident Corp., 245 F. Supp. 2d 194, 197

(D. Me. 2003) (quoting Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)).

The Complaint in this case easily satisfies the relevant pleading standard.  It contains

226 paragraphs and 37 exhibits alleging in detail how Martorello designed, directed and

maintained control over the alleged illegal lending scheme.  As set forth above in this court's

Statement of Facts, Duggan has alleged extensive facts describing Martorello's personal

involvement in all aspects of the business.  Those facts, and the documents on which they rely,

describe in great detail how Martorello maintained control over Red Rock through SourcePoint,

an affiliate of Bellicose, and how he later exercised substantial control over Big Picture Loans

and Ascension through Eventide.  (See Compl. ¶¶ 59-67, 73, 87-99, and Exhibits cited). There is

nothing vague or conclusory about the plaintiff's allegations.

Martorello's effort to equate Duggan's allegations with those at issue in the Supreme

Court case of Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), is

unconvincing.  In that case, the Court rejected claims by the respondent, a Pakistani Muslim

who was detained by federal officials in the wake of the September 11, 2001 terrorist attacks,

that former U.S. Attorney General, John Ashcroft ("Ashcroft"), and the Director of the Federal

Bureau of Investigation, Robert Mueller ("Mueller"), "adopted an unconstitutional policy that

subjected respondent to harsh conditions of confinement on account of his race, religion, or

national origin." Iqbal, 556 U.S. at 666, 129 S. Ct. at 1942.  As the Court described the

complaint in that action:

> The complaint contends that petitioner designated respondent a person of high
> interest on account of his race, religion, or national origin, in contravention of
> the First and Fifth Amendments to the Constitution.  The complaint alleges that
> "the [FBI], under the direction of Defendant MUELLER, arrested and detained
> thousands of Arab Muslim men ... as part of its investigation of the events of
> September 11."  It further alleges that "[t]he policy of holding post-September
> 11th detainees in highly restrictive conditions of confinement until they were
> 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in
> discussions in the weeks after September 11, 2001."  Lastly, the complaint posits
> that petitioners "each knew of, condoned, and willfully and maliciously agreed to
> subject" respondent to harsh conditions of confinement "as a matter of policy,
> solely on account of [his] religion, race, and/or national origin and for no
> legitimate penological interest."  The pleading names Ashcroft as the "principal
> architect" of the policy, and identifies Mueller as "instrumental in [its] adoption,
> promulgation, and implementation."

Id. at 668-69, 129 S. Ct. at 1944 (citations omitted).

The Supreme Court found that the respondent "had not offered sufficient factual

allegations to plausibly support the inference of discriminatory intent" and that his "complaint

failed to supply enough supporting facts to nudge his claim of purposeful discrimination 'across

the line from conceivable to plausible.'" Chao v. Ballista, 630 F. Supp. 2d 170, 177 (D. Mass.

2009) (quoting Iqbal, 556 U.S. at 683, 129 S. Ct. at 1952).  According to the Court, the only

plausible conclusion implied by the respondent's complaint was "that the Nation's top law

enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep

suspected terrorists in the most secure conditions available until the suspects could be cleared

of terrorist activity." Iqbal, 556 U.S. at 683, 129 S. Ct. at 1952.  Because the Court determined

[34]

that the respondent had not alleged sufficient facts "to plausibly suggest petitioners' discriminatory state of mind[,]" it ruled that his complaint failed to comply with the pleading standard required by Rule 8.  Id.

Martorello posits that "Plaintiff's allegations against [him] are analogous to, and in some instances identical to, those dismissed in *Iqbal*."  (Def. Mem. at 13).  However, Duggan's lengthy and factually detailed Complaint bears no resemblance to the complaint described in that case.  While paragraph 25 of Duggan's Complaint describes Martorello in a conclusory fashion as "the architect of the rent-a-tribe lending scheme" with "direct personal involvement in the creation and day-to-day operations of the illegal enterprise[,]" she has alleged detailed facts to support that allegation, as this court has described above.  (Compl. ¶ 25).  Additionally, Duggan has supported her factual allegations with exhibits describing, inter alia, communications regarding Martorello's role and the role of his companies in the alleged lending scheme, servicing agreements between Martorello's companies and the Tribe, and the restructuring of the lending business.  (See, e.g., id., Exs. 3-6, 14, 17, 19-22, 34).  The Complaint in this case is more than sufficient to pass muster under Rule 8.

**B.  Choice of Law**

Martorello next argues that the choice of law provision contained in Duggan's loan agreement with Big Picture Loans requires application of LVD law.  (Def. Mem. at 15-18).  As Duggan has alleged in her complaint, the plaintiff's loan agreement contains a provision entitled "**GOVERNING LAW AND FORUM SELECTION**[,]" which reads as follows:

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of
> Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the
> Code as well as applicable federal law.  All disputes shall be solely and exclusively

resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section
9 of the Code and summarized below for Your convenience.

(Compl. ¶ 121).  Martorello contends that plaintiff's loan agreement "represent[s] a consensual

commercial transaction agreeing to tribal law[.]"  (Def. Mem. at 15).  He further contends that

because the loans at issue in this case are not usurious under LVD law, Duggan's claims should

be dismissed.  (See id. at 15-16).  Duggan counters that the choice of law provision is

unenforceable because tribal law cannot regulate matters involving non-tribal members

outside the reservation, enforcement of the provision would conflict with Massachusetts'

public policy interests against usurious lending, and the provision is unconscionable under state

law.  (Pl. Opp. Mem. at 19-25).  According to Duggan, "all Big Picture's dealings with Duggan

and other non-tribal members in Massachusetts are governed by Massachusetts law."  (Id. at

20).

Ordinarily, a contractual choice of law and forum selection clause such as the one at

issue here is enforceable "absent a strong showing that it should be set aside."  Carter's of New

Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 292 (1st Cir. 2015) (quoting Bremen v. Zapata Off-Shore

Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 1916, 32 L. Ed. 2d 513 (1972)).  Such a showing can exist

where the party challenging enforcement of the clause establishes one or more of the

following:

> (1) the clause is the product of fraud or overreaching; (2) enforcement is
> unreasonable and unjust; (3) its enforcement would render the proceedings
> gravely difficult and inconvenient to the point of practical impossibility; or (4)
> enforcement contravenes "a strong public policy of the forum in which suit is
> brought, whether declared by statute or judicial decision."

Id. (quoting Huffington v. T.C. Grp., LLC, 637 F.3d 18, 23 (1st Cir. 2011)).  Because Duggan has

shown, at this stage, that enforcing the choice of law clause contravenes Massachusetts' strong

[36]

public policy against usurious lending, this court concludes that she has stated a claim that the choice of law provision is unenforceable.  Therefore, it is unnecessary to address the plaintiff's remaining arguments.

<u>Public Policy Against Usury</u>

"Usury is generally defined as the taking of interest in excess of the rate permitted by law." <u>Begelfer v. Najarian</u>, 381 Mass. 177, 181, 409 N.E.2d 167, 170 (1980).  The Massachusetts anti-usury statute, which Duggan has asserted against Martorello in Count III of her Complaint, provides in relevant part as follows:

> (a) Whoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury and shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than ten thousand dollars, or by both such fine and imprisonment.

Mass. Gen. Laws ch. 271, § 49(a).  Thus, in Massachusetts, usury is criminalized as a "Crime Against Public Policy." <u>Feloni v. Coco</u>, No. 16-12178-GAO, 2019 WL 2387761, at *20 (D. Mass. Mar. 4, 2019) (citing Mass. Gen. Laws ch. 271, § 49).

In <u>Begelfer v. Najarian</u>, a case cited by Duggan in opposition to Martorello's motion, the Massachusetts Supreme Judicial Court ("SJC") noted that in 1965, prior to the enactment of the anti-usury statute, members of a Special Commission on Laws Relative to Loans and Credit declined to recommend passage of an anti-usury law in the Commonwealth because they believed existing and recommended legislation was adequate to protect borrowers. <u>Begelfer</u>, 381 Mass. at 182, 409 N.E.2d at 171.  However, by 1970, the Governor was recommending "passage of a usury law to provide an effective tool against organized crime and 'the vicious

offense of loansharking'" and the usury statute was enacted shortly thereafter.  Id.  According

to the SJC, "[t]he law is designed to protect the necessitous debtor from outrageous demands

by lenders."  Id.  The SJC has further acknowledged, in connection with its discussion of the

Massachusetts anti-usury statute, that "[t]he public policy against usury is clearly a matter for

grave legislative concern."  Id. at 185, 409 N.E.2d at 172.  Therefore, Duggan has demonstrated

that enforcement of the choice of law provision in her loan agreement would contravene

Massachusetts public policy.

Martorello disputes that Massachusetts has a public policy against lenders charging

interests rates above the statutory cap because the anti-usury statute allows lenders to avoid

the twenty percent limit if they notify the Commonwealth's Attorney General of their intent to

charge a higher rate and comply with certain record-keeping requirements.  (Def. Mem. at 17).

Martorello is correct that under paragraph (d) of the statute,

> [t]he provisions of paragraph (a) to (c), inclusive, shall not apply to any person
> who notifies the attorney general of his intent to engage in a transaction or
> transactions which, but for the provisions of this paragraph, would be proscribed
> under the provisions of paragraph (a) providing any such person maintains
> records of any such transaction.

Mass. Gen. Laws ch. 271, § 49(d).  However, Martorello does not dispute that "LVD and its

lending entities did not register" their loan transactions with the Massachusetts Attorney

General.  (Def. Mem. at 17).  More importantly, Martorello has failed to explain how paragraph

(d) of the statute undermines "[t]he public policy against usury" that has been recognized

under Massachusetts law.  Begelfer, 381 Mass. at 185, 409 N.E.2d at 172.  Pursuant to the

statute, "[a]ny person who obtains a loan in which the interest and expenses exceed twenty per

cent a year may request that the loan be declared void by the Superior Court or [the SJC] if the

[38]

lender failed to register with the Attorney General." Id. at 178-79, 409 N.E.2d at 168 (citing

Mass. Gen. Laws ch. 271, § 49).  Therefore, the notification requirement, which enables the

state to monitor loans above the statutory cap, is consistent with the policy against usurious

lending.

Martorello also claims that "the [T]ribe, as a coequal sovereign exercising efforts in self-

governance, can hardly be required to register with the state Attorney General's Office." (Def.

Mem. at 17).  He further contends that even if Massachusetts has a public policy that conflicts

with tribal law, the Commonwealth's interests are outweighed by the federal policy of

promoting tribal self-determination and commercial interests, as described by the Supreme

Court in Montana v. United States, 450 U.S. 544, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981), and its

progeny.  (Id. at 17-18; see also Def. Reply Mem. at 21-23).  In other words, Martorello

contends that LVD's sovereign powers as a Native American tribe warrant the application of

tribal law in this case.  This argument is undermined by the alleged facts of the Complaint.

In Montana, the Supreme Court emphasized that as a general rule, "the inherent

sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the

tribe."  Montana, 450 U.S. at 565, 101 S Ct. at 1258.  However, it also recognized two

exceptions in which tribes may "exercise some forms of civil jurisdiction over non-Indians *on*

*their reservations*, [including] on non-Indian fee lands."  Id. (emphasis added).  Thus, as the

Supreme Court has explained:

> First, "[a] tribe may regulate, through taxation, licensing, or other means, the
> activities of nonmembers who enter consensual relationships with the tribe or
> its members, through commercial dealing, contracts, leases, or other
> arrangements."  Second, a tribe may exercise "civil authority over the conduct of
> non-Indians on fee lands within the reservation when that conduct threatens or

has some direct effect on the political integrity, the economic security, or the
health or welfare of the tribe."

Plains Commerce Bank v. Long Family Land & Cattle Co., Inc., 554 U.S. 316, 329-30, 128 S. Ct.

2709, 2720, 171 L. Ed. 2d 457 (2008) (internal citations omitted) (describing Montana).

However, the Court has cautioned that "efforts by a tribe to regulate nonmembers, especially

on non-Indian fee land, are 'presumptively invalid'" and "[t]he burden rests on the tribe to

establish one of the exceptions to *Montana's* general rule that would allow an extension of

tribal authority to regulate nonmembers on non-Indian fee land." Id. at 330, 128 S. Ct. at 2720

(quoting Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 659, 121 S. Ct. 1825, 1835, 149 L. Ed.

2d 889 (2001)).

There can be no genuine dispute that the second Montana exception does not apply to

this case.   As alleged in the Complaint, Duggan has never been to the LVD reservation.  (Compl.

¶ 28).  She applied for, discussed and entered into her loans from her home in Massachusetts.

(Id. ¶¶ 9-10, 27-28, 31, 39).  Either Big Picture Loans or Ascension wired the funds to Duggan's

bank account in Massachusetts and used the electronic ACH system to deduct monthly

payments from that account.  (Id. ¶¶ 28, 35-36, 39).  Accordingly, there is no indication that

Duggan engaged in conduct "on fee lands within the reservation[.]" Plains Commerce Bank,

554 U.S. at 329, 128 S. Ct. at 2720.

With respect to the first Montana exception, the Supreme Court, "with only 'one

minor exception,'" which is not applicable here,[8] has "'never upheld ... the extension of tribal

---

[8] In Brendale v. Confederated Tribes & Bands of Yakima Nation, 492 U.S. 408, 109 S. Ct. 2994, 106 L. Ed.
2d 343 (1989), "five Justices [of the Supreme Court] concluded that *Montana* did permit the [Yakima
Nation] to impose different zoning restrictions on nonmember fee land isolated in 'the heart of [a]

[40]

civil authority over nonmembers *on non-Indian land*.'" Id. at 333, 128 S. Ct. at 2722 (quoting

Nevada v. Hicks, 533 U.S. 353, 360, 121 S. Ct. 2304, 2310, 150 L. Ed. 2d 398 (2001)) (emphasis

in original).  In addition, the Court has explained that to merit tribal regulation over

nonmembers, the behavior at issue must "implicate[ ] tribal governance and internal

relations." Id. at 335, 128 S. Ct. at 2723.  As the Supreme Court stated in Plains Commerce

Bank,

> [t]he logic of *Montana* is that certain activities on non-Indian fee land (say, a
> business enterprise employing tribal members) or certain uses (say, commercial
> development) may intrude on the internal relations of the tribe or threaten tribal
> self-rule.  To the extent they do, such activities or land uses may be regulated.

Id. at 334-35, 128 S. Ct. at 2723.

Based on the facts alleged by Duggan in the instant case, this court cannot conclude that

the plaintiff's actions in borrowing funds from the Tribe at usurious rates implicated the Tribe's

sovereignty over its land, intruded upon its internal relations or posed a threat to its self-rule.

In addition to showing that she engaged in no activity on tribal lands, Duggan has alleged that

the lending activity at issue was part of an illegal scheme designed by Martorello to avoid state

usury laws and exploit the Tribe's sovereign immunity.  "[A] tribe has no legitimate interest in

selling an opportunity to evade state law." Otoe-Missouria, 769 F.3d at 114.   Under the

circumstances alleged here, the sovereign interests of the Tribe are not implicated and do not

render the choice of law clause of Duggan's loan agreement enforceable.  See Gingras, 922 F.3d

at 127 (finding that arbitration provisions requiring application of tribal law, which were

included in lending agreements between plaintiffs and tribal defendants, "are unenforceable

---

closed portion of the reservation,' 492 U.S., at 440, 109 S. Ct. 2994 (opinion of STEVENS, J.), though the
Court could not agree on a rationale[.]"  Plains Commerce Bank, 554 U.S. at 333-34, 128 S. Ct. at 2722.

because they are designed to avoid federal and state consumer protection laws"); Smith, 2021 WL 1257941, at *18 (finding that forum selection clause and choice of law provisions of loan agreement were unenforceable where plaintiff showed that loan was "part of an illegal lending enterprise Martorello designed to avoid having to comply with federal and state usury laws and licensing requirements" rather than a means "to promote trial self-governance").

Finally, Martorello suggests that tribal law should apply because the LVD reservation has a more significant relationship to Duggan's loan transactions and the parties to the loan agreement than Massachusetts. (Def. Mem. at 18). Again, this court disagrees. Although Martorello insists otherwise, the alleged facts establish that the loan agreement at issue was negotiated and executed in Massachusetts, that the funding and repayment of Duggan's loans occurred in Massachusetts and that Duggan was located in Massachusetts at all times relevant to the transactions. (Compl. ¶¶ 9-10, 27-28, 31, 39). They also show that while members of the Tribe carried out limited administrative activities relating to the lending process on the LVD reservation, most of Big Picture Loans' activities relating to the lending process were performed by non-tribal employees outside the reservation. (Id. ¶ 105). Therefore, Duggan has shown that the choice of law provision is likely to be unenforceable and that Massachusetts law should apply in this case.[9]

---

[9] To the extent Massachusetts choice of law rules apply, the result is the same. Under those rules, the court must first ask "whether an actual conflict exists" between the choice of law provision of the parties' contract and the law of the forum state. Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec., LLC, 450 F. Supp. 3d 20, 27 (D. Mass. 2020) (quoting Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004)). If so, "Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." Id. at 30 (quoting Hodas v. Morin, 442 Mass. 544, 550, 814 N.E.2d 320, 325 (2004)) (additional quotations and citation omitted). "To decide whether the choice-of-law provision conforms to public policy," Massachusetts courts consider "[1] whether the State chosen by the parties has a substantial relationship to the transaction and, [2] whether [a] application of the law of the chosen state … would be contrary to a fundamental policy of a state ... which has a materially greater interest

## C. **Claim for Declaratory Judgment**

In Count I of her Complaint, Duggan is seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the choice of law, forum selection, class action waiver and dispute resolution provisions of Big Picture Loans' loan agreements with Massachusetts consumers are void and unenforceable because they violate Massachusetts law, are unconscionable and are contrary to matters of public policy.   Martorello has moved to dismiss this claim on the grounds that there is no actual controversy.  (Def. Mem. at 29-30).  Specifically, Martorello argues that because he has no ownership interest in any loans made by Big Picture Loans or the Tribe, and was not a party to Duggan's loan agreement, Duggan "has no actual controversy with Martorello that this Court may resolve by declaratory judgment."  (Id.).  Because the record reveals otherwise, Martorello's motion to dismiss this claim is denied.

"The Declaratory Judgment Act allows 'any court of the United States' to 'declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought,' but only '[i]n a case of actual controversy within [that court's] jurisdiction.'"  Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight

---

than the chosen state and [b] is the State whose law would apply ... in the absence of an effective choice of law by the parties."  Id. at 31 (quoting KSA Elec., Inc. v. M/A-COM Tech. Sols., Inc., No. 15-10848-FDS, 2015 WL 4396477, at *3 (D. Mass. July 17, 2015)) (additional quotations and citation omitted).  As described above, there is no dispute in this case that tribal law conflicts with the Massachusetts anti-usury law.  Furthermore, Duggan has shown that the application of tribal law would be contrary to Massachusetts' strong public policy against usury and that, under the circumstances of this case, the interests of Massachusetts in applying its usury statute outweigh the Tribe's sovereign interests.  Because Duggan has also alleged that Massachusetts was the place where her loan agreement was negotiated and entered into, as well as the place where Duggan was residing and where her loans were both funded and repaid, this court finds that Massachusetts law should apply.  See id. (describing factors courts must consider when determining what state law would apply in the absence of an enforceable choice of law agreement).

& Mgmt. Bd. for P.R.), 916 F.3d 98, 110-11 (1st Cir. 2019) (quoting 28 U.S.C. § 2201(a)).

"[T]here is not 'the brightest of lines between those declaratory-judgment actions that satisfy

the case-or-controversy requirement and those that do not[.]'" Id. at 111 (quoting

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604

(2007).  Essentially, however, "the question in each case is whether the facts alleged, under all

the circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment[.]"  Id. (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61

S. Ct. 510, 512, 85 L. Ed. 826 (1941)).

Here, Martorello and Eventide have asserted an affirmative defense that illustrates the

existence of a genuine controversy.  By their Eighteenth Affirmative Defense, the defendants

assert that Duggan's state law claims are barred as a result of the enforceability of the choice of

law provision in her loan documents.  (Docket No. 167 at Eighteenth Affirmative Defense).

Martorello's efforts to enforce the choice of law provision in connection with the instant

motion further demonstrates the existence of a controversy between the parties on this

matter.  Therefore, while there is some uncertainty as to whether and to what extent the

plaintiff will continue to pursue her declaratory judgment claim,[10] the motion to dismiss the

claim for a declaratory judgment is denied at this juncture in the litigation.

---

[10] In connection with Martorello's motion to dismiss pursuant to Fed. R. Civ. P. 19 (Docket No. 199),
Duggan indicated that she is seeking declaratory relief regarding the challenged provisions of her loan
agreement only with regard to their relevance and impact on her dispute with Martorello and Eventide.
(Docket No. 204 at 13).

**D.  Claims for Violations of State Lending Laws**

In Counts II-V, Duggan asserts claims against the defendants for violations of

Massachusetts lending and other state statutory laws based on their allegedly usurious lending

activity.  Martorello argues that Duggan has failed to state a plausible claim against him under

any of these statutes because he "never knowingly contracted for, charged, took or received

any unlawful interest from Plaintiff, as is required to be liable under GL c. 271 § 49[,]" the

Massachusetts anti-usury statute, and because Duggan has failed to pierce the corporate veil to

"impose liability on a corporate executive for acts of a tribal government."  (Def. Mem. at 27-28

(emphasis omitted)).  The motion to dismiss Duggan's state statutory claims on this basis is

denied.

Mass. Gen. Laws ch. 271, § 49 provides in relevant part that "[w]hoever in exchange for

either a loan of money or other property knowingly contracts for, charges, takes or receives,

*directly or indirectly*, interest and expenses the aggregate of which exceeds an amount greater

than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or

shorter period, shall be guilty of criminal usury...."  Mass. Gen. Laws ch. 271, § 49(a) (emphasis

added).  Accordingly, to hold Martorello liable under the plain and unambiguous language of

the statute, there is no need to show that he profited *directly* from the allegedly usurious

lending.[11]  As detailed above, Duggan alleges that Martorello profited indirectly from usurious

---

[11] Similarly, the Massachusetts Small Loans Act, which Duggan has asserted in Count II of her Complaint, provides in relevant part that "[n]o person shall *directly or indirectly* engage in the business of making loans of six thousand dollars or less, if the amount to be paid on any such loan for interest and expenses exceeds in the aggregate an amount equivalent to twelve percent per annum upon the summed loaned" without a license from the commissioner of banks.  Mass. Gen. Laws ch. 140, § 96 (emphasis added).  Moreover, Mass. Gen. Laws ch. 140, § 110 provides in relevant part that "[w]hoever, not being duly licensed as provided in section ninety-six ... engages in or carries on, *directly or indirectly*, either

lending practices of which he was fully aware.  The fact that he was not a party to the loan

agreement and did not receive loan repayments directly is insufficient at this stage to defeat

Duggan's state statutory claims.

Assuming, arguendo, that the plaintiff will not be able to pierce the corporate veil to

hold Martorello liable, the Complaint is nevertheless sufficient.  The gist of Duggan's allegations

against Martorello is that he orchestrated an elaborate lending scheme in which he used the

Tribe to mask his extensive control over the lending operations and charge exorbitant interest

rates well above the state statutory cap for short-term loans.  She further alleges that

Martorello and Eventide received enormous profits as a result of the usurious lending

operations.  "Whatever form or disguise the dealing of the [defendants] may assume, it will be

deemed usurious if in effect it is a loan of money at an unlawful rate of interest."  In re Stone

Street Capital, LLC, 31 Mass. L. Rptr. 171, 2013 WL 3341052, at *4 (Mass. Super. May 10, 2013)

(quoting Sylvester v. Swan, 87 Mass. (5 Allen) 134 (1862)).  Moreover, "[n]o device intended to

cover up the real character of [a] transaction can ever avail to defeat the [usury] statute."  Id.

(quoting Hopkins v. Flower, 256 Mass. 367, 372, 152 N.E. 635, 637 (1926)).  For this reason as

well, the motion to dismiss Duggan's state statutory claims is denied.

**E.   Alleged RICO Violations**

In Counts VI-IX of her Complaint Duggan has asserted claims against the defendants for

RICO violations pursuant to 18 U.S.C. § 1962(c), and conspiracy to violate RICO pursuant to 18

---

separately or in connection with or as part of any other business, the business of making loans or buying notes ... shall be punished...."  Mass. Gen. Laws ch. 140, § 110 (emphasis added).  Under the plain language of these provisions, the plaintiff need not show that Martorello contracted with Duggan or received repayments from her directly.

U.S.C. § 1962(d).  Section 1962(c) makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity or collection of unlawful debt."  Brennan v. Ferreira, 251 F.

Supp. 3d 338, 341 (D. Mass. 2017) (quoting 18 U.S.C. § 1962(c)).  Section 1962(d) "makes it

unlawful to conspire" to do so.  RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 330, 136 S.

Ct. 2090, 2097, 195 L. Ed. 2d 476 (2016).  Duggan claims that the defendants "violated § 1962(c)

of RICO by participating directly or indirectly in the conduct of [an] enterprise's illegal

operations, through the 'collection of unlaw debt'" and that they "intentionally and willfully

committed mail fraud and wire fraud" by using ACH transactions, the internet and mail to carry

out their operations.  (Compl. ¶¶ 186, 192, 206).  She further claims that the defendants

"violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of

agreements to violate § 1962(c) and states' usury laws – that is, to conduct and participate,

directly and indirectly, in the collection of unlawful debt."  (Id. ¶¶ 198, 215).  Martorello has

moved to dismiss these claims on the grounds that Duggan lacks standing to pursue RICO claims

against him, has failed to allege that he engaged in unlawful conduct in violation of 18 U.S.C. §

1962(c), and has failed to allege that he engaged in a RICO conspiracy in violation of 18 U.S.C. §

1962(d).  (Def. Mem. at 19-27).  For the reasons that follow, this court finds that Duggan has

standing to pursue these claims and has alleged plausible claims for relief under both sections

of the statute.

<u>Standing to Maintain RICO Claims</u>

Martorello's first challenge to Duggan's RICO claims is that the plaintiff lacks standing to pursue these claims because she has failed to allege facts showing that Martorello, as opposed others or the lending enterprise as a whole, proximately caused her harm.  (Def. Mem. at 19-22).  "The civil damages provision of RICO provides that '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.'"  <u>In re Neurontin Mktg. & Sales Practices Litig.</u>, 712 F.3d 21, 33-34 (1st Cir. 2013) (quoting 18 U.S.C. § 1964(c)).  The Supreme Court has held that a plaintiff may sue under this provision "only if the alleged RICO violation was the proximate cause of the plaintiff's injury."  <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 453, 126 S. Ct. 1991, 1994, 164 L. Ed. 2d 720 (2006).

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  <u>Id.</u> at 461, 126 S. Ct. at 1998.  In addition, the Supreme Court has identified "three functional factors" to consider in answering this question.  <u>In re Neurontin Mktg. & Sales Practices Litig.</u>, 712 F.3d at 35-36.  As the First Circuit described when discussing these factors in <u>In re Neurontin Mktg. & Sales Practices Litig.</u>:

> First, the [Supreme] Court noted concerns about proof, reasoning that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  [*Holmes v. Sec. Investor Prot. Corp.*,] 503 U.S. [258,] 269, 112 S. Ct. 1311[, 1318, 117 L. Ed. 2d 532 (1992)].  Second were concerns about administrability and the avoidance of multiple recoveries: "[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from

[48]

the violative acts, to obviate the risk of multiple recoveries." *Id.* Third, the Court focused on the societal interest in deterring illegal conduct and whether that interest would be served in a particular case: "[T]he need to grapple with [the previous two] problems [may be] simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70, 112 S.Ct. 1311.

Id. at 36 (third and fourth alterations in original).

Here, Martorello argues that Duggan "cannot establish the 'directness concern'" in light of the sale of the servicing business to the Tribe in 2016, prior to the execution of Duggan's loan agreement and the receipt of her loans in 2017 and 2018. (Def. Mem. at 20-21). According to Martorello, "[n]o proximate cause could possibly exist as to Martorello for loans made for the post-sale period when Martorello has had no involvement in any tribal lending business. To the extent Plaintiff has suffered any harm, such harm would have been proximately caused by the entities that actually collected Plaintiff's debts, not Martorello, now an officer at a company that is a mere creditor of the lending business." (Id. at 21). He further reasons that because the entities that collected the loans are "sovereign arm-of-the-tribe lending companies formed by LVD and managed by two members of LVD," there can be no relief under RICO. (Id.).

The defendant's arguments entirely ignore the well-pleaded facts in the Complaint regarding Martorello's personal involvement in the usurious lending scheme. Therein, Duggan has pleaded that Martorello was the architect of the scheme, including the creation of Big Picture Loans and the structuring of the sale of Bellicose to Ascension in a manner that would enable him to maintain control over the lending operations. She has also pleaded that the so-called "co-managers" of Ascension had no day-to-day control over the lending enterprise. Rather, according to the Complaint, Martorello and Eventide remained in control of the

[49]

enterprise, including the activities of both Big Picture and Ascension, even after the sale was completed.   Therefore, Duggan has alleged that she and other consumers who made payments on loans obtained from Big Picture Loans were the direct victims of Martorello's actions.[12]   See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 658, 128 S. Ct. 2131, 2144, 170 L. Ed. 2d 1012 (2008) (finding a direct relationship between the petitioners' wrongful conduct and the respondents' alleged injury where the alleged injury was a "natural consequence of petitioners' scheme").

Martorello's proposed application of the Supreme Court's functional factors suffers from similar deficiencies.  With respect to the first functional factor regarding the ability to ascertain the amount of damages attributable to the defendant's misconduct, Martorello contends that because "any damages allegedly suffered by Plaintiff are only indirectly linked to Martorello, as an executive of a creditor wholly untied to the Tribe's lending capital[,]" "it is difficult 'to ascertain the amount of damages attributable to the violation, as distinct from other, independent, factors,' such as the conduct of the tribal lending entities."  (Def. Mem. at 21 (quoting Holmes, 503 U.S. at 269, 112 S. Ct. at 1318)).   However, as this court has stated above, Martorello's contention that there is no direct link between his actions and Duggan's alleged harm is belied by the Complaint.  Furthermore, there is no merit to Martorello's argument that damages would be difficult to calculate in this case.  "This is not a case where the injury alleged was caused by intervening acts of third parties" who were not part of the

---

[12] To the extent Martorello argues that the directness requirement has not been met because he did not personally collect the debt, his argument is insufficient to defeat the proximate cause requirement of RICO.  See Gibbs v. Haynes Invs., LLC, 368 F. Supp. 3d 901, 930 n.53 (E.D. Va. 2019) ("A plaintiff suing under RICO need not argue that each defendant individually collected the debt.").

allegedly unlawful lending enterprise.  Brice v. Plain Green, LLC, 372 F. Supp. 3d 955, 983 (N.D. Cal. 2019), rev'd on other grounds sub nom. Brice v. Haynes Invs., LLC, 13 F.4th 823 (9th Cir. 2021).  Moreover, "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations."  United States v. Philip Morris USA Inc., 316 F. Supp. 2d 19, 27 (D.D.C. 2004), and cases cited.  Therefore, the first functional factor supports a claim of proximate cause.

With respect to the second functional factor, Martorello essentially argues that his status as "an executive of an entity that previously provided consulting services to a predecessor to Plaintiffs' lender" renders him "too indirectly linked" to Duggan's alleged harm and raises the prospect of multiple recoveries.  (Def. Mem. at 21-22).  This argument too is contradicted by the alleged facts of the Complaint.  Where, as here, there appears to be "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better suited to sue" than a consumer targeted by the allegedly unlawful lending scheme, the second functional factor favors a finding of proximate cause.  Bridge, 553 U.S. at 658, 128 S. Ct. at 2144.

The third and final functional factor-- the societal interest in deterring illegal conduct– warrants the same conclusion.  Martorello argues that the Tribe's sovereign interests, as well as the "greater societal interest" in protecting the sovereignty and self-determination of Native American tribes, supports dismissal of Duggan's RICO claims.  (Def. Mem. at 22).  However, the

only defendants left in this case are not members of any tribe[13] and there can be little doubt

that society has a strong interest in deterring illegal lending schemes that target vulnerable

borrowers.  Accordingly, the defendant's motion to dismiss Duggan's RICO claims for failure to

allege proximate cause is denied.

Sufficiency of Duggan's § 1962(c) Claims

Martorello's next challenge targets Duggan's claim that he violated section 1962(c) of

RICO.  To state a claim under this provision, "a plaintiff must allege each of the four elements

required by the statute: (1) conduct (2) of an enterprise, (3) through a pattern (4) of

racketeering activity" or collection of unlawful debt.  Soto-Negrón v. Taber Partners I, 339 F.3d

35, 38 (1st Cir. 2003) (quoting N. Bridge Assocs., Inc. v. Boldt, 274 F.3d 38, 42 (1st Cir. 2001)).

See also 18 U.S.C. § 1962(c).  Martorello contends that Duggan has failed to state a plausible

claim under § 1962(c) because she has failed "to allege facts demonstrating that Martorello—as

opposed to any other [actor]—participated in the operation or management of the alleged

enterprise, or that he did so *through* the collection of unlawful debts."  (Def. Mem. at 23

(emphasis in original)).  These arguments are insufficient to warrant dismissal of Duggan's RICO

claims.

---

[13] As this court described in its Memorandum of Decision and Order on Defendant's Motion to Dismiss on the Basis of Judicial Estoppel, Duggan originally filed this lawsuit against Martorello, Big Picture Loans and Ascension, and subsequently named officers of the tribal entities, as well as members of LVD's Tribal Council, as defendants in this case.  However, on December 30, 2019, Duggan voluntarily dismissed her claims against all of the Tribe-affiliated defendants, thereby leaving Martorello and Eventide as the only remaining defendants in this action.  (Docket No. 226).

As an initial matter, Martorello's argument that he was nothing more than a passive investor who did not engage in the operation or management of the alleged lending enterprise lacks merit.  As

> [t]he Supreme Court has stated: "In order to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have some part in directing those affairs.  Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.  The "operation or management" test expresses this requirement in a formulation that is easy to apply.

Brennan, 251 F. Supp. 3d at 341-42 (quoting Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 1170, 122 L. Ed. 2d 525 (1993)).  In other words, "in order to be liable for 'conducting' or 'participating' in an enterprise's affairs under section 1962(c), 'one must participate in the operation or management of the enterprise itself.'"  Id. at 342 (quoting Reves, 507 U.S. at 185, 113 S. Ct. at 1173).  Here, Duggan has alleged that Martorello was instrumental in designing and carrying out the Tribe's lending business (Compl. ¶ 59 & Ex. 3 thereto); that he structured the business to make it appear that the Tribe was in control of Big Picture and Ascension when, in fact, Martorello and Eventide maintained control and directed the operations at all relevant times (id. ¶¶ 59-67, 71-75, 87-99); that he agreed to increase the Tribe's share of gross revenues, from 2% of gross revenue to 6% of gross revenue, in an effort to "improve the optics" and maintain the false appearance of tribal control (id. ¶¶ 80-81); and that his actions were aimed at evading state and federal lending laws and achieving significant financial gains while protecting himself and Eventide from potential liability (see id. ¶¶ 1-2, 7-8, 72, 82).  In short, Duggan "alleges that Martorello personally participated in and directed an enterprise whose sole purpose was to collect illegal debts, thereby personally causing those acts and reaping

their benefits." Smith, 2021 WL 1257941, at *21.  These allegations are "more than sufficient

to plausibly plead that Martorello conducted the enterprise's affairs" as required to support a

claim under § 1962(c) of RICO.  Id.  See also Brice, 372 F. Supp. 3d at 985 (finding allegations

sufficient to show that non-tribal defendants in alleged rent-a-tribe lending scheme conducted

or participated in the conduct of a RICO enterprise where the plaintiff alleged that they "were

instrumental in setting up, and knowingly set up, an enterprise whose sole purpose was to

collect illegal debts, thereby causing those acts to occur and reaping the benefits therefrom").

Martorello's next contention – that Duggan failed to allege facts showing that he acted

"through" the collection of unlawful debt—is also inadequate to warrant dismissal.  (Def. Mem.

at 24-25).  "The [RICO] statute's use of the word 'through' implies 'a nexus between [the

predicate acts] and the enterprise.'"  United States v. Brandao, 539 F.3d 44, 53 (1st Cir. 2008)

(quoting United States v. Nascimento, 491 F.3d 25, 45 (1st Cir. 2007)).  "A sufficient nexus or

relationship exists between the [predicate acts] and the enterprise if the defendant was able to

commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or

by the instrumentality of his association with the enterprise."  Id. (quoting United States v.

Marino, 277 F.3d 11, 27 (1st Cir. 2002)).  Duggan's allegations establish that it was only by "the

instrumentality of" Martorello's "association with" the tribal entities, Big Picture Loans and

Ascension, that he was able to carry out a usurious lending business and facilitate the collection

of unlawful debts.  Therefore, Martorello's motion to dismiss is denied with respect to this

issue.

[54]

Sufficiency of Duggan's § 1962(d) Claims

To state a claim for RICO conspiracy, the plaintiff "must allege 'the same elements of a RICO claim, plus allegations that each RICO co-conspirator knowingly joined the conspiracy and involved himself or herself, directly or indirectly, in the commission of at least two predicate offenses.'" Fiorillo v. Winiker, 85 F. Supp. 3d 565, 572 (D. Mass. 2015) (quoting Dickey v. Kennedy, 583 F. Supp.2d 183, 188 (D. Mass. 2008)) (additional quotations and citation omitted). Martorello argues that Duggan's RICO conspiracy claim against him fails to satisfy this requirement because she fails to allege the existence of an illegal agreement to violate RICO. (Def. Mem. at 26). Specifically, Martorello asserts that "all [he] is alleged to have done is to have sold a business to the Tribe and previously been an executive of a company providing typical consulting services to a Tribe operating on its reservation and under its sovereign laws." (Id. at 27). He further argues even if an alleged RICO conspiracy arguably existed, "Martorello effectively withdrew from such a conspiracy, at the latest, in January 2016, when LVD closed on its purchase of Bellicose." (Id. (emphasis omitted)).

Once again, Martorello's arguments are inconsistent with the allegations of the Complaint and the reasonable inferences to be drawn therefrom. The facts alleged therein show that Martorello worked closely with the Tribe to set up a lending enterprise, which was designed by Martorello to evade state usury laws by taking advantage of the Tribe's sovereign immunity, and was largely directed and controlled by him. The factual allegations also demonstrate that in connection with the sale of Bellicose to Ascension, Martorello worked closely with the Tribe to ensure that the new structure would be sufficient "to extend the Tribe's sovereign immunity from suit to the new LLC" while maintaining the "status quo" by

[55]

ensuring that Martorello would remain in control of the lending operations and receive the bulk

of the profits.  (Compl. ¶¶ 72-73 & Ex. 15 at Bates No. 052248).  In fact, as Duggan has alleged

in significant detail, Martorello continued to control the enterprise and remained in control at

the time she obtained her loans.  Therefore, Duggan has adequately pleaded a conspiracy to

violate RICO.  The motion to dismiss this claim is denied.

### F.  Claims for Unjust Enrichment

Martorello has also moved to dismiss Duggan's claims for unjust enrichment, which are

set forth In Counts X and XI of her Complaint.  To state a claim for unjust enrichment, "the

plaintiff must allege: '(1) a benefit conferred upon the defendant by the plaintiff; (2) an

appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by

the defendant of the benefit under the circumstances would be inequitable without payment

for its value.'"  Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (quoting Mass. Eye

& Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009)).  In her

Complaint, Duggan alleges that the plaintiff and the class members conferred a benefit on the

defendants when they repaid principal and interest on usurious loans, that the defendants

were aware of the benefit, and that the defendants have been unjustly enriched through their

receipt of tens of millions of dollars in revenue derived from the unlawful loans.  (Compl. ¶¶

220, 224).  Martorello has moved to dismiss these claims on the grounds that he never received

any benefits from the plaintiff because he was nothing more than an executive of Eventide,

which was a mere creditor of the Tribe.  (Def. Mem. at 28-29).  For the reasons already

discussed, the alleged facts belie Martorello's assertion that he was nothing more than a

creditor of the Tribe's lending enterprise.  Because Duggan has alleged that Martorello

knowingly received payments from Big Picture Loans' usurious lending operations and benefitted from Duggan's repayments on her loans, Duggan has stated a plausible claim against Martorello for unjust enrichment.  See Smith, 2021 WL 1257941, at *22 (finding that plaintiff stated an unjust enrichment claim against Martorello where he alleged "that Martorello benefitted from [plaintiff] paying the loan with the excessive interest, as he received payments from the loans Big Picture made; and that Martorello knew of the benefit generated from the loans offered by Big Picture").   The motion to dismiss is denied with respect to Counts X and XI.

## V. CONCLUSION

For all the reasons set forth herein, "Matt Martorello's Motion to Dismiss Plaintiff's Second Amended Class Action Complaint" (Docket No. 124) for lack of personal jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED.

   / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge